**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| RANCHERS-CATTLEMEN ACTION LEGAL FUND UNITED STOCKGROWERS OF AMERICA; SOUTH DAKOTA STOCKGROWERS ASSOCIATION; FARM AND RANCH FREEDOM ALLIANCE; KENNY and ROXIE FOX; RICK and THERESA FOX; and TRACY and DONNA HUNT, d/b/a THE MW CATTLE COMPANY, LLC | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiffs,* | Case No. _____ 5:24-cv-5085 |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; ANIMAL AND PLANT HEALTH INSPECTION SERVICE; MICHAEL WATSON, in his official capacity as Administrator of the Animal and Plant Health Inspection Service, | |
| *Defendants.* | |

**COMPLAINT**

**NATURE OF THE CASE**

Plaintiffs Ranchers-Cattlemen Action Legal Fund United Stockgrowers of America ("R-CALF USA"), South Dakota Stockgrowers Association ("SDSGA"), Farm and Ranch Freedom Alliance ("FARFA") (collectively the "Organizational Plaintiffs"), Kenny and Roxie Fox, Rick and Theresa Fox, and Tracy and Donna Hunt, d/b/a The MW Cattle Company, LLC (collectively the "Individual Plaintiffs") bring this civil action for declaratory and injunctive relief to halt Defendants United States Department of Agriculture's ("USDA") and the Animal Plant

Health Inspection Service's ("APHIS") final rule mandating that "all official eartags sold for or applied to cattle and bison must be readable both visually and electronically (EID)." *Use of Electronic Identification Eartags as Official Identification in Cattle and Bison*, 89 Fed. Reg. 39,550 (May 9, 2024) ("EID Final Rule"), https://www.govinfo.gov/content/pkg/FR-2024-05-09/pdf/2024-09717.pdf (attached as Exhibit 1).

In support, Plaintiffs allege as follows:

1.      This case is about a common occurrence—a federal agency moving forward to achieve its preferred objective, regardless of the statutory limits placed on it and absent any rational consideration of the costs and benefits of its actions.

2.      Here, APHIS has single-mindedly pursued its goal of electronically tracking the nation's cattle herd through multiple failed attempts to mandate radio frequency ("RFID") eartags for the nation's cattle herd.

3.      In 2005, APHIS published plans for a National Animal Identification System ("NAIS") that would have required electronic tagging and tracking of all cattle in the country, from birth to death. Congressional Research Service, Report, *Animal Identification and Traceability: Overview and Issues* 28–30 (updated Nov. 29, 2010), https://crsreports.congress.gov/product/pdf/R/R40832 (describing history of NAIS). APHIS did not formally propose or finalize any regulatory requirement under NAIS. *Id.* After widespread opposition to NAIS, then-Secretary Vilsack withdrew the plan in 2010. *Id.* at 30.

4.      In 2013, after extensive discussions with stakeholders, APHIS promulgated a final rule regarding the traceability of livestock moving interstate, the 2013 Traceability for Livestock Moving Interstate, commonly known as the Animal Disease Traceability Rule ("2013 ADT Rule"). That rule, adopted after a contentious public rulemaking process, permitted the use of

several forms of "official identification" for certain cattle and bison moving across state lines, including both visual-only and electronically readable eartags.

5.     Shortly thereafter—and in direct contravention to the 2013 ADT Rule's carefully balanced compromise—APHIS along with certain external stakeholders began again to promote or push for mandatory electronic identification of cattle.

6.     In April of 2019, APHIS published a "Factsheet" requiring that by January 1, 2023, certain cattle moving interstate must have RFID eartags.  Without following notice-and-comment procedures, the April 2019 Factsheet effectively rewrote the 2013 ADT Rule by discontinuing the use of metal eartags, and other forms of official identification, and requiring RFID eartags.

7.     After being sued, including by several Plaintiffs here, APHIS quietly removed the Factsheet and mooted the case.

8.     In July of 2020, APHIS published a notice that it was again considering mandating the use of RFID eartags by January 1, 2023. Unlike the April 2019 effort, the proposed mandate was more limited, applying only to a small subset of the nation's cattle herd that moves interstate.

9.     Upon receiving significant pushback on its proposal, APHIS issued an announcement that it would not finalize the July 2020 Notice.

10.     Undeterred, APHIS tried again to mandate RFID usage, this time resulting in the final rule that gives rise to this case. On May 4, 2024, APHIS promulgated a rule that ends the use of visual-only eartags as official identification for certain cattle and bison moving interstate and mandates the use of visually readable EID eartags in their place.

11.     In adopting the EID Final Rule, Defendants violated the Administrative Procedure Act ("APA") and the Regulatory Flexibility Act ("RFA").

12.     Absent this Court's intervention, Plaintiffs, members of R-CALF USA, SDSGA, and FARFA, and ranchers, producers, and farmers across the country who ship their cattle across state lines will be subject to Defendants' onerous, expensive, and unlawful mandate.

## PARTIES

13.     Plaintiff Ranchers-Cattlemen Action Legal Fund United Stockgrowers of America is a Montana nonprofit benefit corporation with its principal place of business in Billings, Montana.

14.     Plaintiff R-CALF USA is the country's largest producer-only membership-based organization that exclusively represents U.S. cattle and sheep producers on domestic and international trade and marketing issues. R-CALF USA is dedicated to ensuring the continued profitability and viability of the U.S. cattle industry. R-CALF USA's membership of approximately 4,000 voluntary dues-paying members consists primarily of cow-calf producers, cattle backgrounders, and feeders. Its members are located in 43 states, and the organization has many local and state association affiliates, along with various main street businesses as associate members of R-CALF USA. R-CALF USA has 1,251 members in the State of South Dakota.

15.     Plaintiff R-CALF USA submitted comments to the EID Proposed Rule on January 30, 2023 and April 19, 2023. *See* Letter from Bill Bullard to Secretary Vilsack (Jan. 30, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-2006 ("*R-CALF USA Comment I*") and Letter from Bill Bullard to APHIS (Apr. 19, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-0089 ("*R-CALF USA Comment II*").

16.     Plaintiff South Dakota Stockgrowers Association is a South Dakota nonprofit corporation with its principal place of business at 426 St. Joseph Street, Rapid City, SD 57701.

17.    SDSGA is the oldest livestock producer organization nationally and continues to represent producer views through membership participation.

18.    Plaintiff SDSGA submitted comments to the EID Proposed Rule on April 19, 2023. *See* Comment from South Dakota Stockgrowers Association (Apr. 19, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-1955 ("*SDSGA Comment*").

19.    Plaintiff Farm and Ranch Freedom Alliance is a Texas nonprofit 501(c)(4) with its principal place of business in Cameron, Texas. FARFA was founded in 2006 specifically in opposition to the plans for the National Animal Identification System.  After the withdrawal of NAIS, FARFA's Executive Director served on the Secretary's Advisory Committee on Animal Health and was deeply involved in the discussions to develop the 2013 ADT Rule.

20.    FARFA is a national organization that supports independent family farmers and protects a healthy and productive food supply for American consumers.

21.    Plaintiff FARFA drafted comments that were joined by a coalition of 2,070 "organizations, farms, ranches, livestock- and food-related business, and individuals" urging USDA and APHIS to withdraw the EID Proposed Rule. *See* Comment from Judith McGeary to APHIS (Apr. 19, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-1947 ("*FARFA Comment*"). Plaintiff SDSGA was also a signatory to that comment. *Id.* at 11.

22.    Plaintiffs Kenny and Roxie Fox are third-generation ranchers. They have owned and operated a cow-calf ranching enterprise near Belvidere, South Dakota since 1988. Mr. Fox is also the chairman of R-CALF USA Animal Identification Committee and is past president of the SDSGA.

23.    Pursuant to and in reliance upon existing regulation, Kenny and Roxie Fox have relied exclusively on branding, as well as the metal eartags and tattoos, to comply with the identification and traceability requirements for the interstate movement of their cattle.

24.     Kenny and Roxie Fox sell calves, cows and slaughter bulls from time-to-time across the state line in Valentine, Nebraska, and their calves have been purchased by out-of-state buyers in the past. They have relied upon a combination of brands, metal eartags, and tattoos to comply each time with the existing regulation.

25.     They are members of R-CALF USA, SDSGA, and FARFA.

26.     Rick and Theresa Fox have owned and operated a cow-calf ranch in Hermosa, South Dakota since 1983. Mr. Fox is past president of SDSGA. They sell calves, yearlings, cows, and bulls. While they predominately sell at Ft. Pierre Livestock Auction, they sell bred cows from time to time that go to out-of-state buyers.

27.     Pursuant to and in reliance upon existing regulation, Rick and Theresa Fox have relied exclusively on branding, as well as the metal eartags and tattoos, to comply with the identification and traceability requirements for the interstate movement of their cattle.

28.     They are members of R-CALF USA and SDSGA.

29.     Tracy and Donna Hunt are cow-calf operators in northeastern Wyoming near Newcastle. They do business as The MW Cattle Company, LLC, which is organized under the laws of the State of Wyoming. Mr. and Mrs. Hunt are members of that entity. Ms. Hunt is a third-generation rancher, with her grandfather first purchasing land in this area in 1926.

30.     The Hunts run livestock in both Wyoming and South Dakota and move their cattle across the state line in the spring/summer and in the fall of each year. They run on deeded and leased lands. Their summer pastures are miles long and encompass thousands of acres.

31.     They obtain a "commuter herd" (which crosses state lines) permit each year. Such permit is reviewed and approved by the State Veterinarian for South Dakota.

32.    Because they do much of their work on horseback when sorting and trailing their livestock, they cannot use scanning equipment as they move them from state to state. It would in fact be a practical impossibility to scan EID tags in the size of pastures used by the Hunts.

33.    Considering the nature of the terrain, the size of the pastures, the manner in which the livestock are managed and moved, and the lack of available corrals, it is not operationally or economically feasible for the Hunts to use EID eartags.

34.    The Hunts use brands to identify and trace their cattle and have been doing so since they began ranching (as Ms. Hunt's father and grandfather did before her). They purchase bred heifers and cows for replacement, with such heifers and cows having already been vaccinated for brucellosis and identified with a tattoo and a permanent metal eartag.

35.    Pursuant to and in reliance upon existing regulation, the Hunts have relied exclusively on branding, as well as the metal eartags and tattoos, to comply with the identification and traceability requirements for the interstate movement of their cattle.

36.    The Hunts primarily sell their livestock through the sale barn located in Torrington, Wyoming (situated approximately eight miles west of the Wyoming/Nebraska state line). It is common for their cattle to be shipped across state lines after such sale and, in fact, many of the buyers who purchase out of Torrington are from out of state. The Hunts also sell cattle from time-to-time in South Dakota.

37.    The Hunts are members of R-CALF USA.

38.    All the Individual Plaintiffs submitted comments to the EID Rule when it was proposed. *See* Comment from Kenny Fox (Apr. 18, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-1807 ("*Kenny Fox Comment*"); Comment from Roxie Fox (Mar. 11, 2023), https://www.regulations.gov/comment/APHIS-2021-

0020-0370 ("*Roxie Fox Comment I*"); Comment from Roxie Fox (Apr. 20, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-1937 ("*Roxie Fox Comment II*"); Comment from Rick Fox (Apr. 19, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-1937 ("*Rick Fox Comment*"); Comment from Theresa Fox (Mar. 16, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-1937 ("*Theresa Fox Comment*"); Comment from Tracy Hunt (Apr. 20, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-2008 ("*Tracy Hunt Comment*"); *and* Comment from Donna Hunt (Apr. 20, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-2008 ("*Donna Hunt Comment*").

39.    As a result of the rule, all the Individual Plaintiffs face increasing costs to their ranching operations.

40.    Defendant USDA is a department within the Executive Branch of the United States Government and an "agency" under 5 U.S.C. § 551(1).

41.    Defendant Thomas Vilsack is named in his official capacity as the Secretary of Agriculture.

42.    Defendant APHIS is a subagency of the USDA and an "agency" under 5 U.S.C. § 551(1).

43.    Defendant Dr. Michael Watson is named in his official capacity as the Administrator of APHIS.

## JURISDICTION

44.    This Court has jurisdiction under 5 U.S.C. §§ 611, 701–706 and 28 U.S.C. §§ 1331, 2201, 2202.

45.    This matter is timely filed. *See* 28 U.S.C. § 2401(a); 5 U.S.C. § 611.

## VENUE

46.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) and (e).

## STATUTORY AND REGULATORY BACKGROUND

### The Animal Health Protection Act (codified at 7 U.S.C. §§ 8301–8317)

47.     Enacted in 2002, the Animal Health Protection Act ("AHPA"), Pub. L. 107–171, title X (May 13, 2002), aims to prevent, detect, control, and eradicate animal diseases and pests. 7 U.S.C. § 8301.

48.     Generally, the AHPA provides that the Secretary of Agriculture may prohibit or restrict the importation or entry, exportation, or interstate movement of animals under certain circumstances.  7 U.S.C. §§ 8303, 8304, 8305.

49.     Under § 8305,

The Secretary may prohibit or restrict—
(1) the movement in interstate commerce of any animal, article, or means of conveyance if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction or dissemination of any pest or disease of livestock; and
(2) the use of any means of conveyance or facility in connection with the movement in interstate commerce of any animal or article if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction or dissemination of any pest or disease of livestock.

50.     Under the AHPA, "[t]he Secretary may promulgate such regulations, and issue such orders, as the Secretary determines necessary to carry out this chapter." 7 U.S.C. § 8315.

51.     Violations of the AHPA are enforced through the Act's penalty provision, which provides for both criminal and civil penalties. 7 U.S.C. § 8313.

### The Regulatory Flexibility Act (codified at 5 U.S.C. §§ 601–612 (as amended))

52.     The Regulatory Flexibility Act ("RFA") requires administrative agencies to consider the effect of their actions on small entities, including small businesses. The purpose of

the RFA is to enhance agency sensitivity to the economic impact of rulemaking on small entities to ensure that alternative proposals receive serious consideration at the agency level.

53.   The RFA provides that, whenever an agency is required by the APA to publish a general notice of proposed rulemaking, it must prepare and make available for public comment an Initial Regulatory Flexibility Analysis ("IFRA"), 5 U.S.C. § 603(a), and subsequently prepare and make public a Final Regulatory Flexibility Analysis ("FRFA"). 5 U.S.C. § 604.

54.   When an agency takes a final action that is subject to the RFA but does not comply with the RFA, "a small entity that is adversely affected or aggrieved by final agency action is entitled 'to judicial review.'" 5 U.S.C. § 611(a).

55.   The small entity size standards are established by the Small Business Administration's ("SBA") guidelines. Those guidelines define

> [t]he [small entity] size standard for beef cattle ranching and farming (NAICS 112111) [as] operations with not more than $2.50 million, for dairy cattle and milk production (NAICS 112120), operations with not more than $3.75 million, and for bison and cervid farms which are included in other animal production (NAICS 112990), operations with not more than $2.75 million in annual sales.

APHIS, *Regulatory Impact Analysis & Final Regulatory Flexibility Analysis* at 27 (Apr. 2024), https://www.regulations.gov/document/APHIS-2021-0020-2012 ("*RIA & FRFA*") (attached as Exhibit 2).

56.   APHIS data "suggests that the majority of cattle operations in the United States are considered small." *Id.* "Approximately 99 percent of beef cattle farms and 91 percent of dairy farms, and 99 percent of other animal production farms generated less than $2.5 million in cash receipts." *Id.*

57.   Individual Plaintiffs meet the small business size standard under the RFA. Each of the Organizational Plaintiffs have members that meet the size standard under the RFA.

## FACTUAL ALLEGATIONS

### <u>Animal Identification and Traceability</u>

58.     Animal disease traceability ("ADT") helps to determine "where diseased and at-risk animals are, where they have been, and when[.]" USDA, *Animal Disease Traceability* (last modified Aug. 29, 2024), https://www.aphis.usda.gov/livestock-poultry-disease/traceability.

59.     "[A]nimal disease traceability does not prevent disease" but may "reduce[] the number of animals and response time involved in a disease investigation." *Id.*

60.     In 2010, USDA launched its current "approach for responding to and controlling animal diseases referred to as the ADT framework." USDA, *Animal Disease Traceability Assessment Report* 6 (Apr. 2017), https://www.aphis.usda.gov/sites/default/files/adt-assessment.pdf.

61.     As announced, the ADT framework included four principles: (1) "[t]he requirement for official identification of livestock when moved interstate[;]" (2) "[a]dministration by the States and Tribal Nations to increase flexibility[;]" (3) "[e]ncouraging the use of low-cost technology[;] and, (4) "[t]ransparent implementation through the full Federal rulemaking process." *Id.* at 6–7 (Apr. 2017).

62.     The ADT program is "structured as a 'bookend' system, as it provides the location where the animal was officially identified and the animal's last location, which is often the termination point or slaughter plant." *Id.* at 8. APHIS has shown the system as follows:

**Figure 1. U.S. Traceability with ADT – "Bookend System."**



USDA, *Animal Disease Traceability Summary of Program Reviews and Proposed Directions from State-Federal Working Group* 4 (Apr. 2018), https://www.aphis.usda.gov/sites/default/files/adt-summary-program-review.pdf.

63.     The ADT program "focuses on interstate animal movements to provide information on the originating and destination premises for animals moved from one State to another." *Id.*

64.     Traceability data is provided from a variety of sources, including:

[a]nimal disease programs, brand inspection regulations and, in certain situations, industry programs like breed registries, performance recording systems, or marketing programs also provide traceability data.

*Id.*

65.     As announced, the ADT program is "intended to be sufficiently flexible to allow State and Tribal animal health officials to implement, with the cooperation of industry, the traceability systems that worked best for them" but "it was not intended to be a top-down system under Federal control." *Traceability for Livestock Moving Interstate*, 78 Fed. Reg. 2,040, 2,042 (Jan. 9, 2013) ("2013 ADT Rule").

66.     In support of the ADT program and its goals, APHIS has proposed and promulgated a series of regulations related to animal identification and traceability. It has also issued guidance and policy documents regarding the same.

*2013 ADT Rule*

67.    On January 9, 2013, APHIS promulgated the 2013 ADT Rule regulating the traceability of livestock moving interstate, with an effective date of March 11, 2013. *Traceability for Livestock Moving Interstate*, 78 Fed. Reg. 2,040 (Jan. 9, 2013) ("2013 ADT Rule"). Codified at 9 C.F.R. Part 86, the 2013 ADT Rule established requirements for the official identification and documentation necessary for the interstate movement of certain types of livestock including cattle.

68.    The 2013 ADT Rule established minimum national identification and documentation requirements and applied only to certain cattle. *Id.* at 2,073. The final rule did not apply to feeder cattle (cattle under 18 months). *Id.* at 2,041.

69.    The final rule defined "official Identification Devices and Methods" to include an "official eartag," properly registered brands accompanied by an official brand inspection certificate, tattoos, and other identification methods acceptable to breed associations (accompanied by a breed registration certificate), "group/lot" identification, backtags, *or* other forms of identification as agreed to by the shipping and receiving states. *Id.* at 2,072–73.

70.    The 2013 ADT Rule "[did] not prohibit the use of RFID technology and electronic records." However, it did bar States and Tribes "from mandating the use of RFID or electronic records, or any other specific technology, for animals moving into their jurisdiction." *Id.* at 2,062.

71.    According to APHIS, the success of the ADT program requires "a high-level of compliance to achieve a solid infrastructure for tracing livestock." USDA, *Animal Disease Traceability Assessment Report* at 20. While education about the 2013 ADT Rule was prioritized after the rule's promulgation, "the USDA began issuing penalties in 2014 for individuals that repeatedly violate the regulation." *Id.*; *see also id.* at 21 (describing penalties issued).

72.    On information and belief, violations of 9 C.F.R. part 86 are prosecuted pursuant to AHPA's penalty provisions, 7 U.S.C. § 8313.

### APHIS Attempts to Mandate RFID Tracking

73.     Despite the ADT program's initial approach of providing sufficient flexibility to "State and Tribal animal health officials to implement, with the cooperation of industry, the traceability systems that worked best for them[,]" 78 Fed. Reg. at 2,042, since at least 2017, APHIS has wanted to move to RFID as a "solution for traceability" despite AHPA's limitation that actions taken must be "necessary. USDA, *Animal Disease Traceability Assessment Report* at 23.

74.     While not "necessarily" endorsed by USDA, the State-Federal Animal Disease Traceability Working Group, which was dominated by pro-RFID members, proposed that "[t]he United States must move toward an EID system for [all cattle needing official ID] with a target implementation date of January 1, 2023." USDA, *Animal Disease Traceability Summary of Program Reviews and Preliminary "Next Step" Proposals* 1, 17–18 (Apr. 2018), https://www.aphis.usda.gov/sites/default/files/adt-summary-program-review.pdf.

75.     This proposal conflicted with the 2013 ADT Rule. It also ignored APHIS's recognition that "implementation of RFID technology, while preferred by many, also has its challenges" including "cost concerns" and technological limitations. USDA, *Animal Disease Traceability Assessment Report* at 23.

76.     APHIS previously recognized that "[m]any producers will not be able to enhance their management systems with RFID[.]" *Id.* Further, the agency understood that

> The implementation of a RFID solution for traceability, if undertaken, would be a significant challenge and would require a lengthy implementation period and a well thought out and detailed plan. A comprehensive infrastructure to support RFID technology must be in place in order to achieve the benefits associated with the technology. Applying RFID eartags is the starting point in the process. While this is significant in itself, it must be recognized that the entire infrastructure including readers and data communications systems must be defined to successfully integrate RFID solutions to advance traceability. RFID readers, software, and databases must be in place along the entire production chain to capture the official identification numbers and movement of the animals in real time to be of value for the industry.

*Id.*

77.     Despite the 2013 ADT Rule and APHIS's recognition that an RFID-only approach presented significant challenges and limitations, the agency has continually moved towards an RFID eartag mandate, in direct contrast to its previous actions and without addressing the identified challenges.

### April 2019 Factsheet and RFID Mandate

78.     In furtherance of its campaign to force mandatory RFID, APHIS issued a "Factsheet" announcing that "[b]eginning January 1, 2023, animals that move interstate and fall into specific categories will need official, individual [radio frequency identification ("RFID")] ear tags." *See* USDA, Factsheet, *Advancing Animal Disease Traceability: A Plan to Achieve Electronic Identification in Cattle and Bison* (Apr. 2019), *archived at* https://www.r-calfusa.com/wp-content/uploads/2020/02/plan-to-achieve-eid-factsheet.pdf.

79.     Without following notice-and-comment procedures, the April 2019 Factsheet effectively rewrote the 2013 ADT Rule by discontinuing the use of metal eartags and requiring RFID eartags for "beef and dairy cattle and bison moving interstate." *Id.* at 2.

80.     The Factsheet also suggested, contrary to the 2013 ADT Rule's exclusion for feeder cattle, that the RFID "tags should be applied at the time of birth or before the animal moves off the farm in interstate commerce." *Id*.

81.     On October 4, 2019, Plaintiffs R-CALF USA, Tracy and Donna Hunt, and Kenny and Roxie Fox filed suit in the United States District Court for the District of Wyoming challenging the April 2019 Factsheet and RFID eartag mandate. *R-CALF USA v. USDA*, 1:19-cv-00205-NDF, 2020 WL 10356243, *1 (D. Wyo. Feb. 13, 2020).

82.     Within weeks of that case being filed, APHIS retracted the Factsheet and mooted the related claims. *Id.*

***July 2020 Notice and Proposed RFID Mandate***

83.     On July 6, 2020, APHIS published a notice that it was considering "a proposal wherein APHIS would only approve RFID tags as the official eartag for use in interstate movement of cattle and bison that are covered under [9 C.F.R. part 86]" and sought public comments regarding the proposal. *Use of Radio Frequency Identification Tags as Official Identification in Cattle and Bison*, 85 Fed. Reg. 40,184, 40,185 (July 6, 2020), https://www.govinfo.gov/content/pkg/FR-2020-07-06/pdf/2020-14463.pdf.

84.     The July 2020 Notice included a nearly identical implementation timeline as the 2019 Factsheet. *Compare* USDA, Factsheet, Advancing Animal Disease Traceability: A Plan to Achieve Electronic Identification in Cattle and Bison (Apr. 2019), *archived at* https://www.r-calfusa.com/wp-content/uploads/2020/02/plan-to-achieve-eid-factsheet.pdf ("Beginning January 1, 2023, all cattle and bison that are required to have official identification under current regulations must have official RFID ear tags.") *with* 85 Fed. Reg. 40,185 ("On January 1, 2023, RFID tags would become the only identification devices approved as an official eartag for cattle and bison pursuant to § 86.4(a)(1)(i).").

85.     The 2020 Proposal would have made RFID eartags the only official eartag available, but it would have continued to permit the use of other official identification forms as outlined in the 2013 Final Rule, including registered brands. 85 Fed. Reg. at 40,185.

86.     In response to the July 2020 Notice, APHIS "received 935 comments by that date from industry groups, producers, veterinarians, State departments of agriculture, and individuals." *Use of Electronic Identification Eartags as Official Identification in Cattle and Bison*, 89 Fed. Reg. at 39,541.

87.     In the end, APHIS "determined that withdrawing our recognition of visual-only (non-EID) eartags as official eartags for cattle and bison moving interstate would constitute a

change in the application of our regulatory requirements of sufficient magnitude to merit rulemaking rather than the notice-based process [APHIS] originally envisioned." *Id.* at 39,542.

88. On March 23, 2021, APHIS issued an announcement to stakeholders that it would not finalize the July 2020 Notice. *Id.* The agency also indicated that if it were to take further action it would do so through a rulemaking process. *Id.*

## APHIS Implements Mandatory EID Tracking

### *January 2023 EID Proposed Rule*

89. Following through with its promise to proceed through notice-and-comment rulemaking, APHIS published a proposed rule on January 19, 2023. *Use of Electronic Identification Eartags as Official Identification in Cattle and Bison*, 88 Fed. Reg. 3,320, 3,323 (Jan. 19, 2023), https://www.govinfo.gov/content/pkg/FR-2023-01-19/pdf/2023-00505.pdf.

90. As with the July 2020 Notice, the Proposed Rule required that "all official eartags sold for or applied to cattle and bison must be readable both visually and electronically." 88 Fed. Reg. at 3,325.

91. But the Proposed Rule differed in several aspects including nomenclature as APHIS/USDA rebranded its RFID eartag mandate to an electronic identification ("EID") eartag mandate. *Id.*

92. But as APHIS readily admitted, the only EID eartags currently available are RFID eartags. *Id.* ("Currently, the only official electronically readable identification tags are RFID tags; however, at some future time there may be other electronically readable technology.").

93. The Proposed Rule explained that APHIS's goal "is to rapidly and accurately collect the tag numbers and be able to adapt to technological developments, not to codify RFID technology as the only technology option for traceability." *Id.* Despite this caveat and because

there are no non-RFID eartags currently available (or even developed), the Proposed Rule, at least for now, effectively mandates RFID eartags.

94.     In substance, the Proposed Rule, like the July 2020 Notice, generally required, with some exceptions, that certain categories of cattle and bison that move interstate must have EID eartags, in lieu of visual tags. *Id.* at 3,325.

95.     The Proposed Rule added a definition for "Official Animal Identification Device Standards (OAIDS)." *Id.* at 3,323, 3,324.

96.     The Proposed Rule defined "Official Animal Identification Device Standards (OAIDS)" as:

> A document providing further information regarding the official identification device recordkeeping requirements of this part, and technical descriptions, specifications, and details under which APHIS would approve identification devices for official use. Updates or modifications to the Standards document will be announced to the public by means of a notice published in the **Federal Register**.

*Id.* at 3,329 (emphasis in original).

97.     Visual-only metal eartags "applied to cattle and bison before [the implementation date] would continue to be recognized as official identification for the life of the animals." *Id.* at 3,323.

98.     The Proposed Rule was initially open for a 60-day comment period, which was extended for an additional 30 days ending on April 19, 2023. 89 Fed. Reg. at 39,542. APHIS received 2,006 comments by the end of the extended comment period.  *Id.* As with the July 2020 Notice, commentors drew from "industry groups, producers, veterinarians, State departments of agriculture, and individuals." *Id.*

### *Plaintiffs Comment on the EID Proposed Rule*

99.     All the Organizational and Individual Plaintiffs submitted comments to the EID Proposed Rule. *See supra* ¶¶ 15, 18, 21, 38.

100.    The Plaintiffs commented that the EID Proposed Rule was unnecessary because current animal disease traceability methods are adequate. *See*, *e.g.*, *R-CALF USA Comment II* at 12–13 (noting that "[t]he U.S. has successfully prevented the spread of diseases using current animal identification devices" as far back as 1929); *SDSGA Comment* ("[t]he cattle and bison health program has been successful in protecting the U.S. cattle industry from economic loss by rapidly detecting foreign, emerging, re-emerging, or domestic program diseases and in preventing their spread"); *FARFA Comment* at 4–5 (noting that "the agency has failed to show that traceability of domestic livestock is the 'weak link' in the ability to address [Foot and Mouth Disease ("FMD")] and similar diseases"); *Kenny Fox Comment* at 1 (suggesting that "[t]he proposed rule will do nothing to prevent or control" certain disease outbreaks like FMD because they are fast-moving and EID eartags and databases only serve as an after-the-fact resolution); *Roxie Fox Comment I* (commenting that the current ADT programs work "great"); *Theresa Fox Comment* (stating that the EID Proposed Rule "doesn't trace, doesn't stop, doesn't distinguish, any disease"); *Tracy Hunt Comment* (observing that "[the EID Proposed Rule] would not result in a traceability system substantially different from what already [is] in place" and that "[t]here has been a rapid traceback system in place for years"); *Donna Hunt Comment* (raising concerns that the EID Proposed Rule would do little to meet its stated purposes—animal disease tracing).

101.    The Plaintiffs also suggested that the EID Proposed Rule was unnecessary and unable to meet its stated objective because the 11% participation rate for the nation's cattle herd was "far too low to enable APHIS to accomplish the goal of rapid and effective animal disease traceback." *R-CALF USA Comment II* at 3; *see also FARFA Comment* at 1, 3–5; *Donna Hunt Comment*. Commentators consistently noted how that participation rate was significantly below the participation rates suggested for effective traceback by animal disease experts, including

former APHIS employees. *R-CALF USA Comment II* at 3–4 (noting that effective participation rates varied, but identifying 70% participation as the lowest effective rate identified by disease experts); *see also FARFA Comment* at 3 (noting that "[i]f 18% was too low for premises registration to be effective, then 11% of cattle being tagged will certainly be ineffective").

102.    The Plaintiffs commented that the EID Proposed Rule does not actually address a fundamental problem APHIS identified with the current ADT program—incorrectly transcribed eartag numbers leading to traceback deficiencies—because the EID eartags may be used in the exact same way as the visual-only eartags currently are. *See*, *e.g.*, *R-CALF USA Comment II* at 1, 2–3 (observing that APHIS "cannot legitimately quantify any expected improvements in disease traceback with the use of expensive EID eartags when the EID component of the tag is not required to be used at any time by anyone"); *Comment from Kenny Fox* (noting that the EID Proposed Rule does not resolve the transcription errors that APHIS has long complained about). Moreover, some Plaintiffs voiced concerns that the change from 9-digit alphanumeric codes to EID tags with a 15-digit code would inject new opportunities for error. *See FARFA Comment* at 4.

103.    The Plaintiffs also voiced significant economic concerns.

104.    For example, R-CALF USA's comment discussed the difficult economic position of many of the nation's cow/calf producers and highlighted USDA data showing that many producers already operate at a loss. *R-CALF USA Comment II* at 4. As R-CALF USA observed, many cattle producers in the Northern Great Plains region are "unable to recover even their costs of production from the marketplace and, hence, were unable to pay basic household costs such as for food, clothing, and electricity from their cattle operation proceeds." *Id.*; *see also SDSGA Comment* (noting that the proposed rule would "unreasonably burden farmers and ranchers" and was "yet another undue economic burden" on independent cattle producers).

105.    Several of the Plaintiffs noted how the EID Proposed Rule disproportionately impacted small producers, may lead to ranchers and farmers leaving the market, and may increase market consolidation and concentration. *See*, *e.g.*, *R-CALF USA Comment II* at 4, 7–8, 12; *FARFA Comment* at 6–7; *id.* at 7 (discussing USDA data about cattle operations in Michigan after the state implemented mandatory EID); *id.* at 9 (noting that the proposed rule "uniquely" benefits the largest, most consolidated portions of the cattle industry, and with the added costs of EID eartags "creates incentives for vertical integration and consolidation in the cattle industry"); *Rick Fox Comment* (noting that there are competing interests within the cattle industry, and that the interests of producers and ranchers are often at odds); *Tracy Hunt Comment* (noting that the proposed rule disproportionately impacts ranchers and producers who have to cross state lines to sell).

106.    Plaintiffs also commented about how APHIS failed to conduct a full cost-benefit analysis. *See*, *e.g.*, *FARFA Comment* at 3. That failure includes the fact that APHIS failed to consider the costs of the rule to consumers. *See Tracy Hunt Comment* (suggesting that consumers were not asking for the mandate, suggesting that consumers want "a healthy product that tastes good at a reasonable price point").

### *May 2024 EID Final Rule*

107.    On May 4, 2024, APHIS and USDA adopted the EID Final Rule requiring that "all official eartags sold for or applied to cattle and bison must be readable both visually and electronically (EID)[.]" *See* 89 Fed. Reg. 39,550.

108.    The Defendants' response to concerns raised by stakeholders was a near wholesale rejection of the comments submitted. *Id.* at 39,542–61. All of Plaintiffs' comments and concerns were rejected or ignored by the Final Rule. *Id.*

109.    The agency previously noted that RFID "implementation … would be a significant challenge and would require a lengthy implementation period and a well thought out and detailed

plan." USDA, *Animal Disease Traceability Assessment Report* at 23. But the EID Final Rule addresses none of those things.

110.    The EID Final Rule only had a six-month implementation period, which multiple commentators opposed. 89 Fed. Reg. at 39,540, 39,546. Some commentators, including R-CALF USA, noted that there were delays in compliant EID eartag availability. *Id.* at 39,546; *R-CALF USA Comment II* at 6. APHIS stated that it considered but rejected extending the compliance period "because it was not clear 1) whether, or 2) to what extent, this alternative would lessen the impact on small cattle or bison operations, most of which do not engage in interstate movement of animals." *RIA & FRFA* at 29.

111.    APHIS also attempted to credit its prior "extensive outreach efforts regarding the use of EID eartags" in support of its assertion that the November 5, 2024 date "provides sufficient time for stakeholders to comply with the new requirements." *Id.* But APHIS confuses discussing RFID/EID use with implementation of their mandated use.

112.    On August 19, 2024, APHIS issued guidance for certain RFID eartags. *See* USDA, *Official Animal Identification Number (AIN) Devices with the "840" Prefix* (Aug. 19, 2024), https://www.aphis.usda.gov/sites/default/files/adt_device_ain.pdf. On information and belief, the August 19 disclosure is the first full description of EID Final Rule-compliant eartags, which was made public less than three months before the rule takes effect.

113.    A search of the Federal Register suggests that APHIS has never "announced [the OAIDS] to the public by means of a notice published in the Federal Register" as promised in the EID Final Rule. 89 Fed. Reg. at 39,564; *see also* 88 Fed. Reg. at 3,324.

114.    A further concern regarding the implementation period stems from supply chain and manufacturing delays remaining from the COVID-19 pandemic. 89 Fed. Reg. at 39,546.

Multiple commenters raised concerns about the ability to purchase and receive complaint EID eartags within the implementation period, noting that eartags were often "backordered" or had "high wait times" for orders. *Id.*; *See also* Karen Bohnert, *Ear Tag Shortages Take a Toll on Animal Identification*, DailyHerd.com (Mar. 28, 2022), https://www.dairyherd.com/news/business/ear-tag-shortages-take-toll-animal-identification (describing months long backlogs for tag orders); *see also* Karen Bohnert, *Allflex Reports Ear Tags Are Back in Full Production Mode*, DailyHerd.com (June 19, 2023), https://www.dairyherd.com/news/business/allflex-reports-ear-tags-are-back-full-production-mode.

115. While APHIS admitted it was "aware of supply chain and manufacturing disruptions" it insisted that those "issues have been resolved" and relied on assurances from "manufacturers of official devices … that manufacturing and shipping capacity is adequate for the projected number of cattle requiring official identification for interstate movement." *Id.*

116. But APHIS's view does not square with reality. For example, one eartag distributor has a popup notifying purchasers that manufacturers "are experiencing **MAJOR DELAYS IN PRODUCTION TIME**" that effects "both blank tags and custom printer tags." EarTagCentral.com (last visited Oct. 30, 2024) (emphasis in original). The distributor provided estimated shipping times for RFID eartags to be between 6-15 weeks but stressed that the "times are **ESTIMATES ONLY** and not guarantees." *Id.* (emphasis in original).

117. APHIS has also previously said that to "achieve the benefits associated with [RFID] technology … RFID readers, software, and databases must be in place along the entire production chain to capture the official identification numbers and movement of the animals in real time to be of value for the industry." USDA, *Animal Disease Traceability Assessment Report* at 23. But there is no such infrastructure in place.

118.    Several commenters "stated that costs to producers extended beyond the cost of EID tags, and included infrastructure such as EID readers, software, and labor" and some alleged that "[APHIS's] RIA was flawed because it did not take these costs into account." 89 Fed. Reg. 39,557. APHIS responded that it disagreed with the commentators and that,

> The official identification requirement does not require the producer to have hardware (readers) or software (computer systems). Readers and software are not required because each EID tag also has a visual component. The tag number is imprinted on the plastic shell containing the EID portion of the tag. *The tags can thus be used in the same manner as visual tags by producers who do not wish to invest in tag-reading hardware and software.*

*Id.* (emphasis added).

119.    In terms of record keeping obligations, the official EID eartags may be used in the exact same manner as current official visual-only eartags are used. This includes the ability to transcribe the eartag numbers by hand from the EID eartags just as producers had with the previously available visual-only tags. It also means that the information may still be kept in paper format or manual entry of tag information.

120.    But transcription errors and delays caused by paper filing systems and manual entries were cited as a reason for the Final Rule. *Id.* at 39,543 ("Transcription errors in animal location and movement documents have the potential to significantly impede trace investigations. … Errors can occur at the level of writing, reviewing, or completing movement documents, and an error in recording a single digit can have major impacts on a trace.").

121.    Despite concerns about transcription errors, including those raised by Plaintiffs, the EID Final Rule eliminates the current 9-digit alphanumeric visual-only tags and replaces them with 15-digit EID tags. *Id.* at 39,550. This change will likely increase the error rate by introducing new opportunities for transcription errors because, as APHIS has recognized, "an error in recording

a single digit can have major impacts on a trace[,]" *id.* at 39,543, and the EID Final Rule includes six additional opportunities for transcription errors.

122.    Despite this, APHIS asserted that it was its "view that transcription error is not likely to significantly increase from the current state when relying on visual read of the eartag[.]" *Id.* at 39550–51. It noted that "all approved EID eartags begin with the same 6 digits: 840003" with "840" being the United States' country code and the next three digits "003, signal that the animal has been identified using a sequential numbering system from a start number of 003,000,000,000." *Id.* at 39,550. APHIS also credited EID eartag "readability standards" as reducing transcription errors compared to metal tags currently in use. *Id.*

123.    On information and belief, APHIS has never proposed readability standards for the visual-only eartags or considered how readability standards for such tags could reduce transcription errors while still providing a low-cost option for producers. *See* 89 Fed. Reg. 39, 550 ("EID eartags have readability standards, while metal tags with NUES numbers do not.").

124.    Similarly, APHIS noted that "field experience and anecdotal observation from regulators at the State and Federal level suggest that the retention rate of these metal tags is lower than our required retention rate of EID eartags." *Id.* at 39,551. The agency also stated that compared to metal eartags, "APHIS-approved official identification [EID] tags undergo rigorous testing and trials to assure a retention rate of 99 percent (a loss of no more than 1 percent per year) and are intended for the life of the animal." *Id.*

125.    On information and belief, APHIS has never proposed retention standards for visual-only eartags or considered how such tags could increase retention rates over the life of the animal.

126.    APHIS previously acknowledged that the benefits of RFID traceability—which presumably includes efficiency gains—can only be achieved with the appropriate infrastructure in place, including readers, software, and databases. *See* USDA, *Animal Disease Traceability Assessment Report* at 23. But, as APHIS has stated, "this final rule does not require the use of infrastructure, such as readers, because tags are required to have a visual component." 89 Fed. Reg. at 39,559.

127.    APHIS provides no reasons establishing why the EID Final Rule is necessary when, by its own terms, the rule does not actually fix the problems it is supposedly addressing because participants within the production chain may continue to use EID eartags in the exact same way that they use visual-only eartags. *Id.* at 39,541. APHIS provided no estimates of how many producers, or what percentage of the nation's herd will use EID eartags in the same way as they used visual-only eartags. Many producers, including Individual Plaintiffs and/or the Organizational Plaintiffs' members, will continue to use the EID eartags in the exact same manner as they currently use visual-only eartags.

128.    Moreover, the current traceability system works. Each year, "APHIS partners with State veterinary officials … to test the performance of States' animal disease traceability systems with regard to the interstate movement of cattle and bison covered under 9 CFR part 86." *Id.* Those tests

> indicate that when State veterinary officials are provided an identification number from an animal that has been identified with an official identification eartag, whether non-EID (*e.g.*, metal or plastic) or electronic, and the number has been entered accurately into a data system, *States on average can trace animals to any one of these four locations in less than 1 hour*: the State where an animal was officially identified, the location in-State where an animal was officially identified, the State from which an animal was shipped out of, and the location in-State that an animal was shipped out-of-State from.

*Id.* (emphasis added).

129.    APHIS noted that

lengthy times or failed traces in the test exercises resulted when numbers from non-EID tags were transcribed inaccurately, movement records were not readily available, or information was only retrievable from labor-intensive paper filing systems.

*Id.* And it stated that the agency

believe[s] electronic tags and electronic record systems provide a significant advantage over non-EID tags and paper record systems, or systems that involve manual entry of tag numbers, by enabling rapid and accurate reading and recording of tag numbers and retrieval of traceability information.

*Id.*

130.    But again, APHIS provides no reasons establishing why this is so, or why the EID Final Rule is necessary, when EID tags may be used the same way as the currently available visual-only eartags whose shortcomings the Rule allegedly fixes.

131.    APHIS also provides no substantial reasons establishing why the EID Final Rule is necessary when the USDA has previously "stated that a participation rate of 70 percent of the nation's cattle herd would be necessary for an ADT program to be effective," *id.* at 39,542, but the Rule only applies to 11 percent of the nation's cattle herd. *Id.* at 39,556.

132.    In response to commentators who raised this concern—that the EID Final Rule is ineffective because its participation rate is too low—APHIS only attempted to dispel these comments by noting that "a higher percentage of the nation's cattle population officially identified would certainly be a benefit to a robust ADT program[.]" *Id.* But they stated that the EID Final Rule was only focused on

enhance[ing] our ability to respond quickly to high-impact diseases of livestock within the constraints of the animal classes and movements that are currently required to have official identification and the animal classes and movements that are currently exempted.

*Id.* APHIS did not expound on why it maintained that emphasis considering contrary information regarding program effectiveness overall, but instead the EID Final Rule relies on perceived, but unsubstantiated, increases in effectiveness compared to the current measures. *Id.*

133.    Further, it is not clear from the EID Final Rule or the *RIA & FRFA* what data will be collected. The Final Rule indicates that "[d]ata collection required by this final rule is limited to the necessary information for adequate animal disease traceability" but does not say what data that is. *See* 89 Fed. Reg. at 39,554.

134.    The EID Final Rule also states that "APHIS-approved official eartags only encode the 15-digit animal identification number. They do not encode any producer information." *Id.* at 39,557. However, a "Premises ID," which is "a unique code that is permanently assigned to a single physical location," is required to purchase any official USDA EID eartags. *See* APHIS, *How to Obtain a Premises Identification Number (PIN) or Location Identifier (LID)* (last modified Oct. 4, 2024), https://www.aphis.usda.gov/animal-disease/traceability/pin. PINs are assigned by the States. *Id.*

135.    Based on the current number of cattle and bison tagged with visual-only eartags, APHIS "conservatively" estimated that the EID Final Rule would require EID eartags on about 11 million cattle and bison, roughly 11–12 percent of the domestic cattle and bison inventory. 89 Fed. Reg. at 39,556.; *see also RIA & FRFA* at 10–11. APHIS provides no sufficient explanation for why this small subset of cattle is the correct universe to calculate the Rule's cost, as opposed to calculating the cost of the Rule based on all cattle to which the Rule may apply.

136.    On information and belief, APHIS has never quantified the relative increase in effectiveness it believes will be achieved by the EID Final Rule, nor has the agency compared such to the 2013 ADT Rule. *See RIA & FRFA* at 29–30; *see also id.* at 25 (discussing the alternative if

not requiring the use of EID eartags). Likewise, APHIS does not appear to have considered the cost of achieving these theoretical benefits relative to the costs placed on production chain participants, particularly small producers.

137.    One reason may simply be that the cost to implement an EID-only traceability program with the necessary infrastructure is prohibitively expensive, costing significantly more than APHIS's estimated annual cost of the promulgated EID Final Rule. *See RIA & FRFA* at 29.

138.    As APHIS readily admits, "it is difficult to quantify the benefits of transiting from visual to EID eartags." *RIA & FRFA* at 24. It then goes on to suppose—without any explanation— that "if there was a one in a hundred chance of a $6 billion outbreak occurring each year, and if the transition from visual only to EID tags decreased the damages associated with outbreaks by 50%, the marginal benefit of the rule will be approximately $30 million dollars per year." *Id.* at 24–25.

139.    But APHIS provides no explanation for why this marginal benefit calculation is correct, or at least sufficient to support the EID Final Rule. As it also admits that the EID Final Rule's "costs may exceed the benefits if: 1) the probability of disease outbreaks are lower than anticipated, 2) the economic costs associated with disease outbreaks are lower than anticipated, or 3) if the transition from visual to EID tags decreases the costs associated with outbreaks by less than expected." *Id.* at 25.

140.    Based on the current number of cattle and bison tagged with visual-only eartags, APHIS "conservatively" estimated that the EID Final Rule would require EID eartags on about 11 million cattle and bison, roughly 11–12 percent of the domestic cattle and bison inventory. 89 Fed. Reg.  39,556.

141.    APHIS estimated that the rule would cost approximately $26.1 million, if no federal funding was provided. *Id.*

142.    The cost estimate only includes direct costs to producers, but did not consider how the Rule may impact consumers through increased beef prices. *But see* Comment from Blessingway Farm LLC (Apr. 17, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-1223 (a signatory to the FARFA comment); Comment from Stephanie Kieselhorst (Mar. 15, 2023), https://www.regulations.gov/comment/APHIS-2021-0020-0419 (a signatory to the FARFA comment).

143.    The *RIA & FRFA* estimates that the Rule would cost on average $34.21 per cattle or bison operation each year. *RIA & FRFA* at 20.

144.    But that average is distributed across all operations and there is significant variation within the industry regarding per operation cost. For example, APHIS data shows that the average cost for EID eartags is higher for smaller operations. *Id.* at 28, 34 ("[S]maller operations could pay anywhere from 72% to 116% more per tag than large operations."). Per APHIS, nearly sixty percent of the herds impacted by the EID Final Rule run between 20 to 999 head. *Id.* The annual cost per year for these operations could range between $53.80 (20 head and FDX Tag cost of $2.69) and $2,077.92 (999 head and FDX Tag cost of $2.08). *Id.* On either end of that spectrum, the cost is potentially more than APHIS's per operation estimate.

145.    APHIS's data identified 640,264 beef cattle ranches and farms which qualify as small entities, compared to only 1,232 large entities. *Id.* at 28. The agency determined that "[b]ecause most small producers do not engage in interstate movement for marketing cattle and are not required to use official ID they will not be impacted by this rule in terms of requirements

to purchase electronic tags." *Id.* at 29. But it provides no data establishing that small operations, within the meaning of the RFA, engage in limited movement across state lines.

146.    Starting on November 5, 2024, all official eartags sold for or applied to covered cattle and bison will be required to be visually readable EID eartags. 89 Fed. Reg. at 39,540. Visual non-EID eartags "applied to animals prior to November 5, 2024 will be recognized as official eartags for the life of the animal." *Id.* at 39,546.

147.    On information and belief, violations of the EID Final Rule may be prosecuted pursuant to AHPA's penalty provisions, 7 U.S.C. § 8313. *See* USDA, *Animal Disease Traceability (ADT) Monitoring and Compliance* 11–12 (updated May 2017) (version 2.4), https://www.aphis.usda.gov/sites/default/files/ADT_monitoring_and_compliance_guidelines.pdf ("The Animal Health Protection Act of 2002 authorizes the assessment of civil penalties for violations of the Act. It also authorizes criminal penalties, under Title 18 of the United States Code, for violations that are "knowingly" committed under the Act.").

## CLAIMS FOR RELIEF

### Count One
### Violation of the Administrative Procedure Act
### Excess of Statutory Jurisdiction

148.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

149.    The APA provides that courts "shall … hold unlawful and set aside agency action … found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.] 5 U.S.C. § 706(2)(C).

150.    "Administrative agencies are creatures of statue" and "[t]hey accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. 109, 117 (2022).

151.    The EID Final Rule exceeds USDA's and APHIS's authority under the Animal Health Protection Act, 7 U.S.C. § 8305. Section 8305 does not authorize USDA or APHIS to mandate the use of EID eartags. The agencies' interpretation of 7 U.S.C. § 8305 is not entitled to deference and the Court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright v. Raimondo* and *Relentless v. Dep't of Commerce*, 144 S. Ct. 2244, 2273 (2024).

152.    AHPA requires that the action taken be "*necessary* to prevent the introduction or dissemination of any pest or disease of livestock[.]" 7 U.S.C. § 8305(1) (emphasis added). But by its own terms the EID Final Rule is not "necessary" because, at best, it provides a determination that the EID Final Rule may marginally improve upon the 2013 ADT Rule, *i.e.*, the rule may "enhance [APHIS's] ability to respond quickly" and it may help APHIS "to move closer to [its] stated objective [of 70 percent participation.]" 89 Fed. Reg. 39,542.

153.    A necessity determination requires detailed findings to support an action, which APHIS failed to provide here.

154.    Under AHPA's enforcement provisions, 7 U.S.C. § 8313(a), USDA and APHIS may seek criminal penalties, including fines and imprisonment, for knowing violations of "this chapter" meaning the AHPA. They may also seek civil penalties for other violations of the Act, 7 U.S.C. § 8313(a) (also limiting enforcement to violations of "this chapter").

155.    However, AHPA makes no provisions for criminal or civil penalties regarding violations of regulations promulgated pursuant to the Act. Thus, Congress has not provided Defendants with the authority to enforce the EID Final Rule.

156.    To the extent that Defendants intend to or will enforce the Final Rule pursuant to 7 U.S.C. § 8313, they would be acting in excess of their statutory jurisdiction.

157.    This Court should hold unlawful and set aside the EID Final Rule because USDA and APHIS acted "in excess of" their statutory authority. 5 U.S.C. § 706(2)(C).

158.    Plaintiffs also qualify for declaratory relief under 28 U.S.C. §§ 2201 and 2202 as against the Defendants' implementation and enforcement of the EID Final Rule.

**Count Two**
**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**

159.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

160.    Administrative Procedure Act ("APA") provides that courts "shall … hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

161.    Agency actions are arbitrary or capricious when, as here, the agency has

> entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

162.    Further, agency actions, like the EID Final Rule, cannot be upheld if the action "is internally inconsistent or not reasonable and reasonably explained." *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 520 (8th Cir. 2024).

163.    The EID Final Rule is arbitrary and capricious because it entirely fails to consider whether the Rule "is *necessary* to prevent the introduction or dissemination of any pest or disease of livestock[.]" 7 U.S.C. § 8305(1) (emphasis added).

164.    The EID Final Rule is arbitrary and capricious because it fails to reasonably explain how the EID Final Rule "is necessary" as APHIS provides only a conclusory statement that "[t]he

ADT program helps prevent the dissemination of disease by helping minimize the effects of disease outbreaks through restrictions, such as the EID eartag requirement, that the agency has determined are necessary for efficient livestock tracing." 89 Fed. Reg. at 39,555. But this bald statement does not reasonably explain how the EID Final Rule achieves any efficiency gains or why hypothetical efficiency gains are significant enough to be deemed "necessary" under the AHPA.

165.    The EID Final Rule is arbitrary and capricious because it is internally inconsistent as it attempts to remedy perceived deficiencies in visual-only eartags by permitting EID eartags to be visually read in exactly the same way as the existing metal tags are.

166.    The EID Final Rule is arbitrary and capricious because it failed to "show that there are good reasons for the new policy[,]" *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), or to reasonably explain why APHIS changed its policy from permitting visual-only eartags as official identification to mandating that any official eartags must be both visually and electronically readable.

167.    The EID Final Rule is arbitrary and capricious because it failed to consider how the EID Final Rule will achieve any efficiency gains or reduce transcription errors when the EID eartags may be used in the exact same way as visual-only eartags.

168.    The EID Final Rule is arbitrary and capricious because it failed to adequately explain how efficiency gains were offset by the costs of the EID mandate.

169.    The EID Final Rule is arbitrary and capricious because USDA and APHIS failed to consider and justify the actual costs of the EID Final Rule.

170.    The EID Final Rule is arbitrary and capricious because the agencies failed to consider how the Rule will impact consumer costs and beef prices.

171.    The EID Final Rule is arbitrary and capricious because the agencies failed to consider an important aspect of the problem–whether the EID mandate violates the Fourth Amendment.

172.    The EID Final Rule is arbitrary and capricious because USDA and APHIS failed to reasonably explain what data would be collected from the EID eartags in the Final Rule and how.

173.    This Court should hold unlawful and set aside the EID Final Rule because USDA and APHIS acted arbitrarily and capriciously. 5 U.S.C. § 706(2)(A).

174.    Plaintiffs also qualify for declaratory relief under 28 U.S.C. §§ 2201 and 2202 as against the Defendants' implementation and enforcement of the EID Final Rule.

**Count Three**
**Violation of the Regulatory Flexibility Act**

175.    Plaintiffs incorporate by reference all the preceding material as though fully set forth herein.

176.    The APA also provides that courts "shall … hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D).

177.    Plaintiffs, or their members, are small entities whose primary industry is beef cattle ranching and farming. Their annual sales are less than $2.5 million. In fact, APHIS's data identified 640,264 "Beef cattle ranching and farming" operations which qualify as small entities. *RIA & FRFA* at 28. They are subject to the EID Final Rule.

178.    The *FRFA* is erroneous because it fails to calculate the true cost of the Rule on producers and consumers and its cost-benefit analysis does not consider how the Rule may only achieve marginal benefits because the EID eartags may be used the same way as the current visual-only eartags are.

179.    This Court should hold unlawful and set aside the EID Final Rule because USDA and APHIS violated the RFA "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D).

180.    Plaintiffs also qualify for declaratory relief under 28 U.S.C. §§ 2201 and 2202 as against the Defendants' implementation and enforcement of the EID Final Rule.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

a.    An order and judgment vacating the EID Final Rule.

b.    Permanent injunctive relief enjoining Defendants from enforcing the EID Rule, and from requiring Plaintiffs and/or their members to tag their cattle with EID or RFID eartags.

c.    A declaration that Defendants exceeded their statutory authority under the Animal Health Protection Act.

d.    A declaration that Defendants' enactment of the EID Final Rule was arbitrary and capricious.

e.    A declaration that the EID Rule is not subject to the Animal Health Protection Act's enforcement and penalty provisions.

f.    A declaration that Defendants violated the Regulatory Flexibility Act and the Administrative Procedure Act.

g.    An award for all reasonable attorneys' fees and costs incurred herein and that Plaintiffs may be entitled to under law.

h.    Such other relief as this Court deems just and proper.

Dated this 30th day of October 2024.

Respectfully,

RICHARDSON, WYLY, WISE, SAUCK
   & HIEB, LLP

By  /s/ Jack H. Hieb_____
    Attorneys for Plaintiffs

Post Office Box 1030
Aberdeen, SD 57402-1030
Telephone No: (605) 225-6310
E-mail: JHieb@rwwsh.com

*~and~*

Kara M. Rollins*
John J. Vecchione*
Sheng Li*
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
Tel: (202) 869-5210
Fax: (202) 869-5238
kara.rollins@ncla.legal
john.vecchione@ncla.legal
sheng.li@ncla.legal
*Pro Hac Vice Pending*

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

RANCHERS-CATTLEMEN ACTION LEGAL FUND
UNITED STOCKGROWERS OF AMERICA; SOUTH

**DEFENDANTS**

UNITED STATES DEPARTMENT OF AGRICULTURE;
THOMAS VILSACK, in his official capacity as Secretary of

**(b)** County of Residence of First Listed Plaintiff   Yellowstone (MT)
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jack H. Hieb
Richardson Law Firm
1 Court Street

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☒ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **INTELLECTUAL** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 830 Patent | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | ☐ 835 Patent - Abbreviated | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | New Drug Application | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards | Act of 2016 | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Act | | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 720 Labor/Management | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | Exchange |
| | Medical Malpractice | | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 791 Employee Retirement | | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | Income Security Act | **FEDERAL TAX SUITS** | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | or Defendant) | ☒ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | 26 USC 7609 | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
5 U.S.C. §§ 611, 702; 28 U.S.C. § 2201
Brief description of cause:
Challenge under Administrative Procedure Act to USDA/APHIS Final Rule, 89 Fed. Reg. 39,550 (May 9, 2024)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
10/30/2024

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**     **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**     **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**     **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**     **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**     **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**     **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**     **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**     **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**     **Related Cases.**  This section of the JS 44 is used to reference related cases, if any.  If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.