# Exhibit 1

89 Fed. Reg. 39,540 (May 9, 2024)
AR-000001–27

**39540**    **Federal Register** / Vol. 89, No. 91 / Thursday, May 9, 2024 / Rules and Regulations

complaint form, call (866) 632–9992. Submit your completed form or letter to USDA by: (1) mail to: U.S. Department of Agriculture, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW, Washington, DC 20250–9410; (2) fax: (202) 690–7442; or (3) email: *program.intake@usda.gov.*

USDA is an equal opportunity provider, employer, and lender.

### List of Subjects in 7 CFR Part 1430

Dairy products, Fraud, Penalties, Price support programs, Reporting and recordkeeping requirements.

For the reasons discussed above, CCC amends 7 CFR part 1430 as follows:

### PART 1430—DAIRY PRODUCTS

■ 1. The authority citation for part 1430 continues to read as follows:

**Authority:** 7 U.S.C. 9051–9060 and 9071 and 15 U.S.C. 714b and 714c.

### Subpart D—Dairy Margin Coverage Program

#### § 1430.403  [Amended]

■ 2. In § 1430.403, amend paragraph (a)(1) by removing the year "2019" and adding "2019 and 2024" in its place.

**Zach Ducheneaux,**

*Administrator, Farm Service Agency, and Executive Vice President, Commodity Credit Corporation.*

[FR Doc. 2024–10162 Filed 5–8–24; 8:45 am]

**BILLING CODE 3410–E2–P**

---

### DEPARTMENT OF AGRICULTURE

### Animal and Plant Health Inspection Service

### 9 CFR Parts 71, 77, 78, and 86

[Docket No. APHIS–2021–0020]

RIN 0579–AE64

### Use of Electronic Identification Eartags as Official Identification in Cattle and Bison

**AGENCY:** Animal and Plant Health Inspection Service, USDA.

**ACTION:** Final rule.

**SUMMARY:** We are amending the animal disease traceability regulations to require that eartags applied on or after a date 180 days after publication in the **Federal Register** of this final rule be both visually and electronically readable in order to be recognized for use as official eartags for interstate movement of cattle and bison covered under the regulations. We are also clarifying certain record retention and record access requirements and revising some requirements pertaining to slaughter cattle. These changes will enhance the ability of Tribal, State and Federal officials, private veterinarians, and livestock producers to quickly respond to high-impact diseases currently existing in the United States, as well as foreign animal diseases that threaten the viability of the U.S. cattle and bison industries.

**DATES:** This rule is effective November 5, 2024.

**FOR FURTHER INFORMATION CONTACT:** Dr. Alexander K. Turner, Acting Director, Animal Disease Traceability and Veterinary Accreditation Center, Strategy and Policy, VS, APHIS, 2150 Centre Ave., Building B, Fort Collins, CO 80526; (970) 494–7353.

**SUPPLEMENTARY INFORMATION:**

#### Background

Under the Animal Health Protection Act (AHPA, 7 U.S.C. 8301 *et seq.*), the Secretary of Agriculture has the authority to issue orders and regulations to prevent the introduction into the United States and the dissemination within the United States of any pest or disease of livestock. Within the U.S. Department of Agriculture (USDA), the Animal and Plant Health Inspection Service (APHIS) has primary regulatory responsibility to prevent, control, and eradicate communicable diseases of livestock in the United States. Knowing where diseased and at-risk animals are, where they have been, and when, is indispensable in emergency response and in ongoing disease control and eradication programs.

The animal disease traceability regulations, which were set forth in a final rule[1] published on January 9, 2013 (78 FR 2040–2075, Docket No. APHIS–2009–0091) and are contained in 9 CFR part 86, provide the requirements for identification and documentation for certain classes of cattle and bison to move interstate. These regulations establish minimum national official identification and documentation requirements for the traceability of livestock moving interstate. The species covered in the regulations include cattle and bison (sexually intact and 18 months of age or older, all female dairy cattle of any age and male dairy cattle born after March 11, 2013, cattle and bison of any age used for rodeo or recreational events, and cattle and bison of any age used for shows or exhibitions), sheep and goats, swine,

horses and other equids, captive cervids (*e.g.,* deer and elk), and poultry.

Under the regulations, official identification devices or methods are determined by the APHIS Administrator. An "official identification device or method" is defined in § 86.1 of the regulations as "[a] means approved by the Administrator of applying an official identification number to an animal of a specific species or associating an official identification number with an animal or group of animals of a specific species or otherwise officially identifying an animal or group of animals."

One of the approved identification methods for cattle and bison covered by part 86 is an official eartag. An official eartag is defined in § 86.1 of the regulations as "[a]n identification tag approved by APHIS that bears an official identification number for individual animals. Beginning March 11, 2014, all official eartags manufactured must bear an official eartag shield. Beginning March 11, 2015, all official eartags applied to animals must bear an official eartag shield. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal." The other methods of official identification of cattle and bison include "[b]rands registered with a recognized brand inspection authority and accompanied by an official brand inspection certificate, when agreed to by the shipping and receiving State or Tribal animal health authorities; or [t]attoos and other identification methods acceptable to a breed association for registration purposes, accompanied by a breed registration certificate, when agreed to by the shipping and receiving State or Tribal animal health authorities; or Group/lot identification when a group/lot identification number (GIN) may be used." 9 CFR 86.4(a)(1)(ii) through (iv).

Historically, APHIS has used metal, non-electronic identification (EID) tags for animal identification in disease programs for many decades and has approved both non-EID and radio frequency identification (RFID, a form of EID) tags for use as official eartags in cattle and bison since 2008.

Since the enactment of the animal disease traceability regulations, APHIS has worked with stakeholders to enhance its traceability capacity within the Animal Disease Traceability (ADT) program. In January 2017, APHIS staff officers met with State officials and

---

[1] To view the final rule, supporting documents, and comments we received, go to: *https://www.regulations.gov/docket/APHIS-2009-0091.*

AR-000001

APHIS Veterinary Services field officers to gather input on what was working well in the traceability program and what gaps remained. A report of our findings was published in April 2017 (*https://www.aphis.usda.gov/ traceability/downloads/adt-assessment.pdf*). Among other findings, the report discussed gaps in tracing animals due to the challenges of reading and recording numbers from non-EID eartags. A similar gap identified was the need for greater efficiency in collecting Animal Identification Numbers (AINs) or other official identification numbers of individual animals at slaughter and removing those identification numbers from future tracing efforts. Eliminating this gap was determined not to be feasible with visual-only eartags, but could be achieved with EID eartags.

On April 4, 2017, we published in the **Federal Register** (82 FR 16336, Docket No. APHIS–2017–0016) a notice [2] announcing a series of public meetings aimed at soliciting comment on the animal disease traceability program. A total of nine public meetings were hosted by APHIS between April and July of that year, and an additional meeting was hosted by the Kansas Department of Agriculture. As discussed in the April 2017 notice, the purpose of the meetings paralleled the prior discussion with State officials and APHIS field officers: to "hear from the public about the successes and challenges of the current ADT framework." We specifically solicited attendance from cattle and bison industry members, as well as impacted States and Tribes.

The notice and meetings generated 462 written public comments. A working group composed of State and Federal officials, formed in March of 2017 to plan and attend the public meetings, was further tasked with listening to the discussions and preparing a final report summarizing input from the meetings and proposing directions to address gaps in the traceability system. The report was presented at the National Institute for Animal Agriculture fall public forum in September of 2017 and published in April of 2018 (*https:// www.aphis.usda.gov/publications/ animal_health/adt-summary-program-review.pdf*).

During the remainder of 2017, 2018, and 2019, APHIS personnel frequently met with stakeholders to discuss questions and topics that arose during the 2017 outreach meetings. In addition

to individual and industry organization meetings, APHIS officers met with State officials as well as industry stakeholders at national public forums including the United States Animal Health Association and the National Institute for Animal Agriculture forum.

During this period, cattle and bison organizations provided significant and ongoing input on the animal disease traceability program. Although not everyone agreed, many stakeholders commented that electronic records and electronic identification were of significant value and were needed to protect the industry from diseases with potential for high economic impacts.

While APHIS focuses on interstate movement of livestock, States and Tribal Nations remain responsible for the traceability of livestock within their jurisdictions. APHIS partners with State veterinary officials each year to test the performance of States' animal disease traceability systems with regard to the interstate movement of cattle and bison covered under 9 CFR part 86. (Tribes are free to request such test exercises on a voluntary basis and APHIS will report to the Tribes the results of any such exercise. At this time, Tribes have not requested such test exercises.) Results of these test exercises can be viewed on APHIS' traceability web page.[3] The results indicate that when State veterinary officials are provided an identification number from an animal that has been identified with an official identification eartag, whether non-EID (*e.g.*, metal or plastic) or electronic, and the number has been entered accurately into a data system, States on average can trace animals to any one of these four locations in less than 1 hour: the State where an animal was officially identified, the location in-State where an animal was officially identified, the State from which an animal was shipped out of, and the location in-State that an animal was shipped out-of-State from. However, lengthy times or failed traces in the test exercises resulted when numbers from non-EID tags were transcribed inaccurately, movement records were not readily available, or information was only retrievable from labor-intensive paper filing systems. We believe electronic tags and electronic record systems provide a significant advantage over non-EID tags and paper record systems, or systems that involve manual entry of tag numbers, by enabling rapid and accurate reading and

recording of tag numbers and retrieval of traceability information.

In support of greater efficiency in traceability and in furtherance of the above-listed program goals, on July 6, 2020, we published in the **Federal Register** (85 FR 40184–40185, Docket No. APHIS–2020–0022) a notice [4] in which we announced our proposal to approve only RFID tags as the official eartag for use in interstate movement of cattle and bison that are covered under the regulations. Specifically, the notice proposed that:

• Beginning January 1, 2022, USDA would no longer approve vendors to use the official USDA shield in production of visual eartags or other eartags that do not have RFID components.

• On January 1, 2023, RFID tags would become the only identification devices approved as an official eartag for cattle and bison pursuant to § 86.4(a)(1)(i).

• For cattle and bison that have official USDA visual (metal) tags in place before January 1, 2023, APHIS would recognize the visual (metal) tag as an official identification device for the life of the animal.

The 2020 notice further clarified that we were proposing no changes to the regulations pertaining to, nor proposing to restrict the use of, other official identification methods authorized by 9 CFR 86.4(a)(1)(ii) through (iv) (such as the use of tattoos and brands when accepted by State veterinary officials in the sending and receiving States).

We solicited comments on the 2020 notice for 90 days ending on October 5, 2020. We received 935 comments by that date from industry groups, producers, veterinarians, State departments of agriculture, and individuals.

Many of the commenters representing industry organizations and State department of agriculture regulatory officials were supportive of the transition and agreed with APHIS that RFID allowed for greater efficiency than non-electronic means of identification and furthered the goals of the ADT program with regard to animal traceability. We also received many comments expressing opposition to the proposal. These commenters expressed concern about issues including perceived costs, retention time on the animals of RFID eartags, as well as our legal authority under the Administrative Procedure Act (5 U.S.C. 500 *et seq.*) to change the eartag requirements using a

---

[2] To view the notice, go to: *https:// www.regulations.gov/document/APHIS-2017-0016-0001.*

[3] See ADT Trace Performance Metric Report 2013–2022. *https://www.aphis.usda.gov/ traceability/downloads/adt-trace-perf-report-2013-2022.pdf.*

[4] To view the notice, supporting documents, and comments we received, go to: *https:// www.regulations.gov/document/APHIS-2020-0022-0001.*

notice-based procedure rather than rulemaking.

After reviewing the comments on the July 2020 notice, we determined that withdrawing our recognition of visual-only (non-EID) eartags as official eartags for cattle and bison moving interstate would constitute a change in the application of our regulatory requirements of sufficient magnitude to merit rulemaking rather than the notice-based process we originally envisioned. We also determined that the goal of maximizing transparency and public participation would also best be served through rulemaking in this instance. Therefore, on March 23, 2021, we issued a stakeholder announcement indicating that we would not finalize the 2020 notice, and that we "would use the rulemaking process for further action related to the proposal." [5]

To that end, on January 19, 2023, we published in the **Federal Register** (88 FR 3320–3330, Docket No. APHIS–2021–0020) a proposal [6] to amend the animal disease traceability regulations to require that eartags applied on or after a date 6 months (180 days) after publication in the **Federal Register** of a final rule be both visually and electronically readable in order to be recognized for use as official eartags for interstate movement of cattle and bison covered under the regulations. The proposed rule differed from the 2020 notice in that we referred to electronic identification (EID) tags rather than to RFID tags to recognize the permissibility of other electronically readable technology, in addition to RFID technology, should it become available in the future. We also proposed several other changes to part 86 aimed at clarifying the regulations, including revising the definition of dairy cattle, amending certain provisions pertaining to recordkeeping, and revising certain requirements pertaining to slaughter cattle. We began soliciting comments concerning the proposal for 60 days, ending March 20, 2023, and in response to several requests by commenters, we extended [7] the comment period by 30 days to April 19, 2023.

We received 2,006 comments by the extended date. The comments were from industry groups, producers, veterinarians, State departments of agriculture, and individuals.

Similar to the response to the notice published on July 6, 2020,[8] many of the commenters representing industry organizations and State departments of agriculture regulatory officials were supportive of the proposed rule and agreed that EID furthered the goals of the ADT program with regard to animal traceability. We also received many comments expressing opposition to our proposal. Our responses to those comments are provided below, organized by topic.

**General Comments**

Several commenters stated that our proposed rule would not improve animal disease traceability because an insufficient number of animals are covered under the proposed rule. These commenters noted that USDA has stated that a participation rate of 70 percent of the nation's cattle herd would be necessary for an ADT program to be effective.

Having a higher percentage of the nation's cattle population officially identified would certainly be a benefit to a robust ADT program, but our focus in this rulemaking is to continue to enhance our ability to respond quickly to high-impact diseases of livestock within the constraints of the animal classes and movements that are currently required to have official identification and the animal classes and movements that are currently exempted.

The source [9] cited by the commenters was the 2009 Congressional testimony of Dr. John Clifford, a former APHIS Deputy Administrator for Veterinary Services. Dr. Clifford was testifying about what measures were in place to survey for and respond to the possible introduction of high-risk foreign animal diseases (FADs) into the United States. His comments should be viewed through that lens and understood to mean that, in order to be fully prepared for a possible incursion of an FAD, an estimated 70 percent [10] of animals of a specific species/sector would need to be traceable. At the time of his testimony, Dr. Clifford estimated that 25 percent of the nation's beef cattle herd participated

in the USDA's National Animal Identification System (a voluntary system that prefigured the current ADT program). The higher the number of animals that are traceable, the higher the likelihood that we are able to trace any particular instance of disease and effectively respond.

These statements do not preclude APHIS from taking measures, such as our proposed rule, to move closer to that stated objective, nor do they contradict our claim that our proposal would improve the efficacy of our current ADT program. For the reasons outlined in the proposed rule and summarized above in this document, requiring EID for eartags will improve our ability to trace the cattle and bison that are currently required to have official identification and that meet this requirement with eartags.

A commenter stated that our proposed rule would not improve ADT because our proposal included no measure to solve problems with paper records by, for example, requiring the digitization of paper records used in disease traceback investigations.

We are making no change in response to the commenter. While the regulations do not require the digitization of paper records, APHIS has elsewhere encouraged the use of electronic recordkeeping through efforts such as targeted funding to State and Tribal animal health officials operating under an ADT cooperative agreement to support their electronic recordkeeping systems and maintain their internal databases used for animal disease traceability. Cooperators have used this funding in a variety of ways, including providing accredited veterinarians and livestock markets with free EID readers. Partly as a result of these efforts, electronic interstate certificate of veterinary inspections (ICVIs) are readily available now and frequently used. Moreover, our proposal included editing language in the definition of *interstate certificate of veterinary inspection (ICVI)* in § 86.1 to clarify that electronic ICVIs may be used as an alternative to paper ICVIs. Our intention with respect to this change was to continue to encourage electronic recordkeeping in order to further alleviate the potential problems caused by paper records. However, because electronic ICVIs may sometimes be impracticable for the regulated community, we are not requiring the use of electronic ICVIs.

A commenter stated that typos were not a legitimate basis for major Federal action and claimed that APHIS was suggesting that ranchers "are doing sloppy work."

---

[5] The notice was posted to *https:// www.aphis.usda.gov/aphis/newsroom/news/sa_by_ date/sa-2021/rfid-traceability-rulemaking*. It is available by contacting *traceability@usda.gov*.

[6] To view the proposal, supporting documents, and the comments we received, go to *https:// www.regulations.gov/document/APHIS-2021-0020-0001*.

[7] The comment extension notice was published on March 20, 2023 (88 FR 16576, Docket No. APHIS–2021–0020).

[8] See footnote 4.

[9] *https://www.usda.gov/sites/default/files/ documents/5_5_09_Clifford_Dep_Admin_for_Vet_ Services_APHIS_National_Animal_ID.pdf*.

[10] More recently, a 2018 World Perspectives study commissioned by the National Cattlemen's Beef Association estimated that a window of 45 percent to 90 percent, with a midpoint of 68 percent, is needed for traceability to have "national significance." ("Comprehensive Feasibility Study: U.S. Beef Cattle Identification and Traceability Systems." World Perspectives, Inc. 2018.)

AR-000003

Transcription errors in animal location and movement documents have the potential to significantly impede trace investigations. APHIS recognizes that producers and others who complete these documents typically take care in producing the documents; however, reading and transcribing tag identifiers by hand, especially National Uniform Eartagging System (NUES) tags that may be obstructed with debris or worn down, is a process that is inherently subject to human error. Errors can occur at the level of writing, reviewing, or completing movement documents, and an error in recording a single digit can have major impacts on a trace.

Some commenters stated that APHIS has failed to articulate the need for the proposed EID requirement, as the current ADT program has proven adequate. One of these commenters cited examples of successful disease outbreak control of bovine tuberculosis (TB) in Michigan; mad cow disease in Washington in 2003; and foot-and-mouth disease (FMD) in California in 1929.

Successes in the past do not mean EID is unnecessary. As explained in the proposed rule and summarized earlier in this document, APHIS partners with State veterinary officials each year to test the performance of States' animal disease traceability systems. Results of these test exercises currently show that when State veterinary officials are provided an identification number from an animal that has been identified with an official identification tag, either metal or EID, that has been entered accurately into a data system, over half of States can trace animals to any one of four locations in less than 1 hour (these four locations are: the State where an animal was tagged, the location in-State where an animal was tagged, the State from which an animal was shipped out of, and the location in-State that an animal was shipped out-of-State from). However, lengthy times in the trace test exercises resulted when numbers from visual (metal) tags were transcribed inaccurately, movement records were not readily available, or information was only retrievable from labor-intensive paper filing systems. EID tags and electronic record systems thus provide significant advantage over other forms of official identification to rapidly and accurately read and record tag numbers and retrieve traceability information.

As for the examples cited by the commenter, Michigan was unable to regain TB-free status in the vast majority of the State until improvements to its traceability program were made following the State's implementation of the mandatory use of RFID ear tags in cattle and bison in 2007. Michigan faces a unique challenge in eradicating bovine TB, as the disease is endemic in free-ranging white-tailed deer present in specific areas of Michigan, and the disease can be transmitted between deer and cattle. Because of this, Michigan maintains a split-state status for TB: the State is divided into a Modified Accredited Zone and Accredited Free areas.[11] International trading partners and States have required Michigan to maintain a robust traceability program to continue to allow animals to move internationally or to other States from the Accredited Free areas of Michigan. Utilizing mandatory RFID tags in this traceability program allows immediate uploading of accurate records to the Michigan Department of Agriculture and Rural Development's system, which in turn allows Michigan to show their trading partners proof of where animals have been within the State, and helps to guarantee rapid response in the event of an animal disease emergency.

In addition to allowing for more rapid tracing of animals into and out of TB-positive herds, the mandatory RFID tagging requirement allows Michigan to provide real-time animal movement data for animals leaving the Modified Accredited Zone. This program allows State and Federal animal health officials to trace potentially exposed herds within hours, as opposed to days or weeks, saving both time and money. TB traces in Michigan are linked to source and exposed herds more accurately, which reduces the number of additional herds impacted by quarantine and testing. We believe Michigan's experience further supports our contention that increased use of EID eartags nationwide will improve APHIS's animal disease traceability program.

Regarding the 1929 outbreak of FMD in California, historically, cattle movement in the United States was much smaller. Animals today can be transported quickly and easily across State lines, allowing for a much more rapid and uncontrolled spread of disease. While the United States was fortunate to contain the disease in 1929, containing an outbreak would be far more difficult today. Moreover, the cost of containment, eradication, and the loss of export markets would far outweigh the cost of EID tags.

Regarding the 2003 case of bovine spongiform encephalopathy (BSE, "mad cow disease") in Washington, the diseased cow was traceable to Canada. The United States was unable to trace all the cows in the diseased cow's cohort, leading to suspicion that more cows with BSE existed in the United States, which resulted in negative impacts to cattle prices and export markets that lasted several years.[12] We consider this further support for improving the animal disease traceability program, as we believe that a more effective and efficient animal disease traceability program may have prevented those impacts.

As we have previously stated, in order to be fully prepared for a possible incursion of a high-risk FAD, an estimated 70 percent of each species/sector would need to be traceable. To be an effective tool for disease control, the traceability must be successful to the source of the disease and exposed animals within the time window of the particular disease's exposure and transmission parameters. This rulemaking furthers this goal.

Some commenters claimed that the ADT program's goal to trace an animal from birth to death in less than 24 hours was flawed, as birth-to-death traceability is not needed for fast-moving diseases such as FMD. The commenter suggested that the program need only trace where the infected animal has been in the last few days. The commenters also claimed that slow-moving diseases such as TB do not require rapid traceback.

The ADT program does not have a goal of tracing an animal from birth to death in less than 24 hours; the ADT program's goal is to be able to trace animals' movements completely and as rapidly as necessary to contain the disease in question, which depends on the speed of disease transmission.

Traceability is necessary for controlling both fast-moving diseases, like FMD, as well as slower-moving diseases, like TB and brucellosis. In both cases, speed of data retrieval and information sharing is important for efficiently and effectively completing a trace investigation. Responders can better identify animals that may have come in contact with an affected animal, which sometimes can number in the thousands or tens of thousands, implement mitigation strategies, and thereby minimize the economic impact of outbreaks to the industry. This speed of information retrieval and sharing is

---

[11] The Modified Accredited Zone is currently comprised of 4 counties; the State's remaining 79 counties are Accredited Free areas (*https://www.michigan.gov/mdard/animals/diseases/bovine-tuberculosis*).

[12] Coffey, B., Mintert, J., Fox, J.A., Schroeder, T.C. and Valentin, L., 2005. The economic impact of BSE on the US beef industry: product value losses, regulatory costs, and consumer reactions. Kansas State University Agricultural Experiment Station and Cooperative Extension Service, MF–2678.

AR-000004

enhanced when electronic identification and recordkeeping methods are utilized.

A commenter stated that use of EID eartags would not be enough to help control a potential FMD outbreak, and that prevention should be the first line of defense.

APHIS agrees that a response to FMD in the United States would require a multifactorial approach. As explained in Dr. Clifford's 2009 testimony [13] before Congress, APHIS' response plan includes specific emergency response guidelines; coordination with Departments and Agencies that will support and partner with USDA in emergency response; rapid response teams stationed around the country; access to personnel through the International Animal Health Emergency Response Corps; the National Veterinary Stockpile; and guidelines regarding the use of FMD vaccine.

Moreover, while prevention and biosecurity are necessary first-line defenses, we do not agree that they are sufficient risk mitigation strategies alone. EID eartags will make the process of tracing infected and exposed animals more efficient and will improve our implementation of mitigations, like tracing animals forward or utilizing vaccination or regionalization strategies. EID would be critical to reopening export markets closed as a result of an FMD outbreak, as the rapid tracing afforded by EID would help the United States demonstrate freedom from disease and disposition of all infected and exposed animals.

A commenter stated that early diagnosis and good animal husbandry are more important to disease control than ADT, as evidenced by the failure of EID to prevent the porcine epidemic diarrhea (PED) outbreak of 2013.

While we agree that good animal husbandry is important for preventing disease and that early diagnosis can help prevent its spread, this does not negate the importance of an ADT program, which can help us contain potentially devastating disease outbreaks before they can do substantial damage.

The commenter is correct that electronic identification of swine moving interstate would not have materially impacted the spread of PED. However, this is due to the nature of the disease and swine industry practices, rather than a failure of EID identification. The primary mechanism of PED spread was through fomites (*e.g.*, pig feed, trucks, etc.) and not animal-to-animal contact where tracing would have been of greater benefit. In contrast,

diseases of cattle and bison, such as TB, brucellosis, and FMD, often are transmitted by animal-to-animal contact and, when the cattle or bison are moving in interstate commerce, the diseases can rapidly damage the cattle and bison industry in multiple States.

Some commenters disagreed that our proposal would address animal disease outbreaks because they claimed the risk of outbreaks of diseases of livestock originates from people crossing the border into the United States. Commenters specifically cited the risk of human-to-animal transmission of TB.

The commenter's claim that disease outbreaks of TB in cattle and bison are largely the result of zoonosis, and exposure to infected humans is not supported by data. Information from APHIS' National Tuberculosis Eradication Program indicates that TB is usually spread through the purchase of infected animals or exposure to infected cattle or wildlife. While human-to-animal transmission of TB may periodically occur, genomic testing shows the incidence to be low.

Some commenters disagreed that our proposal would address livestock disease outbreaks because they claimed the risk of livestock disease outbreaks originates from imported cattle and beef. The commenters suggested that APHIS focus its efforts on restricting imports to prevent the introduction of livestock disease rather than improving ADT.

This rulemaking is limited in scope to improving our national animal disease traceability program; restrictions on the importation of live animals and animal products are outside of its scope. We note that, under our regulations in 9 CFR part 93, APHIS only allows the importation of live animals from countries that meet certain freedom from disease testing requirements. Under 9 CFR part 94, APHIS similarly restricts the importation of animal products based on the animal disease status of the exporting region. Animals and animal products that do not meet these requirements may not be imported into the United States.

A commenter stated that the proposed rule does not mention biosecurity and, therefore, is not focused on disease prevention.

We agree with the commenter that biosecurity is important to preventing disease and encourage producers to follow biosecurity practices. The commenter is correct that this final rule is not focused on disease prevention. As acknowledged in the proposed rule, the intent of the proposed rule was not to prevent disease epidemics. Rather, it would facilitate containing disease outbreaks before they can do substantial

damage to the U.S. cattle and bison industries. This final rule is specifically focused on improving our ability to trace animals accurately and rapidly in order to prevent that potential damage.

Many commenters who opposed the proposed EID tag requirement based their opposition on issues related to food safety. Commenters stated that the majority of food-borne illnesses in meat are the result of practices at the slaughterhouse and in processing and handling. Since animal identification programs end at the time of slaughter, commenters argued that requiring EID tags on cattle will not increase food safety.

Within the USDA, food safety of meat and meat food products falls under the purview of the Food Safety and Inspection Service (FSIS). APHIS does not have statutory authority to regulate for food safety. The EID eartag requirement is intended to facilitate animal disease traceability, thereby improving our ability to trace outbreaks of diseases of livestock in live animals and more efficiently control or eradicate these diseases. This is consistent with our statutory authority under the AHPA.

It was further stated that, to address food safety and animal disease, APHIS should increase oversight and testing at the large meat processing plants. The commenters felt that would be more effective in preventing the spread of disease than requiring EID eartags.

As noted above, FSIS is a separate agency of USDA that regulates the slaughter and processing of meat and meat food products. APHIS does not provide oversight of the slaughter or processing operations; however, APHIS conducts surveillance for domestic animal diseases, such as brucellosis and TB, and some foreign animal diseases in certain species through slaughter surveillance. APHIS regularly evaluates its slaughter surveillance programs for efficacy; however, we disagree with the commenter that more stringent oversight of such facilities would prove more effective than requiring EID tags. Slaughter facilities are a terminal point, and cattle and bison may pass through multiple intermediate locations and commingle with animals from other premises and of other health statuses prior to slaughter. In the event of a disease outbreak, addressing this possible intermediate movement requires rapid and accurate traceability of all potentially affected livestock.

Some commenters asked us to reinstate mandatory country of origin labeling (COOL) in order to have a successful traceability program. Some commenters asked whether we intended

---

[13] See footnote 9.

to use EID tags for the purposes of COOL.

COOL pertains to the labeling of food products and is not related to APHIS' animal disease traceability program. Moreover, COOL was never under APHIS' purview, but under the purview of the Agricultural Marketing Service (AMS).

Some commenters expressed their support for the continued exemption of cattle under 18 months of age from official identification requirements.

The regulations will continue to exempt most feeder cattle (beef cattle less than 18 months of age) from official identification requirements.

A commenter stated that ADT should only apply to breeding cattle or cattle in interstate commerce. Conversely, other commenters recommended that we apply the EID tag requirement to all cattle and/or that all cattle should be tagged at birth or before being sold, as this would improve our ability to locate diseased animals and lessen the effects of a disease outbreak. Some of these commenters added that this issue should be addressed in a separate rulemaking.

We will consider the commenters' recommendations in the future; however, changing the type of cattle needing official identification is outside the scope of this rulemaking. Should APHIS decide to change the type of cattle that require official identification in the future, this process would occur through rulemaking that would solicit public comment.

Some commenters expressed concern about APHIS expanding ADT requirements to encompass other types of cattle in the future.

This rulemaking is only intended to address the transition to EID official eartags for cattle and bison that are currently required to have official identification.

Some commenters expressed confusion regarding whether the EID tag requirement applied to their animals. Commenters provided various examples of beef cattle that do not move interstate, or that moved interstate but were less than 18 months of age. It was stated that the rule would require producers to tag their direct-to-slaughter cows and bulls. Similarly, two commenters requested that we exclude small producers from the EID eartag requirements in order to reduce burden on these entities.

This final rule does not change the types of animals to which official identification requirements apply, nor does it change the categories of animals that are exempted from official identification requirements. Under the current regulations in § 86.4(b), which this final rule does not change, the following categories of cattle and bison are subject to official identification requirements for interstate movement: all sexually intact cattle and bison 18 months of age or over; all female dairy cattle of any age and all male dairy cattle born after March 11, 2013; cattle and bison of any age used for rodeo or recreational events; and cattle and bison of any age used for shows or exhibitions. Cattle and bison are exempted from official identification requirements if they are going directly to slaughter.

Because of these strictures, many small entities have cattle that are excluded from the requirement currently, including many of the commenters who asked whether the rule applies to them. Beef feeder cattle under 18 months of age are not subject to the identification requirements. Direct-to-slaughter cattle, including cull cattle, are not subject to the identification requirements. Cattle and bison that do not move interstate are not subject to the identification requirements, unless required by APHIS program disease regulations in 9 CFR subchapter C.

Some commenters stated that when the new EID tag requirement goes into effect, we should continue to exempt animals moved between States on pasture-to-pasture movement permits, *i.e.,* commuter herd agreements, from the requirements for official identification.

The EID tag requirement does not change the categories of animals that are subject to, or exempted from, the requirements for official identification.

Under a commuter herd agreement between a livestock owner and State or Tribal animal health officials, cattle and bison may be moved interstate between two premises, without a change of ownership in the course of normal livestock operations, subject to the conditions of the agreement. The regulations in § 86.4 provide for interstate movement of commuter herds under commuter herd agreements. See 9 CFR 86.4(b)(1)(i)(A). The EID tag requirement does not affect those regulations and, therefore, does not have any implications for the interstate movement of commuter herds.

A commenter stated that animals involved in private treaty sales for the purpose of breeding should be exempt from EID tag requirements when moved interstate.

This comment is outside the scope of this rulemaking. Per § 86.2(b), no person may move covered livestock interstate or receive livestock moved interstate unless all requirements of part 86 are met. Private treaty sales of breeding cattle are required to meet these requirements, including official identification and an ICVI.

A commenter stated that allowing animals to move through a livestock facility to a slaughter establishment where a backtag can be applied, in accordance with § 86.4(b)(1)(ii)(B), leaves a potential gap in traceability to the premises of origin.

Section 86.4(b)(1)(ii) refers to a situation in which cattle are exempted from the requirement for official identification. Exemptions from the requirement for official identification are outside the scope of this rulemaking.

A commenter stated that finalizing this proposed rule would "invite limitless incremental regulation from other agencies."

The commenter's stated supposition for this statement is that this rulemaking represents a concerted effort by the Federal Government, as a whole, to wrest livestock management decisions from individual producers. APHIS has no intent to do so, nor is it aware of any such effort.

The same commenter opined that the rule could be used by APHIS as a basis for incremental further expansion of the ADT program, citing, as purportedly analogous examples, requirements by the Security and Exchange Commission regarding environmental, social, and governance reporting, and policies by the Food and Drug Administration regarding the use of antibiotics in livestock.

APHIS has no authority over the regulatory actions and policies of other agencies. However, as noted above, the proposed rule is a distinct action meant, primarily, to change the official eartag requirements for cattle and bison covered by the ADT regulations in order to improve its emergency response and ongoing disease control and eradication programs. The proposed rule is not intended as part of a suite of interlocking, incremental regulatory changes to the regulations, and any possible future revisions to the regulations would be through proposed rules with the opportunity for public comment.

Some commenters, while generally supporting the use of EID eartags for official identification of cattle and bison, believed that such use should be voluntary rather than a requirement.

The use of EID official eartags has been voluntary for many years. In our view, and as stated above, continuing to allow the use of EID eartags by producers on a voluntary basis will not provide the degree of enhancement to our traceability capacity that is needed

AR-000006

for optimal animal disease investigation and control.

We also received a number of comments regarding the public comment period and outreach efforts related to this rulemaking. A few commenters stated that more stakeholder outreach was needed. Some commenters stated that APHIS ignored previous stakeholder outreach in drafting our proposed rule. Some commenters requested an extension of the comment period, ranging from 30 days to 90 days, to allow more time for public input.

We extended the comment period for the proposed rule by 30 days, which we consider appropriate given our prior outreach efforts to stakeholders. We disagree that our outreach efforts were inadequate or that the feedback received during our outreach efforts was ignored. As stated in the proposed rule and summarized earlier in this document, outreach included meetings with State officials and APHIS Veterinary Services field officers; nine public meetings that solicited attendance from cattle and bison industry members, as well as impacted States and Tribes; the July 2020 notice seeking public comment for 90 days; as well as the January 2023 proposed rule, which solicited comment for a total of 90 days. All input and comments received from these efforts were considered when drafting this rulemaking.

**Effective Date and Implementation**

Some commenters advocated grandfathering in existing eartags, *i.e.,* recognizing visual tags, such as National Uniform Eartagging System eartags, as official eartags for animals tagged with them prior to November 5, 2024, the effective date of the EID tag requirement.

We agree with these commenters. As we noted in the proposed rule, visual eartags applied to animals prior to November 5, 2024 will be recognized as official eartags for the life of the animal.

Some commenters expressed concern about the effective date of November 5, 2024, stating that 6 months was a relatively short amount of time to notify producers of the new requirements and for producers to meet the EID tag requirement. Other commenters expressed support for our proposed timeline.

We believe that an effective date of November 5, 2024 provides sufficient time for stakeholders to comply with the new requirements. APHIS has engaged in extensive outreach efforts regarding the use of EID eartags, as summarized earlier in this document, and it has ensured that the new requirements will

only apply to eartags applied to animals after the effective date.

Two commenters stated that implementation of the proposed rule would be difficult due to a general labor shortage.

We note that producers may apply official eartags to their animals themselves. Whether producers have tags applied to their animals at approved tagging sites, apply tags to their animals themselves, or hire labor to apply tags to their animals, we do not believe there is more labor involved in the application of EID eartags as opposed to applying eartags that are only visually readable.

Multiple commenters expressed concern about potential shortages of EID tags in light of supply chain and manufacturing challenges. Some commenters mentioned that EID tags are often backordered or that there are high wait times for EID tag orders. Some commenters recommended we create a contingency plan in the event EID tags required by this rulemaking are not available once the final rule goes into effect.

APHIS ADT staff have had frequent conversations with manufacturers of official devices and have been assured that manufacturing and shipping capacity is adequate for the projected number of cattle requiring official identification for interstate movement.

APHIS is aware of supply chain and manufacturing disruptions due to the COVID–19 pandemic, but these issues have been resolved. APHIS is also aware of long wait times due to customization or brand preferences that are desired by the producer, but the regulations do not require such customizations or that any specific brand be used. We do not believe either of these issues indicate that a current shortage exists or that a future shortage is likely, and the commenters have not provided any additional evidence of reasonably foreseeable supply chain issues.

Finally, as discussed in further detail later in this document, we believe that the streamlining changes we proposed to the approval process for new EID devices will help insulate against unforeseen supply chain disruptions.

**Definitions (§ 86.1)**

In § 86.1, we proposed to revise the definitions of *approved tagging site, dairy cattle, interstate certificate of veterinary inspection (ICVI),* and *official eartag.* We also proposed to add a new definition for *Official Animal Identification Device Standards (OAIDS).* Comments we received for each of the revisions and addition to § 86.1 are addressed below.

*Approved Tagging Site*

The current regulations define an *approved tagging site* as "A premises, authorized by APHIS, State, or Tribal animal health officials, where livestock may be officially identified on behalf of their owner or the person in possession, care, or control of the animals when they are brought to the premises." In order to offer greater clarity regarding the nature of an approved tagging site by specifying that such sites are where official identification tags are physically applied to animals, we proposed to revise this definition to read as follows: "A premises, authorized by APHIS, State, or Tribal animal health officials, where livestock without official identification may be transferred to have official identification applied on behalf of their owner or the person in possession, care, or control of the animals when they are brought to the premises."

One commenter, while expressing support, suggested we also revise the definition to require the physical address of the originating premises to be recorded alongside the animal's official identification number in order to address a purported ambiguity in the current regulations. The commenter stated that, occasionally, livestock exempt from the official identification requirements for interstate movement by § 86.4(b)(1)(i)(C) that arrive to an approved tagging site only have their official identification numbers recorded with the physical address of their originating premises if they receive their official identification at the tagging site, while, for livestock that arrive already bearing official identification and only have backtags applied at the tagging site, no record is made of their originating premises.

We are making no change in response to this comment. Cattle moving interstate, whether or not already bearing official identification, must be accompanied by an ICVI or alternative movement document. (See § 86.5(a).) These records contain the physical address of the animal's originating premises. Therefore, in both scenarios referenced by the commenter, records correlating the animal's official identification number to their originating premises already exist, and we do not agree that the definition of *approved tagging site* is an appropriate place to reference these records requirements.

However, if States or Tribes wish to require an approved tagging site to complete this additional recordkeeping, they could do so as part of their State or Tribal agreements for authorizing an

approved tagging site, as requirements for approved tagging sites may vary according to the relevant authority.

One commenter asked whether a ranch was considered an approved tagging site and, if so, whether this involved an approval process. Another commenter asked how a location can become an approved tagging site.

Per the definition of *approved tagging site,* approved tagging sites may be authorized by State, Federal, or Tribal animal health officials. Individual States maintain lists of the approved tagging sites in their State. The commenters are encouraged to contact the appropriate animal health official in their area [14] to receive a list of approved tagging sites in their State, as well as information regarding becoming an approved tagging site. Requirements for approved tagging sites may vary depending on the relevant authority.

A commenter stated that the process for becoming an approved tagging site should be consistent with the process for becoming a Secondary Tagging Site for the Agriculture Marketing Service Process Verified Program.

We are making no change in response to the comment, as approved tagging sites, as defined in § 86.1 are not related to Process Verified Programs. As mentioned above, approved tagging sites may be authorized by State, Federal, or Tribal animal health officials. Accordingly, the requirements for authorizing an approved tagging site may vary depending on the relevant authority.

One commenter asked whether all in-State general auction markets were approved tagging sites.

No. In-State general auction markets may become approved tagging sites if authorized as such by APHIS, State, or Tribal animal health officials.

*Dairy Cattle*

The current definition for *dairy cattle* reads, "All cattle, regardless of age or sex or current use, that are of a breed(s) used to produce milk or other dairy products for human consumption, including, but not limited to, Ayrshire, Brown Swiss, Holstein, Jersey, Guernsey, Milking Shorthorn, and Red and Whites." We proposed to add to this definition cattle that are reared under the same management practices as purebred dairy cattle. The definition in the proposed rule read: "All cattle, regardless of age or sex, breed, or current use, that are born on a dairy farm or are of a breed(s) used to produce

milk or other dairy products for human consumption, or cross bred calves of any breed that are born to dairy cattle including, but not limited to, Ayrshire, Brown Swiss, Holstein, Jersey, Guernsey, Milking Shorthorn, and Red and Whites." Commenters raised concerns that caused us to further revise this definition, which we discuss later in this document.

We also proposed changes throughout part 86 to align the regulations with this revised definition. This included revising § 86.4(b)(1)(iii)(B) to include the offspring of dairy cattle in the list of cattle subject to the official identification requirements, as well as revising § 86.5(c)(7)(ii) to require that the official identification numbers of all dairy cattle, regardless of whether the dairy cattle are sexually intact, must be recorded on ICVIs.

Multiple commenters expressed their support for the revised definition for *dairy cattle* presented in the proposed rule, stating that the revision would help eliminate confusion and ambiguity.

We agree with the commenters. Eliminating ambiguity in the definition will help ensure that all dairy cattle, which have an increased risk of disease, meet the appropriate requirements for official identification and movement documentation.

A commenter requested we clarify whether our proposed revision intends to capture beef animals "born on a dairy farm," and, if so, requested that we clarify that these animals would be required to have official identification if moved interstate. The commenter also noted that compliance challenges may present themselves in situations where an animal's farm of birth is unknown.

The increased disease risk relevant to animals born on a dairy farm that we discussed in the proposed rule applies specifically to beef/dairy cross bred cattle born on a dairy farm. We agree with the commenter that the phrase "born on a dairy farm" is unclear, as it may give the false impression that it applies to beef animals born on a dairy farm that are not beef/dairy cross bred animals. Therefore, we are revising our proposal to address this potential confusion. The revised definition of *dairy cattle* will read as follows: "All cattle, regardless of age or sex or current use, that are of a breed(s) or offspring of a breed used to produce milk or other dairy products for human consumption, including, but not limited to, Ayrshire, Brown Swiss, Holstein, Jersey, Guernsey, Milking Shorthorn, and Red and Whites."

Some commenters, while expressing their support for a revised definition, asked us to replace the phrase "cross

bred calves of any breed" in the revised definition presented in the proposed rule with the phrase "cross bred cattle of any breed" to further eliminate confusion regarding to which animals the definition applies.

The commenters are correct that we intended to capture cross bred cattle of any age, rather than only calves, in our proposed revised definition. We believe the modification to the proposed definition provided above addresses these commenters' concern.

One commenter asked whether the change to the *dairy cattle* definition would apply across all Federal regulations administered by APHIS. The commenter stated that consistency in definitions would prevent discrepancy and aid enforcement.

In the proposed rule, we proposed to revise definitions in 9 CFR parts 71, 77, and 78 to correspond with the changes to the definitions that we proposed for part 86. While we accounted for the definitions of *official eartag* and *interstate certificate of veterinary inspection (ICVI),* we erroneously neglected to account for the definition of *dairy cattle,* which the commenter correctly points out is also used in part 78. Therefore, we will revise the definition of *dairy cattle* in part 78 to correspond with the change to the definition made in part 86.

Some commenters disagreed with our proposed revised definition, arguing that there is no increased risk of disease transmission from cattle that are reared under the same management practices as purebred dairy cattle.

We disagree with the commenters. As stated in the proposed rule, dairy farm management practices, such as pooling colostrum from multiple cows for many calves, commingling calves at different locations during their lifetimes, and movement to many destinations, result in a higher risk of disease transmission. Beef/dairy crosses born on dairy farms are likely to be exposed to these practices, especially in early life; therefore, they are at an increased risk of disease transmission.

Two commenters stated that our revised definition would discourage producers from including beef/dairy cross bred calves as part of their operations.

The commenter provided no evidence to support this claim. We also note that APHIS' operational guidance has consistently held that beef/dairy cross bred cattle fall under the definition of dairy cattle, and are therefore already required to have official identification; our change to the dairy cattle definition codifies this longstanding guidance

---

[14] Contact information for State animal health officials (SAHOs) may be found at: *https://www.usaha.org/saho.*

regarding how to interpret the regulations.

*Interstate Certificate of Veterinary Inspection (ICVI)*

We proposed to add editorial and formatting changes to the definition of *interstate certificate of veterinary inspection (ICVI)* to clarify that electronic ICVIs may be used.

A commenter stated that APHIS should require the recording of official identification on ICVIs at the most specific applicable level. The commenter opined that official individual animal identification numbers should be recorded on ICVIs even when animals are identified using a group/lot identification number (GIN).

We are making no changes in response to the comment. A GIN is used to uniquely identify a unit of animals of the same species that is managed as one group throughout the preharvest production chain. Animals identified using a GIN are not required to have the GIN, or any additional animal identification number, affixed to them. Instead, the GIN is recorded on documents accompanying the animals as they move interstate. Because these animals move as a unit, a GIN provides sufficient information to identify the animals in the event of a trace. We also note that cattle and bison typically do not move on GINs due to the current industry structure within the United States.

A commenter asked us to clarify in the definition of *ICVI* that accredited veterinarians who issue ICVIs must be licensed and accredited in the State of origin of the animal requiring documentation, as the current definition only requires that issuing veterinarians are licensed in State of origin and federally accredited.

We are making no changes in response to the commenter, as we do not agree that the definition of *ICVI* is an appropriate place to state the regulations and standards relevant to accredited veterinarians. The commenter is incorrect that the definition of *ICVI* lists licensure or accreditation requirements for veterinarians. Requirements for licensure and accreditation for veterinarians are covered in 9 CFR part 161.

*Official Animal Identification Device Standards (OAIDS)*

We proposed to add a definition of *Official Animal Identification Device Standards (OAIDS)* to replace the Animal Disease Traceability General Standards document. The proposed OAIDS, like the existing Standards

document, provides guidelines, technical standards, and specifications for tag manufacturers requesting APHIS approval of new official identification devices. As stated in the proposed rule, in addition to edits corresponding to changes proposed to the regulations, changes to the document include the following:

• Accepting EID device testing equivalent to International Committee for Animal Recording (ICAR) testing and allowing APHIS to consider requests, on a case-by-case basis, for approval of alternative field trials or eartags with previously generated verifiable data if equivalency to the standards is demonstrated;

• Modifying the field trial requirements by reducing timelines for the three approval statuses (trial: from 0–12 months to 0–6 months; preliminary: from 12–24 months to 6–12 months; and conditional: from 24–36 months to 12–36 months), reducing the number of required field trial locations (from at least 6 to at least 2), and reducing the number of cattle and bison required for field trials (from a minimum of 1500 to a minimum of 300); and

• Reducing the timeframe before allowing unlimited sales of devices from a minimum of 24 months to a minimum of 12 months if devices meet the required performance standards.

Numerous commenters expressed support for this addition and the changes we proposed to make to the document. These commenters noted that streamlining the approval process for EID devices will ensure availability of tags, insulate against supply chain disruptions, and help facilitate the introduction of new technologies.

We agree with the commenters. As stated in the proposed rule, our changes are meant to encourage manufacturers to seek APHIS approval of new official identification devices.

One commenter expressed concern regarding reducing the timeframe before allowing unlimited sales of a device from 24 months to 12 months, stating that this could compromise assurance of the devices' quality and longevity.

We are making no changes in response to the commenter. Tag retention, durability, safety, and efficacy are of utmost importance to APHIS. Our approval process for EID eartags continues to require testing and field trials or performance data that ensure the eartags meet the required standards. We note the benchmark of unlimited sales is conditional and does not constitute full approval. The timeframe for full approval will remain 36 months (30 for swine); prior to full approval,

manufacturers are required to have a mechanism in place to collect and report tag failure data to APHIS.

We believe that the tag standards listed in the OAIDS, including the aforementioned 12-month timeframe for unlimited sales, will maintain a high standard of quality without discouraging manufacturers from applying for official status. As we noted in the proposed rule, we determined that requiring manufacturers to wait 24 months before allowing unlimited sales of a device that met the required performance standards could have been inhibiting manufacturers from seeking APHIS approval.

One commenter stated that the proposed changes to the OAIDS render the proposed rule a major rule, as the document allows for "regulatory flexibility."

Under the Congressional Review Act (CRA), major/non-major designations occur at the final rule stage and are the purview of the Office of Management and Budget based on an assessment of expected annual costs associated with the rule. APHIS has no discretion to label the rule major or not major under the CRA. However, we note that the commenter's stated basis for considering the rule major does not align with the criteria in the CRA, which is whether the rule is likely to result in (1) an annual effect on the economy of $100,000,000 or more; (2) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or (3) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. 5 U.S.C. 804(2).

Two commenters stated we should reduce the required lifespan of a device to 3 years from 10 years. One commenter stated 3 years was sufficient because the typical lifespan for beef cattle going to slaughter is 18–24 months. The other commenter stated a 10-year requirement was a hindrance to the adoption of future technologies.

The commenters are incorrect that the requirements specify that tags should have a lifespan of 10 years. The OAIDS states that a tag is expected to remain on an animal in a physically functional state for the animal's expected lifetime, which, for cattle and bison, is up to 15 years.

We disagree with the commenters that tags should only have a lifespan of 3 years. Cattle and bison under 18 months of age and cattle and bison going

AR-000009

directly to slaughter are exempt from the requirements for official identification, rendering their example irrelevant. Moreover, a device that only functions for 3 years would add burdensome costs to producers, as they would need to replace tags more frequently. It would also make record retention and tracing more difficult, especially for longer-lived animals, as the animals would be associated with a different identification number every 3 years.

*Official Eartag*

The current definition of official eartag reads, "An identification tag approved by APHIS that bears an official identification number for individual animals. Beginning March 11, 2014, all official eartags manufactured must bear an official eartag shield. Beginning March 11, 2015, all official eartags applied to animals must bear an official eartag shield. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal." We proposed to revise this definition to remove language referencing the 2014 and 2015 dates, which are no longer relevant. Our proposed revised definition reads as follows: "An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal."

One commenter asked that we establish a standard for a "high retention rate" to aid State officials in enforcement.

Retention rates required for approved EID tags have already been established in the former Animal Disease Traceability General Standards document and are included in the OAIDS. For cattle and bison, device loss rates must not exceed 1 percent annually or 3 percent in a 3-year period.

*Additional Definitions*

One commenter asked us to define the term *premises,* as one of the dictionary definitions for "premises" necessitates a deed.

We are making no changes in response to the commenter, as we believe the regulations are sufficiently clear that a premises in part 86 relates

to a geographical location, not a deed. For example, the definition of a *premises identification number (PIN)* in § 86.1 describes a premises as "a geographically distinct location."

**Recordkeeping Requirements (§ 86.3)**

Section 86.3 addresses recordkeeping requirements for official identification. Current § 86.3(a) states that any State, Tribe, accredited veterinarian, or other person or entity who distributes official identification devices must maintain for 5 years a record of the names and addresses of anyone to whom the devices were distributed. We proposed to add a requirement to that paragraph that official identification device distribution records must be entered by the person distributing the devices into the Tribal, State, or Federal databases designated by APHIS.

We also proposed to add a new paragraph (b), which would state that records of official identification devices applied by a federally accredited veterinarian to a client's animal must be recorded in a readily accessible record system to help ensure such records are available to APHIS for traceback investigations.

Finally, we proposed to add a new paragraph (d), stating that records required under paragraphs (a) through (c) of § 86.3 must be maintained by the responsible person or entity and be of sufficient accuracy, quality, and completeness to demonstrate compliance with all conditions and requirements under part 86. The proposed new paragraph further required that APHIS be allowed access to all records during normal business hours, to include visual inspection and reproduction (*e.g.,* photocopying, digital reproduction), and the responsible person or entity must submit to APHIS all reports and notices containing the information specified within 48 hours of receipt of request for records.

Two commenters asked us to amend § 86.3(a) to allow the person distributing EID eartags to provide records to a State official, via a spreadsheet, and the State official to enter the records into a State or Federal database.

We are making no changes in response to the commenter, as we interpret our proposed change to § 86.3(a) as written to already allow for the arrangement described by the commenter. A person who provides records to a State official to enter into a State or Federal database would fulfill the requirement of entering the official identification device distribution records into an acceptable database.

Two commenters asked us to amend § 86.3(b) (redesignated in our proposal

as § 86.3(c)) to read, "Approved livestock facilities must keep any ICVIs or alternate documentation that is required by this part for covered livestock to enter the facility through interstate movement" rather than "Approved livestock facilities must keep any ICVIs or alternate documentation that is required by this part for the interstate movement of covered livestock that enter the facility." The commenters stated that this change would clarify that this requirement is pertains to livestock moving to the market from out-of-state, rather than moving from the market to an out-of-state facility.

We are making no change in response to the commenter, as we believe the regulations as written are sufficiently clear that this paragraph refers to livestock that enter an approved livestock facility from out of state.

One commenter stated that the proposed rule was not specific enough about who was responsible for recordkeeping. The commenter asked whether the responsible party was the veterinarian, producer, or tag distributor.

We disagree that these requirements are not sufficiently specific. In our proposed rule, § 86.3(a) specifies that any State, Tribe, accredited veterinarian, or other person or entity who distributes official identification devices is responsible for maintaining records of the names and addresses of anyone to whom the devices were distributed. In other words, the recordkeeping requirements of § 86.3(a) apply to whoever distributes the official identification device in any one transaction, whether that be a State, Tribe, accredited veterinarian, or other person or entity. We also note that a producer applying official identification devices to their own animals, but not distributing the official identification devices to anyone else, does not fall under § 86.3(a).

In our proposed rule, § 86.3(c) specifies that approved livestock facilities are responsible for keeping ICVIs or alternate documentation that is required by part 86 for the interstate movement of covered livestock that enter the facility.

Two commenters stated that we should amend proposed § 86.3(d) to place the responsibility for ensuring "accuracy, quality, completeness" of an ICVI on the veterinarian who created the ICVI, not the approved livestock facility that maintains the document.

The commenters have misinterpreted the regulations. Contrary to the commenters' implication, § 86.3(d) does not specifically or exclusively place

AR-000010

**39550**    **Federal Register** / Vol. 89, No. 91 / Thursday, May 9, 2024 / Rules and Regulations

responsibility for the accuracy, quality, and completeness of ICVIs on approved livestock facilities. Section 86.3(d) requires "the responsible person or entity" to maintain records required under § 86.3(a) through (c) and to ensure that they are accurate, of quality, and complete. Multiple persons or entities may bear this responsibility. Standards for accredited veterinarians in 9 CFR part 161 stipulate that accredited veterinarians cannot issue documents unless they have been "accurately and fully completed" (9 CFR 161.4). This standard applies to ICVIs or alternative documentation referred to in § 86.3(c). The approved livestock market maintaining ICVIs or alternative documentation as required by § 86.3(c) is responsible for providing accurate information, such as information regarding which animals have been sold and to whom, to a veterinarian creating ICVIs for animals leaving the facility. Ensuring the continued accuracy, quality, and completeness is also a part of the proper maintenance of records and is not a standard limited to their creation.

Some commenters asked us to shorten the 48-hour timeframe for entities to submit to APHIS all requested records to 24 hours, stating that 48 hours was too long. Other commenters asked us to increase this timeframe to 72 hours, as many livestock markets operate 1 day each week and may not have the staff availability to meet the 48-hour requirement and to align with the potential 72-hour national stop movement order for livestock transport.

We believe that 48 hours is a reasonable compromise. While animal traces should occur as quickly as possible, 24 hours may not be practical for some markets, due to staffing and availability constraints. The 72 hours cited by commenters refers to a potential emergency response for highly contagious disease outbreaks, in which all animal movement would be stopped for 72 hours. This potential order should not affect the ability to provide information necessary for a trace, and it would be disadvantageous to delay tracing until the order were lifted, as the delay may inhibit the speed of our response to a disease threat.

One commenter asked whether training on database use will be provided to those responsible for recordkeeping.

We are unsure to which database the commenter is referring. The proposed rule referred to three different types of recordkeeping: (1) for recordkeeping of device distribution, APHIS provides training for APHIS databases such as the Animal Identification Management

System (AIMS); (2) for recordkeeping of applying official ID, accredited veterinarians may use AIMS or various medical record systems and receive training from their vendors; (3) finally, State officials maintain records of ICVIs and tag distributions in the State's regulatory database for which APHIS does not provide training.

One commenter asked what would happen to records if an individual, such as an accredited veterinarian, responsible for recordkeeping went out of business.

Tag distributors must maintain records in accordance with § 86.3, whether or not their business is still in service.

One commenter asked us to include the specific requirements of recordkeeping in the final rule, rather than in the OAIDS, to increase compliance.

We are making no changes in response to the commenter. Apart from streamlining the approval process of new EID tags and applying changes corresponding to this rulemaking, the OAIDS contains the same information as the previous iteration of the document, titled the Animal Disease Traceability General Standards document. As we have not historically experienced problems due to the location of the information contained within the Standards document, we do not have reason to believe that the OAIDS is an unsuitable location for the information contained therein.

One commenter asked us to add a time requirement of 48 hours for entering records of distributed devices into an acceptable database.

As we have not experienced problems with the timely entrance of distribution records into a database, we disagree that specifying a time requirement in the regulations is necessary. The entry into a database should occur immediately upon distributing the tags, because the tags may be applied upon receipt to an animal for immediate movement.

One commenter asked whether a producer who applied tags to their animals themselves would be responsible for the recordkeeping requirement in § 86.3.

No. Under § 86.3(a), a person distributing tags must maintain for 5 years a record of the names and addresses of anyone to whom the devices were distributed. If a producer is applying tags to their own animals and not distributing tags to another person, this requirement does not apply to them.

One commenter stated that they would prefer if States had consistent forms for submitting recordkeeping

information regarding EID tag distribution to States.

This is outside the scope of this rulemaking. APHIS does not mandate the type of form States must use for this recordkeeping.

Finally, in reviewing the proposed rule while drafting this final rule, we noticed that our proposed § 86.3(a) incorrectly omitted mention of distribution records kept by large producer organizations that redistribute tags to their members in their own databases. In order to prevent the interpretation that this will no longer be permissible, we are amending the second sentence of this paragraph to state that identification device distribution records must be entered by the person distributing the devices into the Tribal, State, Federal, or other database acceptable to each government entity.

### Official Identification for Cattle and Bison (§ 86.4)

Section 86.4 concerns official documentation required for different species. As discussed earlier in this document, we proposed to revise § 86.4(a)(1)(i) to add the requirement that, beginning November 5, 2024, all official eartags sold for or applied to cattle and bison must be readable both visually and electronically.

Some commenters stated that allowing EID tags to be visually readable will fail to reduce, or will actually increase, human error as individuals would be transcribing 15-digit, rather than 9-digit, identification numbers, thus negating the intent of the rule.

We disagree that requiring EID tags to be visually readable will increase the likelihood of human error. The 15-digit identification numbers of the AIN numbering system currently used for all approved EID eartags begin with the same 6 digits: 840003. The first 3 digits of an AIN comprise the country code, which, for the United States, is 840. The following 3 digits, 003, signal that the animal has been identified using a sequential numbering system from a start number of 003,000,000,000. As a result, an individual visually reading an EID tag would only read 9 unique characters (the characters following 840003). These characters are comprised solely of numbers, whereas the 9-digit NUES numbers are alpha-numeric. Moreover, EID eartags have readability standards, while metal tags with NUES numbers do not. These include larger font size and color contrast. Given these comparisons of AIN numbers and NUES numbers, it is our view that transcription error is not likely to significantly increase from the current

AR-000011

state when relying on visual read of the eartag; if anything, several factors should make it easier, not harder, to transcribe the tag number. However, the use of EID tags would allow for an electronic read of the tag if a transcription error were believed to have occurred.

Some commenters asked for clarification about whether using brands as official identification would continue to be acceptable. Others stated that EID eartags should not replace brands as a means of official identification.

We proposed no changes to the regulations pertaining to, nor did we propose to restrict the use of, other methods of official identification for cattle and bison authorized by the regulations, which include "brands registered with a recognized brand inspection authority and accompanied by an official brand inspection certificate, when agreed to by the shipping and receiving State or Tribal animal health authorities" (9 CFR 86.4(a)).

Some commenters expressed preference for brands over eartags, claiming the former to be a more effective and reliable means of identification.

As stated above, this rulemaking does not discontinue brands as an official means of animal identification for cattle and bison. Brands registered with a recognized brand inspection authority and accompanied by an official brand inspection certificate remain an official means of identification for cattle and bison, if agreed upon by the shipping and receiving State.

Some commenters expressed concern about the retention rates of EID eartags that may fall off the animal or may be relatively easy to remove.

We do not agree that tag retention is a greater issue for EID tags than metal tags. APHIS-approved official identification tags undergo rigorous testing and trials to assure a retention rate of 99 percent (a loss of no more than 1 percent per year) and are intended for the life of the animal. While data on retention rates of metal NUES tags is lacking, field experience and anecdotal observation from regulators at the State and Federal level suggest that the retention rate of these metal tags is lower than our required retention rate of EID eartags. As one commenter mentioned, metal tags are not immune from potential problems, including tag loss, illegibility, and infection.

Almost all reported retention issues with EID tags are due to user error or use of unofficial tags intended for use for a shorter duration in feedlot cattle.

Regarding removal, it is unlawful to intentionally remove any official identification under current regulations in part 86. We proposed no change to this regulation.

A commenter interested in selling alternative identification devices that use Bluetooth and GPS technology stated that RFID tags are unreliable and subject to fraudulent use.

As stated above, approved official identification tags undergo rigorous testing and field trials to ensure they meet our high standards for efficacy. The regulations prohibit the fraudulent use and recording of official identification. Sections 86.3 and 86.4(d) and (f) outline requirements regarding recordkeeping, removal, and sale or transfer of devices.

Two commenters asked for an explanation of the protocol for replacing lost EID eartags.

Procedures for replacing any lost official identification devices are outlined in § 86.4(d) and remain unchanged as a result of this rulemaking.

Two commenters asked whether tags can be applied to animals directly by producers, or whether tags must be applied at approved tagging sites. One of these commenters stated that it should be permissible for producers to apply tags themselves.

Current regulations do not stipulate that the tags can only be applied at approved tagging sites. If a producer desires, they may purchase tags directly from a vendor and apply the tags to their own animals. In this case, the producer has no recordkeeping requirement regarding tag distribution.

Some commenters expressed concern that tags produced in foreign countries may compromise national security. Commenters also expressed concern that foreign-sourced tags could increase the vulnerability of the United States to supply chain sabotage.

Commenters provided no evidence to support the contentions that tags produced in foreign countries may "compromise national security" or increase the vulnerability of the United States to "supply chain sabotage." However, all APHIS purchasing is compliant with all Federal contracting laws and regulations and with the Buy American Act (41 U.S.C. 8301–8303). This has always been true of contract purchasing by APHIS for the Animal Disease Traceability Program.

One commenter stated that PINs should not be a requirement to acquire and apply EID tags as that information can be gathered on other documents, such as health certificates.

The PIN is defined in 9 CFR 86.1 as a nationally unique number assigned by a State, Tribal, and/or Federal animal health authority to a premises that is, in the judgment of the State, Tribal, and/ or Federal animal health authority a geographically distinct location from other premises. All currently approved EID eartags (RFID AIN "840" eartags) are associated with a PIN or a State location identification number (LID), inasmuch as a PIN or a LID is required for purchase of the tags (as stated in the OAIDS). A PIN is the numerical equivalent of a 911 postal address or a GPS number. A LID is the State-managed equivalent for producers who prefer to have the State store their information, rather than the Federal Government.

The commenter did not explain their specific concerns regarding PINs. That being said, we note that a PIN or LID is associated with the location where cattle are tagged, rather than the location of the cattle owner. Cattle may move to new locations that may have different PINs, LIDs, or new owners at will, but the PIN or LID associated with the location where the tag was placed on the animals remains specific to that location, thus facilitating traceback of the animals to that location when needed.

Health certificates cannot substitute for a PIN number because although information on health certificates include the location where the animal was loaded for interstate movement and destination location; they do not necessarily provide the location where a tag was placed on the animal.

Multiple commenters agreed with our decision to use language in the regulations to keep EID technology-neutral. Other commenters expressed support for their various preferred identification technologies, which included UHF, biometric, Bluetooth, and satellite geolocation. Commenters also asked whether high frequency or low frequency RFID tags would be the required or recommended standard.

We are neither requiring nor recommending any one type of EID eartag over another. Maintaining technological neutrality in the regulations will allow APHIS to adapt to technological developments and conduct animal disease traceability as rapidly and accurately as possible. So long as devices meet the standards, including for retention and safety, laid out in the OAIDS, and are readable both electronically and visually, they may be approved for use by APHIS. Producers will be able to decide which approved technology works best for them, based on their individual circumstances.

AR-000012

Some commenters stated that EID infrastructure should also support non-ADT uses.

EID infrastructure already supports non-ADT uses. For example, many dairies use EID tags to tie individual animals to production and management records. That information is separate from and not collected by the ADT program.

One commenter asked whether, in the event of an emergency, State departments of agriculture would be able to use orange EID tags typically used for heifer calves for other animals.

States are free to distribute any color of EID tag that is available. While orange tags are typically reserved for brucellosis vaccinates, this is not a requirement in the regulations.

Two commenters expressed concern regarding the purported difficulty of applying EID eartags. The commenters mentioned the difficulty of organizing tags not packed in sequential order and applying tags in cold conditions, as well as risk of fatigue and trauma to the hands.

The OAIDS provides guidance for packaging eartags, and states that packaging must maintain the tags in sequential order. The commenters do not provide evidence to support the implication that applying EID eartags is significantly more difficult in cold conditions or prone to causing fatigue and trauma to the hands than applying metal eartags or other forms of approved official identification, such as brands.

One commenter stated that the USDA should target tag distribution to cattle newly subject to the revised definition of *dairy cattle,* as it now includes beef/dairy cross bred cattle.

As noted in the economic analysis that accompanied the proposed rule, historically, APHIS has instructed dairy cattle operations that beef/dairy cross bred cattle should follow the same traceability regulatory requirements as purebred dairy cattle. Thus, official identification requirements applied to these animals prior to the implementation of this final rule and no targeted distribution is necessary.

One commenter stated that we should maintain the current use of AIN Device Managers to distribute official identification.

This final rule makes no changes to the current use of AIN Device Managers. Individuals may continue to distribute AIN devices by becoming AIN Device Managers. More information regarding this process can be found in the OAIDS.

One commenter volunteered to be a tag distributor for bison producers.

The commenter may reference the OAIDS document for further information on how to become an AIN Device Manager and distribute tags.

Several commenters stated that the regulations should specify that only 840-series, and not 900-series, EID tags may be used as official identification on domestic cattle because 900-series tags are not unique in their official identification. 840-series tags refer to EID eartags that begin with the prefix "840" and are manufactured using the AIN numbering system for the official identification of individual animals born in the United States. 900-series tags refer to eartags that begin with the prefix "900," and are not manufactured for the official identification of individual animals in the United States, but are sometimes used by producers for individual livestock management purposes.

We believe the regulations already address the commenters' concern about the need for nationally unique numbers. Per the definition of official eartag, an official eartag is an identification tag that bears an official identification number. The regulations state that an official identification number is a nationally unique number that is permanently associated with an animal and adheres to the NUES system, AIN system, location-based number system, flock-based number system, or any other numbering system approved by the Administrator for the official identification of animals.

Currently, all APHIS-approved EID eartags available for domestic animals are manufactured using the 840-series AIN numbering system. 900-series tags do not meet the definition of an official eartag, as they do not bear an official identification number. Although 900-series tags may be suitable for non-ADT uses, they are not approved for use as official ID for animals born in the United States.

We disagree that the regulations should require the use of any specific numbering system. As stated in the proposed rule, this flexibility will allow for the possibility that different numbering systems may be developed and used in the future on EID eartags. Additionally, situations may arise that require the use of official ID that is not an 840-series tag. For example, cattle not born in the United States may have official identification from the country of origin or an alternate official ID approved by APHIS to designate a non-U.S. born animal. The NUES numbering system is also allowed under the regulations for official tags. Because NUES eartags applied to animals before November 5, 2024 will still be recognized as official for the lifetime of those animals, the NUES numbering format will still be in use for some time after that.

Several commenters encouraged the USDA to allow the use of all currently used EID tags as official identification for ADT purposes. Two commenters specifically asked that we allow 900-series tags to be used for official identification, as these tags are already used by some producers.

We disagree with the commenters. Nine hundred-series EID eartags currently used by producers for livestock management purposes do not fulfil the requirements of EID eartags approved by APHIS for official identification purposes. APHIS approves the use of EID eartags for official identification that meet certain standards for durability, efficacy, and safety. These standards are essential to ensuring that methods of official identification meet industry needs and are retained and effective for the purpose of traceability.

A 900-series tag could provide traceability for a single movement; however, because the tag is not associated with an official identification number, the initial distribution location and additional movements would not be tracked or readily available for officials performing disease traces. Additionally, other characteristics of the 900-series tags make them unsuitable for traceability. For example, it is illegal to remove 840-series tags, while there is no regulation preventing the removal, replacement, or reuse of 900-series tags.

One commenter asked whether official ID tags can be reused after the death of an animal.

Tags cannot be reused. A requirement of official identification tags is that they are unique and not reusable. This prohibition prevents an animal in a disease trace from being confused with another animal that should not be included in the trace.

One commenter stated that the proposed rule did not address the problem of retiring eartags of dead livestock and asked about protocol in such situations.

The commenter is correct that this proposal does not address tag retirement protocols. Expired cattle generally do not pose a high disease threat, although a lack of tag retirement data can pose challenges in disease traces if the final disposition of the animal is unknown. Retiring tags may become more feasible once EID is more commonly used for official identification. As this rulemaking would increase the use of EID, it may allow us to address this issue in the future.

Some commenters stated that electric and magnetic fields (EMFs) emitted by

RFID technology have the potential to harm humans and animals.

We do not agree with this comment. RFID tags are passive devices and do not emit EMFs. The Food and Drug Administration is not aware of any adverse health effects associated with RFID technology.

Several commenters asked us to require a specific placement and color for EID eartags for the sake of simplicity and uniformity.

The commenters do not provide evidence of the potential benefits of adding such a requirement. APHIS-approved official identification eartags are available in multiple colors from several manufacturers and vendors. The color orange is typically reserved by manufacturers for official EID tags to be used in official calfhood vaccinates for brucellosis, although the regulations do not require this. Otherwise, the color of the tags is at the owner's discretion. The placement of official RFID tags is recommended in the left ear, but there is no such regulatory requirement, and the tags may be placed in either ear at the owner's discretion.

One commenter stated that they have encountered problems finding the identity of cattle with EID eartags, as they were unable to obtain identifying information from the State about a stray bull found on a ranch that had an 840-series eartag for identification.

Producer data confidentiality is highly valued and protected. Availability of identifying information is limited to regulatory officials for the purpose of disease tracing activities and not available to the general public.

Several commenters asked that we address the issue of imported cattle that have lost their eartags. One of these commenters stated that they have encountered difficulties due to being unable to apply an 840-series tag to imported cattle that have lost their eartags.

It is not possible to tag animals born outside of the United States with 840-series tags as 840 is the country code for the United States. We recognize this is an issue and are working to provide an acceptable EID alternative for imported cattle that lose their official identification. However, this is outside the scope of this rulemaking.

Some commenters stated that branding as a method of official identification should be phased out, citing animal welfare concerns. One commenter stated that brands should not be used for animal disease traceability, but rather restricted to use for proof of ownership.

The scope of this rulemaking is limited to official eartags for cattle and bison. Other authorized forms of official identification, including branding, are outside the scope of this rulemaking.

One commenter stated that "male" parts of RFID tags should be more readily available from manufacturers, as these parts can fail.

APHIS is not aware of issues specific to "male" ends of RFID tags. APHIS recommends that anyone encountering such issues contact the relevant tag distributor or manufacturers, as manufacturers are required to report tag issues to APHIS.

## Movement Within Slaughter Channels

The existing regulations in § 86.4(b)(1)(ii) allow cattle to move interstate to an approved livestock market and then to slaughter or directly to slaughter without official identification. Current § 86.4(b)(1)(ii)(C) stipulates that the cattle or bison must be identified if held for more than 3 days. The existing regulations are silent on identification requirements for slaughter cattle or bison that are not held at slaughter or held at slaughter for 3 or fewer days and then move to a new location.

To address this potential gap in traceability, we proposed to add paragraph (b)(1)(ii)(D) to § 86.4 to read as follows: "Cattle and bison leaving a slaughter establishment may only be moved to another recognized slaughter establishment or approved feedlot and can only be sold/re-sold as slaughter cattle and must be accompanied by an owner-shipper statement in accordance with § 86.5(c)(1). Information listed on the owner-shipper statement must include the name and address of the slaughter establishment from which the animals left, the official identification numbers, as defined in § 86.1, correlated with the USDA backtag number (if available), the name of the destination slaughter establishment, or approved feedlot (as defined in 9 CFR 77.5) to which the animals are being shipped."

This paragraph clarifies that the animals must stay within the intended terminal slaughter channels but may be moved to an additional slaughter plant or approved feedlot with appropriate documentation and identification.

Two commenters expressed their support for this proposed change, noting that it would expedite disease tracking.

Two commenters recommended improvements to the proposed new language in § 86.4(b)(1)(ii)(D) to allow cattle and bison leaving a slaughter establishment to be moved to a USDA-approved livestock auction (in addition to another slaughter establishment or feedlot).

We disagree with the commenters. Proposed paragraph § 86.4 (b)(1)(ii)(D) clarifies that animals may only move to another slaughter establishment or approved feedlot, with appropriate documentation and identification, and must remain in a terminal market. If animals were allowed to move from a slaughter facility to a livestock market for resale outside of the slaughter channel without official identification, they could circumvent the traceability regulations required for animals that would otherwise move interstate to a market, and thus become untraceable.

Multiple commenters asked us to add a definition of *slaughter channels* in order to provide clear regulations about other movements of cattle, including slaughter channel cattle not moving from points of sale to slaughter facilities in a timely manner; slaughter channel cattle being diverted from slaughter channels; and slaughter cattle moving to unapproved feed yards and holding pens. One commenter asked us to replace the phrase "slaughter facility" in § 86.4 with the term "slaughter channel" to clarify that livestock located anywhere in a slaughter channel are subject to the additional health and traceability requirements of the proposed rule.

We disagree with the commenters that a definition of *slaughter channel,* or a replacement of the term "slaughter facility" with the term "slaughter channel," is needed, because any movement not specifically described as an exemption in § 86.4 requires the animals to meet all requirements for official identification. This includes the examples provided by the commenter if the cattle involved do not meet the requirements for the exemptions.

## EID in Use of More Than One Official Eartag

Section 86.4(c) concerns situations in which the use of more than one official eartag is allowed. We proposed to remove references to visual-only eartags in this section.

Specifically, current paragraph (c)(3) of § 86.4 allows the application of a radio frequency identification or visual-only tag eartag with an animal identification number (AIN) having an 840 prefix to animals already tagged with NUES tags and/or brucellosis vaccination eartags. Because visual-only eartags will no longer be allowed as official identification under part 86, we proposed to revise this paragraph to state that a visually and electronically readable official eartag may be applied to animals currently identified with non-EID official eartags or vaccination tags.

AR-000014

**39554**    **Federal Register** / Vol. 89, No. 91 / Thursday, May 9, 2024 / Rules and Regulations

We also proposed to remove § 86.4(c)(4), which states that a brucellosis vaccination visual eartag with a NUES number may be applied to an animal that is already officially identified with one or more official eartags. As a result of this rulemaking, the visual, *i.e.,* non-EID, brucellosis NUES tag would no longer be allowed as official identification under part 86, which eliminates the need for the paragraph.

A commenter expressed confusion about whether and why it was possible for an animal to have multiple forms of official identification.

Section 86.4(c) allows for the use of more than one official eartag in certain situations when the need to maintain the identity of an animal is intensified, such as for export shipments, quarantine herds, field trials, experiments, or disease surveys. Multiple forms of official identification are also allowed if an individual wishes to apply a visually and electronically readable official eartag to an animal that is currently identified with non-EID official eartags or vaccination tags. Our proposed rule did not include changes to the situations in which an animal is allowed multiple forms of official identification. To mitigate identification challenges associated with these situations, additional recordkeeping is required in these instances to ensure that adequate traceability is maintained.

## Data Security

Many commenters expressed concerns related to data security and confidentiality. Commenters sought clarity about what data APHIS would collect when the requirement is implemented, where the data would be stored, and with whom it would be shared.

Commenters did not elaborate on their specific data concerns in great detail. APHIS takes care to protect personally identifiable information (PII) and proprietary business information in its recordkeeping, in compliance with the Privacy Act of 1974 (5 U.S.C. 552a).[15] Moreover, an EID tag is encoded with a number but no owner-specific information (*e.g.,* a number that identifies the animal, such as 840 001 018 932 052 or 42CXP9965).

We also note that APHIS and State animal disease traceability databases are not public databases. They are accessible only to Federal and State officials who meet strict permissions

and security requirements; therefore, proprietary information will not be available to competitors or unauthorized individuals.

Some commenters expressed the view that producer information should be exempt from Freedom of Information Act (FOIA; 5 U.S.C. 552) requirements, in order to preserve the confidentiality of that information for producers.

We are making no change in response to the comments, as APHIS does not have the authority to define or redefine exemptions to FOIA. We can only apply FOIA consistent with the statute and caselaw.

That being said, we believe that there are adequate provisions in the law for the protection of confidential producer data. Some commenters appear to have the misconception that all information in Federal databases is available on request; however, FOIA and the Privacy Act each provide substantial protections for producer information, including the protection of financial and personal identifying information. Under FOIA, Exemption 4 protects trade secrets or commercial or financial information that is confidential or privileged; and Exemption 6 protects information that, if disclosed, would invade another individual's personal privacy. The Privacy Act protects personal information held by the Federal Government by preventing unauthorized disclosures of such information. Individuals also have the right to review such information, request corrections, and be informed of any disclosures. FOIA facilitates these processes.

Some commenters stated that the proposed rule does not adequately protect producers' data from potential cyberattacks or security breaches.

The commenters did not provide details regarding their specific concerns regarding these hypothetical threats. Both State and Federal databases undergo extensive security testing, restrictions, and permission for access to assure that only authorized individuals may access data. Both APHIS and States employ substantial teams of security and information technology experts to assure data security and integrity.

Commenters expressed differing views regarding where to keep animal identification data collected as a result of this rulemaking. Some commenters stated that a "government" or "national" database was needed, others stated that data should be held in State databases and shared with Federal officials when needed, while others stated that data should be kept in

private databases to protect confidentiality.

Animal traceability data and disease information are kept in various Federal as well as State databases, with as-needed access restricted to the State and Federal officials responsible for managing high-impact diseases of the cattle industry. Device distribution records may also be stored in databases kept by producer organizations redistributing tags. As noted earlier, State and Federal databases undergo extensive security testing, restrictions, and permission for access, and both APHIS and State agencies employ teams of security and information technology experts to ensure data integrity and security.

One commenter stated that producers should have access to records of the animals produced on their farm after the animals leave the farm.

We disagree with the commenter, as this would compromise producer data confidentiality. Availability of information stored in APHIS and State animal disease traceability databases is limited to regulatory officials for the purpose of disease tracing activities.

One commenter stated that data integrity needs to be maintained when tags are retired and then reused.

Tags used for official identification are not reused.

One commenter stated that RFID technology can elicit and transmit information from clothing, appliances, and vehicles, placing personal information at risk.

The commenter provides no evidence to support this claim. RFID tags that are currently approved for official use by APHIS are passive tags. A passive tag is powered only by the reader emitting a radio signal, which allows the antenna within the tag to emit a signal back to the reader. There is no active power source within the tag, and the tag is unable to emit any signal without first being exposed to an RFID reader. There are no batteries associated with passive RFID tags.

Some commenters stated that data collection should be minimal, and access to it should be limited to animal disease traceability purposes.

APHIS agrees. Data collection required by this final rule is limited to the necessary information for adequate animal disease traceability. Access to animal traceability data and disease information kept in Federal and State databases is restricted to the State and Federal officials responsible for managing high-impact diseases of the cattle industry.

One commenter recommended APHIS make improvements to information

---

[15] See the systems of records notice for the animal disease traceability program, found at *https://www.regulations.gov/document/APHIS-2011-0057-0001.*

database systems to facilitate sharing of data between agencies.

The commenter did not detail specific improvements they believe should be made. Enhanced sharing of electronic information with appropriate permissions is one of the ADT program's goals. In the past, we have supported this goal by efforts such as funding electronic databases through cooperative agreements, and we intend to continue doing so as funding allows.

One commenter stated that the software available from APHIS is not user-friendly and asked us to provide software that will better meet the requirements of this rule.

We are unsure to what software the commenter is referring.

**Legal Issues**

A commenter stated that APHIS lacks authority to require the use of EID eartags, as the requirement does not directly and actively detect, control, or eradicate pests or diseases, nor is it an operation or measure such as "drawing of blood and diagnostic testing" authorized by 7 U.S.C. 8308.

The legal basis for this rulemaking is the AHPA, under 7 U.S.C. 8305, by which the Secretary of Agriculture may restrict the movement in interstate commerce of any animal, article, or means of conveyance if the Secretary determines that the restriction is necessary to prevent the introduction into or dissemination within the United States of any pest or disease of livestock. This authority is not limited to, as the commenter implies, the examples of "drawing of blood and diagnostic testing of animals" under 7 U.S.C. 8308. Moreover, 7 U.S.C. 8308 supports, rather than undercuts, this rulemaking; it provides the agency authority to "carry out operations and measures to detect, control, or eradicate any pest or disease of livestock," including but not limited to diagnostic testing. Tracking via EID eartags is plainly a measure for these activities; it inherently facilitates them by allowing APHIS to quickly and easily identify livestock for the detection, control, or eradication of any livestock pest or disease.

One of these commenters further stated that APHIS lacked the authority to require EID tags because this requirement is not a valid prohibition or restriction in interstate commerce authorized by 7 U.S.C. 8305.

We disagree with the commenter. The Secretary of Agriculture is authorized by 7 U.S.C. 8305 to prohibit or restrict the movement in interstate commerce of any animal, article, or means of conveyance if the Secretary determines that the prohibition or restriction is

necessary to prevent the introduction or dissemination of any pest or disease of livestock. The ADT program helps prevent the dissemination of disease by helping minimize the effects of disease outbreaks through restrictions, such as the EID eartag requirement, that the agency has determined are necessary for efficient livestock tracing.

We also note that this final rule does not require producers to purchase and affix EID eartags to their cattle as the only acceptable official identification device or method to meet the official identification requirements for interstate movement; the regulations continue to list eartags as one of several forms of authorized official identification, which also include tattoos and brands when accepted by State officials in the sending and receiving States.

Several commenters stated that the proposed rule violates the Tenth Amendment as certain States have codified into State law their own options for animal identification.

The Tenth Amendment provides that "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Regulating interstate commerce, which includes the interstate movement of animals, is a power delegated to Congress as an enumerated power under the Commerce Clause of the Constitution. Exercising this enumerated power through the AHPA, Congress has delegated to the Secretary of Agriculture the authority to restrict the movement in interstate commerce of any animal or article necessary to prevent the introduction into or dissemination within the United States of any pest or disease of livestock. The Tenth Amendment does not refute APHIS' authority to restrict the interstate movement of animals for this purpose and, in turn, displace a State's exercise of its regulatory power.

Two commenters stated that this rulemaking violated the intent of Article 1, Section 8, of the Constitution. One of these commenters stated that the USDA was falsely asserting that Congress has delegated and granted it broad powers which are implied, plenary, and inherent. The commenter noted that Congress has not mandated an electronic animal identification scheme, and therefore APHIS lacks the authority to impose one.

We did not assert that Congress has granted the USDA "broad powers which are implied, plenary and inherent." Under the AHPA, Congress has delegated authority to the Secretary of Agriculture to promulgate regulations to prevent the introduction into the United

States and the dissemination within the United States of any pest or disease of livestock. This rulemaking is consistent with Congress's clear, intelligible directive to protect animal health because it is intended to prevent the introduction and dissemination of livestock pests or diseases by improving the existing ADT program. USDA has issued this rulemaking based on Congress's grant of clear authority to it, not based on some implied or vague powers. Additionally, electronic animal identification represents a logical, modest update to the ADT program that is within USDA's mandate to implement.

Two commenters stated that this rulemaking violates the Fourth Amendment. One of these commenters stated that this was because requiring EID eartags constituted "unconstitutionally seizing the cattle producers [sic] value-added information without compensation." The commenter also alleged that the rulemaking violates the Fifth Amendment because the "value-added information associated with the mandatory EID eartags further constitutes the private property of the owner of the cattle."

The requirement for official EID tags does not involve seizing a producer's value-added information. Some producers use EID eartags to participate in value-added verification programs overseen by the AMS. Producers may, but are not required, to use official EID eartags to participate in these verification programs and, alternatively, may also use 900-series tags. The premiums producers are paid for cattle participating in these verification programs are a result of the specific management practices required by said programs. While information regarding such management practices may be correlated with an animal's EID number, this information is kept in the hands of the producer; the producer's possession or use of the information is not interfered with at all, and, in any event, this information is not the same as the information collected for animal disease traceability purposes that is kept in State and Federal databases. Information correlated with an animal's EID number kept in State and Federal databases is limited to information necessary for disease tracing.

A commenter stated that this rulemaking violated Executive Orders 14005 and 14017 by requiring producers to purchase EID eartags manufactured in China. Another commenter stated that this rulemaking should adhere to Executive Order 14005 and be made in the United States.

Executive Orders 14005 and 14017 apply only to Federal Government purchases. APHIS abides by the Executive Orders and complies with the Buy American Act (41 U.S.C. 8301–8303).

We also note that this rulemaking does not stipulate that producers must purchase eartags made in a foreign country. APHIS approves official EID tags by any manufacturer, foreign or domestic, that fulfils the rigorous criteria listed in the OAIDS. Additionally, as noted earlier, eartags are one of several forms of authorized official identification. Producers who do not wish to use eartags may use another form of authorized official identification, such as tattoos and brands when accepted by State officials in the sending and receiving States.

**Cost and Fairness**

Many commenters opposed the proposed rule because of their belief that the cost of purchasing EID tags placed an undue financial burden on producers, particularly small farmers and ranchers. Commenters also claimed that these costs to producers would fuel consolidation in the livestock industry.

We do not agree with these comments regarding the magnitude of costs to the domestic cattle and bison industry, and do not think this rulemaking will result in further consolidation of the cattle industry. The commenters who raised these concerns often based them on the belief that official identification would be required for all or most cattle and bison regardless of whether they enter interstate commerce. Official identification is not required for all cattle or bison. Under the current regulations in § 86.4(b), which this final rule does not change, the following categories of cattle and bison are subject to official identification requirements for interstate movement: all sexually intact cattle and bison 18 months of age or over; all female dairy cattle of any age and all male dairy cattle born after March 11, 2013; cattle and bison of any age used for rodeo or recreational events; and cattle and bison of any age used for shows or exhibitions. Cattle and bison are exempted from official identification requirements if they are going directly to slaughter. Thus, large categories of cattle, such as feeder cattle or cull cattle going to slaughter, are not subject to the identification requirements. In addition, cattle and bison only require official identification under the regulations if they move interstate or are in Federal or State disease programs. Accordingly, many small producers will be exempted because they never move cattle interstate, so their cattle do not require official identification.

While we acknowledge the commenters' concern over consolidation of the cattle industry, we disagree that an EID tag requirement would cause consolidation. Data from USDA's National Agricultural Statistics Service reflect consolidation as a broader trend in the cattle industry that is present in both States that have and States that have not implemented a State-specific EID tag requirement.

That being said, we acknowledge that producers may at some point have to assume costs associated with purchasing EID tags as a result of this rulemaking. Accordingly, we have prepared a regulatory impact analysis (RIA) that estimates aggregate annual costs to the domestic cattle and bison industry as a result of the rule. The analysis estimates, conservatively, that 11 million cattle and bison are tagged with visual official identification per year to fulfill official identification requirements under the regulations. This number represents approximately 11 percent to 12 percent of the cattle and bison in the domestic inventory. We estimate that these are the average percentages of cattle that would be required to have EID tags instead of visual-only tags each year under this rule. The cost is estimated to be approximately $26.1 million, assuming no Federal funding is provided. (APHIS has historically provided funding for EID eartags and intends to continue doing so as long as funding is available. Funding is discussed in greater detail later in this document.) This equates to an average cost of $30.45 per cattle or bison operation each year; or based on total industry cash receipts from 2021, approximately 2.5 cents per $100 (0.025 percent).

The RIA also articulates the benefits of increased traceability that were previously identified in the economic analysis that accompanied the 2013 final rule establishing the regulations, particularly the foregone liabilities when traceability is not quick or accurate, and delineates how EID furthers the aims of efficient and accurate traceability that undergird the regulations. The RIA for this final rule is available on *Regulations.gov* as a supporting document for this final rule, as well as by contacting the individual listed below **FOR FURTHER INFORMATION CONTACT**. For reasons discussed in the 2013 economic analysis and the RIA that accompanies this final rule, it has been and continues to be APHIS' position that the benefits associated with timely and accurate animal traceability significantly outweigh costs to regulated entities.

Many commenters stated that the rule unfairly favors large corporations over small producers. It was stated that small producers would have to pay more to comply with the regulations than large operations due to bulk discounts offered by EID tag manufacturers. Other commenters stated that large corporations were favored because they are allowed to use GINs to officially identify their animals.

The commenters are correct that many EID tag manufacturers currently offer lower rates for EID tags bought in bulk. The calculations for the average price of an EID tag in the RIA factor in these price differences. As noted previously, most small producers will not be affected by this rulemaking because they do not move their cattle interstate. Small producers that are affected by this rulemaking may consider creative ways to capitalize on bulk discounts for EID tags, such as cooperative buying. These would be individual business decisions based on producer's unique circumstances. We also note that, while APHIS cannot commit to long-term funding for EID tags because the availability of Federal funding in future fiscal years is dependent on annual Congressional appropriations and USDA–APHIS budgetary priorities, APHIS has provided these tags free of charge since 2020. Funding for EID eartags is discussed in greater detail later in this document.

This rulemaking does not change the regulations regarding the use of GINs. Methods of official identification other than official eartags are outside the scope of this rulemaking.

Some commenters stated that this rulemaking would force small operations out of the livestock market and thus undermine the resiliency of the nation's food system.

We disagree that an EID requirement undermines efforts to build and maintain a resilient food supply. For the reasons discussed earlier in this document, many small producers will not be affected by this rulemaking. A resilient food supply relies on the health and wellbeing of our nation's livestock, which is the intended outcome of an effective and efficient ADT system.

Some commenters stated that this rulemaking is designed to benefit export markets by making it easier for companies to "ship products around the world" or by protecting international trade markets, at the expense of small producers who will bear the cost of the rulemaking.

We acknowledge possible benefits to export markets and trade associated

with domestic animal disease traceability and EID—these are referenced in the RIA that accompanies this final rule. We disagree, however, that this final rule is intended to directly benefit cattle and bison exporters. This final rule pertains to interstate movement of cattle and bison, not the export of cattle and bison, and foreign markets are free to set their own import requirements. While it is true that many of these requirements currently include EID, that is not within APHIS' purview. Furthermore, options already exist for exporters to meet any such requirements; many exporters currently use third-party verification programs under the purview of AMS to comply with traceability requirements of export markets.

Commenters stated that costs to producers extended beyond the cost of EID tags, and included infrastructure such as EID readers, software, and labor. A commenter stated that this rulemaking would require additional labor for accredited veterinarians to enter data into a database, the cost of which would be passed on to producers. It was stated that our RIA was flawed because it did not take these costs into account.

We disagree with the commenters. The official identification requirement does not require the producer to have hardware (readers) or software (computer systems). Readers and software are not required because each EID tag also has a visual component. The tag number is imprinted on the plastic shell containing the EID portion of the tag. The tags can thus be used in the same manner as visual tags by producers who do not wish to invest in tag-reading hardware and software.

We disagree that this final rule requires producers to incur additional labor costs related to application of tags because the regulations already require the placement of official identification. The EID requirement only changes the type of eartag that must be used for cattle that require official identification and that are officially identified using eartags. The labor involved in applying a metal NUES eartag should not be any more burdensome than the labor involved in applying an EID eartag.

Likewise, this final rule imposes no new requirement for accredited veterinarians to enter data into a database. Accredited veterinarians may continue collecting the information already required by the regulations in their medical records in the same way they currently do, so long as the records are retrievable when a disease outbreak occurs. Costs passed on to the producer should only reflect the difference in the

cost of tags because this final rule does not require any additional labor.

Some commenters stated that APHIS should acknowledge that EID tags are meant to be read electronically and update the RIA to account for the cost of readers.

APHIS disagrees that EID tags are meant to be read only electronically. As explained above, EID tags must be readable both electronically and visually. To ensure the visual readability of eartags, the OAIDS requires that EID tags be readable from 30 inches with 20/20 vision, while there was no readability standard for metal NUES tags.

Two commenters stated that mandatory EID may increase corporate control over the livestock industry by giving packers more information about how animals are produced.

APHIS-approved official eartags only encode the 15-digit animal identification number. They do not encode any producer information.

Many commenters noted that APHIS has provided funding for EID eartags in the past and stated that the agency should commit to continuing this funding. Some commenters specified that funding should be provided for at least the first 2 years after the final rule's implementation. Commenters also stated that APHIS should provide funding for necessary equipment and related costs, such as readers, data management systems, and labor.

Since 2020, APHIS has provided funding for EID eartags, as well as readers and ear taggers. Since the availability of Federal funding in future fiscal years is dependent on annual Congressional appropriations and USDA–APHIS budgetary priorities, a long-term commitment to this funding is not possible. We intend to continue to provide assistance as long as funding is available. However, in the absence of Federal funding, producers would have to assume costs associated with purchasing EID tags. For this reason, we have prepared an assessment that estimates annual aggregate costs to the domestic cattle and bison industry associated with this rule.

As noted earlier, this final rule does not require producers or livestock markets to have electronic reading equipment or additional data management systems, because the official EID tags must be readable visually as well as electronically. Producers may continue using EID eartags the same way they currently use non-EID, visual-only eartags.

Finally, for the reasons discussed earlier in this document, we disagree that this rulemaking will cause

producers to incur additional labor costs. The application of an EID eartag should not result in more labor costs than the application of a non-EID eartag.

Two commenters stated that the USDA should continue funding States via cooperative agreements. A commenter stated that funding for States to support ADT infrastructure should be increased.

This final rule does not impact the ADT annual cooperative agreements with States, Territories, or Tribes. We note that this funding is separate from the additional funding that APHIS has provided since 2020 to support EID tags and infrastructure. APHIS intends to provide funding for EID eartags and infrastructure for as long as funding is available, but we are unable to commit to multi-year funding for the reasons discussed above.

Two commenters stated that the RIA was inaccurate in its statement that the cost of tags would increase from $3.3 million annually (the estimated cost of metal NUES tags) to $29.3 million annually (the estimated cost of EID tags), as APHIS has been providing metal NUES tags to producers at no cost.

The commenter is correct that APHIS has provided NUES eartags at no cost to producers. The commenter fails to acknowledge, however, that APHIS has also been providing EID tags at no cost to producers since 2020. The estimates in the RIA take into account that funding for neither type of tag has been guaranteed in the past, nor can funding for EID tags be guaranteed in the future, as this funding depends on each year's Agency budget and competing disease priorities.

Two commenters stated that the estimates for the annual cost of EID eartags in the RIA were flawed because they only accounted for costs to animals currently being identified by non-EID tags. The commenters stated that the estimated number of affected animals did not consider animals currently tagged with EID tags, or animals that are required to have official identification but are not in compliance with the regulations.

Cattle and bison already identified with official EID eartags are already in compliance with this final rule, and therefore would not incur new expenses as a result of it. While we recognize that some people may not comply with the current regulations regarding official identification, we have no means of estimating their number. We also note that people currently not in compliance with the regulations are unlikely to begin complying as a result of this rulemaking, and therefore would not

**39558**    **Federal Register** / Vol. 89, No. 91 / Thursday, May 9, 2024 / Rules and Regulations

increase demand for official identification tags.

A commenter stated that the RIA does not include information about the estimated economic impact for individual operations.

The commenter is incorrect. The RIA states that, assuming the Federal Government does not provide tags free of charge in the future, the average cost per operation to purchase EID eartags would range from $26.24 to $29.45 for FDX eartags, and from $31.13 to $34.73 for HDX eartags.

A commenter stated that our cost estimates did not consider costs incurred for livestock moved interstate after purchased at an in-State general auction market. The commenter asked whether the buyer would be charged for the cost of eartags or be required to place official eartags on the animals they purchased.

Under the current regulations in § 86.4(b), which this final rule does not change, cattle and bison that are required to have official identification must be officially identified prior to interstate movement unless they are exempted from the requirement for official identification. Animal classes and movements that currently require official identification will continue to require official identification, while animal classes and movements exempted from the official identification requirements will continue to be exempted.

A commenter stated that we should adjust the estimate of impacted cattle in the RIA to account for the expanded definition of dairy cattle.

We disagree with the commenter. APHIS has not expanded the definition of dairy cattle. The change to the definition of *dairy cattle* is a codification of guidance that APHIS has consistently given to producers and State animal health officials, and not a change in policy. Beef/dairy cross breeds should already be officially identified. We have no indication of noncompliance or controversy surrounding this policy. Assuming regulated parties are in compliance, beef/dairy crosses are already accounted for in our estimate of 11 million impacted cattle.

We acknowledge the possibility that there may be cattle producers that did not consider their beef/dairy cross breeds to be dairy cattle, and were alerted to our interpretation of the definition of dairy cattle to encompass beef/dairy cross breeds by this rulemaking. However, as we have no indicators of widespread noncompliance, we expect this scenario to be rare and expect the number of

cattle to be affected by it to be de minimis.

A commenter asked why the RIA did not report on tracing exercises using branded cattle.

While the regulations allow the use of brands to fulfil the requirements for official identification if agreed upon by sending and receiving States, brands do not uniquely identify an animal and are not intended for animal traceability. Brands are not unique outside of local areas, are currently only used in 14 States, and are not systematically recorded in national databases. For these reasons, tracing exercises are restricted to animals identified with AIN 840-numbered tags and NUES tags.

A commenter suggested further cost-benefit analysis to assess the impact on cattle and bison producers while ensuring maximum expansion of ADT capability.

The commenter did not specify what they believe our analysis is lacking. We believe the RIA comprehensively assesses the costs and benefits of this rule.

Some commenters disagreed with our estimation that the number of impacted cattle would be 11 million. A commenter stated that, previously, the USDA estimated that the final rule would impact 30 million cattle that cross State lines annually. Another commenter stated that many State identification programs are tied to the Federal system, and therefore even cattle that do not cross State lines would be impacted by this rulemaking.

The commenter is mistaken that we previously estimated this rulemaking would impact 30 million cattle, and the commenter provides no source for this figure. Our estimate of 11 million cattle is based on the number of official identification tags that have been used in previous years. Many animals that move interstate are exempt from official identification requirements, such as beef cattle under 18 months of age, and animals going to slaughter or to an approved livestock market.

Regarding the concern about State identification programs, APHIS is unaware of any intrastate movement requirements that may mimic Federal regulations. Moreover, intrastate movement regulations are beyond our jurisdiction.

A commenter stated that the RIA uses outdated 15-year-old data to determine that many small entities would not be affected because most small entities market through local auctions. The commenter stated that this is no longer necessarily the case, as small entities have increased their use of online livestock video auctions and alternative

livestock marketing channels that would require the use of an EID tag. The commenter also stated that market consolidation has reduced the available number of livestock auctions, forcing some small producers to market outside their state.

The RIA uses NAHMS data from 2008 as well as from 2017 to determine that small operations are less likely to move cattle interstate. Data from the 2008 NAHMS report indicated that 82 percent to 88 percent of beef cattle were marketed through general auction markets. These markets tend to be in-state auctions or out-of-state APHIS approved markets, for which official identification is not required. Data from the 2017 NAHMS report further indicated that small operations were most likely to use auction markets, while larger producers used auctions as well as other marketing channels. Although the published literature on small sized farms moving cattle interstate is scarce, we believe the data from these reports are still applicable and relevant. We are not aware of any significant change in marketing practices for small producers.

Furthermore, we disagree with the commenter that small producers are forced to market out of State due to market consolidation, as the number of APHIS-approved livestock markets has increased steadily each year. In 2013, when the ADT rule was implemented, there were 703 active APHIS-approved markets; today there are 1,310.

A commenter stated that a calculated benefit of $30 million per year is inaccurate, as the calculation is based on incorrect assumptions that EID eartags will reduce the time to detect an outbreak, reduce herd surveillance costs, improve practices that identify diseased cattle, and reduce the probability of countries imposing trade restrictions because of a disease outbreak in cattle.

APHIS would like to clarify the commentor's misunderstanding. Thirty million dollars was our estimate of the additional cost of EID tags; we assessed, but did not quantify, expected benefits.

Although use of EID would not reduce the time it takes to initially detect a disease or conduct surveillance, EID reduces the time to find diseased and exposed animals. APHIS disease investigations are often concluded through quarantine and testing or depopulation of cattle herds when the animal of interest is not identifiable, which incurs costs for livestock producers as well as APHIS. As explained in the RIA, when outbreaks of livestock diseases occur, the use of EID eartags can help limit their size and

AR-000019

scope, thus reducing the number of animals that are depopulated, the impact to producers and communities, and the probability that trade restrictions are imposed. Additionally, rapid containment of foreign animal diseases and identification of affected, exposed, and vaccinated animals will expedite the return of export markets, should they close in the event of a disease outbreak.

A commenter stated that, because only approximately eight manufacturers have had their EID eartags approved for official use by APHIS, this rulemaking creates an oligopoly of eartag manufacturers on which producers are forced to rely.

This rulemaking does not in any way restrict new manufacturers from applying for approval of their eartags for use as official identification. In fact, changes proposed in this rulemaking streamline the approval process for new EID devices in order to encourage new manufacturers to enter the market. APHIS will continue to approve official identification tags from new companies that are in compliance with our regulations.

A commenter stated that producers need assurance that eartags and related infrastructure will be available at a reasonable price.

APHIS will continue to approve eartags for official identification. As noted earlier, this final rule does not require the use of infrastructure, such as readers, because tags are required to have a visual component.

A commenter asked us to include an assessment of biometric tools for official identification that have the potential to reduce costs per head of cattle.

The RIA includes in its assessment the types of EID eartags that are currently approved for use, which include FDX and HDX RFID tags. APHIS would consider any type of alternate EID methods that are supported by credible research.

Two commenters stated that future new EID technologies mentioned in the proposed rule could result in higher costs for producers.

The RIA estimated costs to producers based on EID technology available and approved for use today, which is currently limited to RFID. In the proposed rule, we stated that we refer to EID, rather than RFID, tags in the regulations in order to allow for other electronically readable technology, should it become available in the future. Just as referring to EID would not limit official eartags to the technology available today, it would also not limit official eartags to a hypothetical higher-cost technology available in the future.

Maintaining technological neutrality in the regulations provides flexibility for the regulated community to choose the technology that best meets their individual needs, cost being one consideration.

Some commenters stated that ADT raises fear of market manipulation by multinational packing corporations or the government.

The commenters did not elaborate on their specific concerns regarding market manipulation and provided no supporting evidence of this hypothetical situation. As discussed earlier in this document, APHIS protects personally identifiable information (PII) and proprietary business information in its recordkeeping.

A commenter stated that the requirement for ICVIs is an added expense.

The commenter is incorrect. Cattle and bison to which official identification requirements apply are already required to be accompanied by an ICVI or alternate movement document before moving interstate. We did not propose to substantively change any regulations pertaining to ICVIs. Rather, we proposed to make an editorial change to the definition of ICVIs to account for the use of electronic ICVIs in addition to paper ones.

A commenter stated that this rulemaking will result in the elimination of incentive programs that encourage producers to adopt EID, which may have been the only way some producers could afford the technology.

We believe that the "incentive programs" to which the commenter is referring are the verification programs overseen by AMS. We disagree that this rulemaking will necessarily eliminate these verification programs. Verification programs can fulfill trading partners' requirements for traceability from birth to slaughter as well as additional recordkeeping requirements for exported cattle. Because the current regulations and this rulemaking do not fulfil these requirements, we expect continued need for verification programs.

**Miscellaneous**

There were a number of comments that did not fall into any of the categories listed above.

A commenter asked for clarification on the meaning of preemption language in § 86.8 and the preemption language mentioned in the proposed rule relevant to Executive Order 12899 (sic).

Section 86.8 provides that States and Tribes may not specify an official identification device or method for interstate movement if the regulations allow for multiple devices or methods, nor may a receiving State or Tribe impose requirements that would require the shipping State or Tribe to develop a particular type of system or alter an existing system in order to meet the requirements. There was no Executive Order 12899 language in the proposed rule; however, we believe the commenter is referring to Executive Order 12988, which was referenced, and transposed the numbers. The 12988 language in the preamble of the proposed rule, in contrast, has the effect of stating that, if finalized, State laws that conflict with the specific provisions of this rulemaking would be preempted. For example, a State's animal identification regulations could not continue to allow for non-EID forms of official identification of cattle and bison that are subject to the ADT regulations.

We emphasize that the regulations in part 86 apply only to interstate movement; States may develop their own official identification requirements for intrastate movement that apply after an animal arrives from a shipping State or may otherwise impose in-State requirements for the cattle once the movement has occurred.

The same commenter asked whether a State could impose official identification importation requirements for classes of animals otherwise exempt in the ADT rule.

The final rule [16] that established § 86.8 indicated that States may require the official identification of classes of animals that are exempt under our regulations, provided that the receiving State's requirement does not require the shipping State to develop a particular type of system or alter an existing system.

The same commenter asked whether a State could restrict the types of official identification devices required for imported animals when the ADT rule permits additional approved methods of identification for the species, such as restricting the use of GINs for the movement of pigs and instead requiring individual animal IDs. The commenter asked us to amend the regulations to allow a State to impose these additional requirements if they are not currently permissible.

Because the current regulations allow for group or lot identification as a means of official identification, restricting the use of GINs and requiring individual animal ID for pigs, or cattle or bison as applicable to this rulemaking, is prohibited under § 86.8.

---

[16] See footnote 1.

**39560**    **Federal Register**/Vol. 89, No. 91/Thursday, May 9, 2024/Rules and Regulations

Amending § 86.8 as requested is outside the scope of this rulemaking, and one of the amendments requested by the commenter goes against the stated aims of the ADT program.

Finally, the same commenter asked us to explain the enabling legislation for § 86.8.

The enabling legislation for § 86.8 is the AHPA.

Two commenters stated that this rulemaking would reduce the speed of commerce. Conversely, another commenter stated that EID allows for the collection of animal movement data at the speed of commerce.

We disagree with the commenters who stated the rule would reduce the speed of commerce. EID and electronic records have the potential to increase the efficiency and speed of routine operations in the cattle and bison industry. EID tags allow staff to read animals' identification numbers without having to restrain or handle the cattle or bison. For cattle or bison requiring ICVIs, electronic tags also allow veterinarians to rapidly and accurately complete health certificates and movement documentation without slowing the speed of commerce.

One commenter asked that we amend § 86.5(c)(7)(i) to require that the official identification numbers of cattle and bison are recorded during the transfer from an approved livestock facility directly to a recognized slaughtering establishment.

We will consider the commenters' suggestion; however, this is outside the scope of this rulemaking.

One commenter asked us to state that forms used for interstate poultry movement must meet the same accuracy and clarity criteria that pertain to ICVIs for poultry and other species.

We will consider the commenters' suggestion; however, this is outside the scope of this rulemaking.

One commenter asked us to create a standardized ICVI form.

This is outside the scope of this rulemaking. We note that all ICVI forms are required to contain the same information, which is listed under the definition of *interstate certificate of veterinary inspection (ICVI)* in § 86.1.

One commenter stated that this rulemaking could reduce the use of the brucellosis vaccine because the use of EID tags would double the cost of brucellosis vaccination.

APHIS requires brucellosis vaccination for cattle in the Greater Yellowstone Area. Cattle that are vaccinated for brucellosis are required to have official identification and currently use metal official NUES tags. While we acknowledge that EID tags are more expensive than metal NUES tags, and discuss these differences in cost in the RIA, we disagree with, and the commenter provides no evidence to support, the speculation that these costs would discourage compliance with the requirement for brucellosis vaccination.

Some commenters asked us to remove the requirement to tattoo animals that receive the brucellosis vaccine because correct placement of an EID eartag makes tattoo placement difficult.

We disagree with the commenters that EID tag placement interferes with brucellosis tattoo placement. While official EID tags may be placed in either ear, the recommended placement is the left ear to avoid interference with the brucellosis tattoo, which is required on the right ear.

One commenter stated that additional education regarding proper tag application and retention for veterinarians and producers is necessary.

APHIS agrees that education assists in proper tag application and increased tag retention. We support education through efforts such as cooperative agreements and outreach and intend to continue such efforts as funding allows.

One commenter asked for guidance stating that exports from the United States to Canada will clearly state requirements for use of an approved indicator with the International Organization for Standardization (ISO) 11784.

The final rule does not pertain to the export of livestock. Requirements for exported livestock are found in 9 CFR part 91.

One commenter asked us to establish performance standards for the retention of backtags referenced in § 86.4(b)(1)(i)(C).

Backtags are not methods of official identification but are mentioned in § 86.4(b)(1)(i)(C), in the context of an exemption for cattle and bison that are moved interstate from the requirement of official identification if certain conditions are met. The existing regulations require that backtags used to fulfil this exemption must "ensure that the identity of the animal is accurately maintained until tagging." We believe this adequately addresses the required performance of backtags used in this context.

Two commenters stated that the use of alternative movement records should be increased, and that these alternative movement records could be created by a veterinarian or their designee, but APHIS should not require an inspection or attestation of health by a veterinarian.

The existing regulations in § 86.5(a) already provide for alternatives to the ICVI for animals moving interstate. Alternate documentation requires an agreement between both shipping and receiving States to be considered official movement documentation. The current regulations do not specify that an alternative movement document requires an inspection or attestation of health by a veterinarian.

Two commenters stated that the USDA and States should target enforcement of ADT requirements beyond fixed-facility livestock auction markets to avoid incentivizing direct selling outside of markets.

We do not believe this rulemaking will incentivize direct selling outside of markets. Compliance with the regulations in 9 CFR part 86 is required for animals subject to these regulations, regardless of whether the animal is sold through a livestock market or a private sale. Accredited veterinarians responsible for inspection and interstate movement of animals are subject to the same requirements and face the same sanctions for noncompliance, regardless of whether they work for or from a market or private treaty sale. Accredited veterinarians must submit copies of the documentation (ICVI or alternate movement documents) to the origin and destination State official within 7 days of inspecting the animal, and they must complete this documentation accurately and completely. Accredited veterinarians that are non-compliant are subject to sanctions including monetary penalties, loss of accreditation, and, in some cases, criminal penalties.

A commenter asked whether there will be civil or criminal penalties for not adhering to the requirements of the final rule.

The AHPA lists criminal and civil penalties relevant to violating the requirements of the regulations in section 8313. Changes to the regulations do not impact the Act.

Some commenters stated that this rulemaking could subject cattle producers to liability, should the animal bearing their EID eartag contract a disease after the animal is sold or should food safety issues arise in meatpacking plants.

Under this rulemaking, producers are not liable for disease infection after an animal leaves their premises. The EID requirement thus has no known implications for producer liability.

One commenter claimed that the reason behind requiring EID for eartags is the Global Roundtable for Sustainable Beef.

The commenter provided no evidence to support this claim. As explained in the proposed rule and earlier in this document, the purpose of this action is

to improve our animal disease traceability program's ability to trace animals accurately and rapidly in order to aid us in disease response.

Several commenters requested that APHIS seek equivalency from trading partners by requiring imported cattle to have EID.

The scope of this rulemaking is limited to requirements for domestic cattle in interstate commerce. New requirements for imported cattle would require a separate rulemaking.

Some commenters stated that the ADT program needs to be compatible with the general traceability principles of the World Organization for Animal Health (WOAH).

We are unsure of what specific principles the commenters are referring to. However, we note that, as a WOAH member country, the United States contributes to development of, and complies with, the guidelines that the member countries develop.

Finally, we note that we are making non-substantive editorial changes to the OAIDS to improve clarity, readability, and accuracy. This includes changes such as reordering information, removing duplicative information, and removing broken links. It also includes editing to a paragraph explaining which criteria manufacturers must meet for low-frequency devices. The edits remove a sentence stating that substantial sales data or approval in another country may be considered in lieu of International Committee on Animal Recording's (ICAR) materials/environmental testing. We are making this edit because sales data or approval in another country may not be an adequate substitute for ICAR testing, and we do not have a standard for what "substantial sales data" means. The revised OAIDS is published alongside this final rule.

Therefore, for the reasons given in the proposed rule and in this document, we are adopting the proposed rule as a final rule, with the changes discussed in this document.

**Executive Orders 12866, 13563, and Regulatory Flexibility Act**

This final rule has been determined to be significant for the purposes of Executive Order 12866, as amended by Executive Order 14094, "Modernizing Regulatory Review," and, therefore, has been reviewed by the Office of Management and Budget.

We have prepared an economic analysis for this final rule. The economic analysis provides a cost-benefit analysis, as required by Executive Orders 12866 and 13563, which direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The economic analysis also examines the potential economic effects of this final rule on small entities, as required by the Regulatory Flexibility Act. The economic analysis is summarized below. Copies of the full analysis are available on the *Regulations.gov* website (see footnote 6 in this document for a link to *Regulations.gov*) or by contacting the person listed under **FOR FURTHER INFORMATION CONTACT**.

We are amending the animal disease traceability regulations to recognize only eartags that are both visually and electronically readable as official eartags for use for interstate movement of cattle and bison that are covered under the regulations. We are also clarifying certain record retention and record access requirements. These changes will enhance the ability of State, Federal, and private veterinarians, and livestock producers, to quickly respond to high-impact diseases currently existing in the United States, as well as foreign animal diseases that threaten the viability of the U.S. cattle and bison industries. The benefits of animal disease traceability include enhancing the ability of the United States to regionalize and compartmentalize animal health issues, minimizing the costs of disease outbreaks, and enabling the reestablishment of foreign and domestic market access with minimum delay following an animal disease event.

APHIS conducted a cost-benefit analysis to determine how the transition to electronic identification (EID) tags will affect the cattle and bison industries. Our analysis suggests that approximately 11 million cattle are currently tagged with official non-EID eartags per year. The rule will not change the number of cattle tagged, but it will increase the estimated average annual cost of purchasing tags by approximately $26.1 million dollars per year, or $30.39 per cattle or bison operation. As noted in APHIS' cost-benefit analysis, the cost of purchasing new tags is the only additional costs APHIS has determined will be imposed on producers, regardless of whether they currently own electronic reading equipment.

We began soliciting comments concerning the proposal for 60 days, ending March 20, 2023. In response to several requests by commenters, we extended the comment period by 30 days, to April 19, 2023. We received 2,006 comments from industry groups, producers, veterinarians, State departments of agriculture, and individuals. While many of these comments were in support of the proposed rule, we did receive concerns regarding the economic impacts of this rule. Comments included concerns regarding the potential additional costs of having to adhere to the new EID technology, beyond the cost of the EID tags, along with concerns that this rulemaking will disproportionately impact small businesses. We have evaluated these concerns carefully and, while the new EID tags will increase the costs of identifying certain cattle and bison as outlined in this analysis, we have found the other concerns to be unsubstantiated, which we discuss in the cost section of this analysis.

Radio frequency identification (RFID) technology, a type of electronic identification, has been available in the livestock industry for many years. APHIS has evaluated the cost structure of current RFID technologies, commonly known as FDX and HDX. Both technologies work well and have similar qualities. This report describes the cost structure of these EID eartags. We provide 10 years of historic population levels for cattle and bison in order to provide the reader with a range of cost estimates based upon a fluctuating cattle and bison population.

EID eartags are a vital component to efficient and accurate traceability of cattle and bison. It benefits stakeholders by significantly reducing the numbers of animals and response time involved in a disease investigation.

One of the most significant benefits of the rule will be the enhanced ability of the United States to regionalize and compartmentalize animal disease outbreaks. Regionalization is the concept of separating subpopulations of animals to maintain a specific health status in one or more disease-free regions or zones. This risk-based process can help to mitigate the adverse economic effects of a disease outbreak. Traceability of animals is necessary to form these zones that facilitate reestablishment of foreign and domestic market access with minimum delay in the wake of an animal disease event. The use of EID eartags can significantly reduce the amount of time it takes animal health officials to complete a trace investigation, which involves knowing where diseased and potentially exposed animals are, and where they have been. Animals that may have come

in contact with an affected animal can number in the thousands or tens of thousands. Transitioning from visual to electronic identification devices may significantly reduce the time it takes animal health officials conducting a trace to scan animals in a herd during a disease response. The more efficiently and effectively animal health officials can complete a trace, the faster we can regionalize and compartmentalize animal disease outbreaks in order to mitigate adverse economic impacts. Having an EID system in place will, therefore, minimize not only the spread of disease but also the trade impacts an outbreak may have.

## Executive Order 12372

This program/activity is listed in the Catalog of Federal Domestic Assistance under No. 10.025 and is subject to Executive Order 12372, which requires intergovernmental consultation with State and local officials. (See 2 CFR chapter IV.)

## Executive Order 12988

This final rule has been reviewed under Executive Order 12988, Civil Justice Reform. This rule: (1) Preempts all State and local laws and regulations that are in conflict with this rule; (2) has no retroactive effect; and (3) does not require administrative proceedings before parties may file suit in court challenging this rule.

## Executive Order 13175

This final rule has been reviewed in accordance with the requirements of Executive Order 13175, ''Consultation and Coordination with Indian Tribal Governments.'' Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a government-to-government basis on policies that have tribal implications, including regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. APHIS has determined that Executive Order 13175 is applicable to this rulemaking and that therefore consultation is required, as this final rule may affect one or more Tribes and the cost associated with managing cattle and bison herds. To raise awareness of this rulemaking, APHIS hosted an informational webinar to Tribal nations on October 27, 2021, to notify Tribes of this rulemaking and solicit consultation. On May 18, 2022, the APHIS Office of

National Tribal Liaison sent letters to all 574 Tribal Leaders inviting them to attend an upcoming Tribal listening session. The listening session was held on June 23, 2022. Sixteen individuals attended, and we did not receive feedback that substantively affected the development of this rulemaking. APHIS will work with the Office of Tribal Relations to ensure that additional outreach occurs in 2024. If a Tribe requests consultation, APHIS will coordinate with the Office of Tribal Relations to ensure that meaningful consultation occurs.

## Paperwork Reduction Act

In accordance with section 3507(d) of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), the reporting, recordkeeping, and third-party disclosure requirements described in this final rule are currently approved by the Office of Management and Budget (OMB) under OMB control number 0579–0327. The categories of burden and numbers haven't changed as a result of this rule. The last approval from 2021 (*https://www.regulations.gov/document/ APHIS-2021-0056-0001*) is still accurate.

## E-Government Act Compliance

The Animal and Plant Health Inspection Service is committed to compliance with the EGovernment Act to promote the use of the internet and other information technologies, to provide increased opportunities for citizen access to Government information and services, and for other purposes. For information pertinent to E-Government Act compliance related to this final rule, please contact Mr. Joseph Moxey, APHIS' Paperwork Reduction Act Coordinator, at (301) 851–2533.

## Congressional Review Act

Pursuant to subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996 (also known as the Congressional Review Act, 5 U.S.C. 801 *et seq.*) OIRA has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2).

## Unfunded Mandates Reform Act of 1995

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), Public Law 104.4, establishes requirements for Federal agencies to assess the effects of their regulatory actions on State, local, tribal governments, and the private sector. Under section 101 of the UMRA, APHIS generally must prepare a written statement, including a cost-benefit analysis, for proposed and final rules with ''Federal mandates'' that may

result in expenditures by State, local, or tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year. When such a statement is needed for a rule, section 205 of the UMRA generally requires APHIS to identify and consider a reasonable number of regulatory alternatives and adopt the least costly, more cost-effective, or least burdensome alternative that achieves the objectives of the rule.

This rule contains no Federal mandates (under the regulatory provisions of title II of the UMRA) that may result in expenditures by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year. Thus, this rule is not subject to the requirements of sections 202 and 205 of the UMRA.

## List of Subjects

### 9 CFR Part 71

Animal diseases, Livestock, Poultry and poultry products, Quarantine, Reporting and recordkeeping requirements, Transportation.

### 9 CFR Part 77

Animal diseases, Bison, Cattle, Reporting and recordkeeping requirements, Transportation, Tuberculosis.

### 9 CFR Part 78

Animal diseases, Bison, Cattle, Quarantine, Reporting and recordkeeping requirements, Swine, Transportation.

### 9 CFR Part 86

Animal diseases, Bison, Cattle, Livestock, Reporting and recordkeeping requirements.

For the reasons stated in the preamble, APHIS amends 9 CFR parts 71, 77, 78, and 86 as follows:

## PART 71—GENERAL PROVISIONS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 7 U.S.C. 8301–8317; 7 CFR 2.22, 2.80, and 371.4.

■ 2. Amend § 71.1 by revising the definition of ''Official eartag'' to read as follows:

## § 71.1   Definitions.

\*    \*    \*    \*    \*

*Official eartag.* An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the

AR-000023

approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal.

\*    \*    \*    \*    \*

## PART 77—TUBERCULOSIS

■ 3. The authority citation for part 77 continues to read as follows:

**Authority:** 7 U.S.C. 8301–8317; 7 CFR 2.22, 2.80, and 371.4.

■ 4. Amend § 77.2, by revising the definitions of ''Interstate certificate of veterinary inspection (ICVI)'' and ''Official eartag'' to read as follows:

### § 77.2   Definitions.

\*    \*    \*    \*    \*

*Interstate certificate of veterinary inspection (ICVI).* An official document issued by a Federal, State, Tribal, or accredited veterinarian certifying the inspection of animals in preparation for interstate movement.

(1) The ICVI must show:

(i) The species of animals covered by the ICVI;

(ii) The number of animals covered by the ICVI;

(iii) The purpose for which the animals are to be moved;

(iv) The address at which the animals were loaded for interstate movement;

(v) The address to which the animals are destined; and

(vi) The names of the consignor and the consignee, and their addresses if different from the address at which the animals were loaded or the address to which the animals are destined.

(vii) Additionally, unless the species-specific requirements for ICVIs provide an exception, the ICVI must list the official identification number of each animal, except as provided in paragraph (2) of this definition, or group of animals moved that is required to be officially identified, or, if an alternative form of identification has been agreed upon by the sending and receiving States, the ICVI must include a record of that identification. If animals moving under a GIN also have individual official identification, only the GIN must be listed on the ICVI. An ICVI may not be issued for any animal that is not officially identified, if official identification is required. If the animals are not required by the regulations to be officially identified, the ICVI must state the exemption that applies (*e.g.,* the cattle and bison do not belong to one of the classes of cattle and bison to which the official identification requirements of this part apply). If the animals are required to be officially identified but the identification number does not have to be recorded on the ICVI, the ICVI

must state that all animals to be moved under the ICVI are officially identified.

(2) As an alternative to recording individual animal identification on an ICVI, if agreed to by the receiving State or Tribe, another document may be attached to provide this information, but only under the following conditions:

(i) The document must be a State form or APHIS form that requires individual identification of animals, or a printout of official identification numbers generated by computer or other means;

(ii) A legible copy of the document must be attached to the original and each copy of the ICVI;

(iii) Each copy of the document must identify each animal to be moved with the ICVI. The document must not contain any information pertaining to other animals; and

(iv) The following information must be included in the identification column on the original and each copy of the ICVI:

(A) The name of the document; and

(B) Either the unique serial number on the document or both the name of the person who prepared the document and the date the document was signed.

\*    \*    \*    \*    \*

*Official eartag.* An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal.

\*    \*    \*    \*    \*

## PART 78—BRUCELLOSIS

■ 5. The authority citation for part 78 continues to read as follows:

**Authority:** 7 U.S.C. 8301–8317; 7 CFR 2.22, 2.80, and 371.4.

■ 6. Amend § 78.1 by revising the definitions of ''Dairy cattle'', ''Interstate certificate of veterinary inspection (ICVI)'', and ''Official eartag'' to read as follows:

### § 78.1   Definitions.

\*    \*    \*    \*    \*

*Dairy cattle.* All cattle, regardless of age or sex or current use, that are of a breed(s) or offspring of a breed used to produce milk or other dairy products for human consumption, including, but not limited to, Ayrshire, Brown Swiss, Holstein, Jersey, Guernsey, Milking Shorthorn, and Red and Whites.

\*    \*    \*    \*    \*

*Interstate certificate of veterinary inspection (ICVI).* An official document

issued by a Federal, State, Tribal, or accredited veterinarian certifying the inspection of animals in preparation for interstate movement.

(1) The ICVI must show:

(i) The species of animals covered by the ICVI;

(ii) The number of animals covered by the ICVI;

(iii) The purpose for which the animals are to be moved;

(iv) The address at which the animals were loaded for interstate movement;

(v) The address to which the animals are destined; and

(vi) The names of the consignor and the consignee and their addresses if different from the address at which the animals were loaded or the address to which the animals are destined.

(vii) Additionally, unless the species-specific requirements for ICVIs provide an exception, the ICVI must list the official identification number of each animal, except as provided in paragraph (2) of this definition, or group of animals moved that is required to be officially identified, or, if an alternative form of identification has been agreed upon by the sending and receiving States, the ICVI must include a record of that identification. If animals moving under a GIN also have individual official identification, only the GIN must be listed on the ICVI. An ICVI may not be issued for any animal that is not officially identified, if official identification is required. If the animals are not required by the regulations to be officially identified, the ICVI must state the exemption that applies (*e.g.,* the cattle and bison do not belong to one of the classes of cattle and bison to which the official identification requirements of this part apply). If the animals are required to be officially identified but the identification number does not have to be recorded on the ICVI, the ICVI must state that all animals to be moved under the ICVI are officially identified.

(2) As an alternative to recording individual animal identification on an ICVI, if agreed to by the receiving State or Tribe, another document may be attached to provide this information, but only under the following conditions:

(i) The document must be a Tribal or State form or APHIS form that requires individual identification of animals, or a printout of official identification numbers generated by computer or other means;

(ii) A legible copy of the document must be attached to the original and each copy of the ICVI;

(iii) Each copy of the document must identify each animal to be moved with the ICVI. The document must not

AR-000024

**39564**    **Federal Register** / Vol. 89, No. 91 / Thursday, May 9, 2024 / Rules and Regulations

contain any information pertaining to other animals; and

(iv) The following information must be included in the identification column on the original and each copy of the ICVI:

(A) The name of the document; and

(B) Either the unique serial number on the document or both the name of the person who prepared the document and the date the document was signed.

\*    \*    \*    \*    \*

*Official eartag.* An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal.

\*    \*    \*    \*    \*

## PART 86—ANIMAL DISEASE TRACEABILITY

■ 7. The authority citation for part 86 continues to read as follows:

**Authority:** 7 U.S.C. 8301–8317; 7 CFR 2.22, 2.80, and 371.4.

■ 8. Amend § 86.1 by:

■ a. Revising the definitions of "Approved tagging site", "Dairy cattle", and "Interstate certificate of veterinary inspection (ICVI)";

■ b. Adding in alphabetical order the definition for "Official Animal Identification Device Standards (OAIDS)";

■ c. Revising the definition of "Official eartag"; and

■ d. Adding an OMB citation at the end of the section.

The revisions and additions read as follows:

### § 86.1    Definitions.

\*    \*    \*    \*    \*

*Approved tagging site.* A premises, authorized by APHIS, State, or Tribal animal health officials, where livestock without official identification may be transferred to have official identification applied on behalf of their owner or the person in possession, care, or control of the animals when they are brought to the premises.

\*    \*    \*    \*    \*

*Dairy cattle.* All cattle, regardless of age or sex or current use, that are of a breed(s) or offspring of a breed used to produce milk or other dairy products for human consumption, including, but not limited to, Ayrshire, Brown Swiss, Holstein, Jersey, Guernsey, Milking Shorthorn, and Red and Whites.

\*    \*    \*    \*    \*

*Interstate certificate of veterinary inspection (ICVI).* An official document issued by a Federal, State, or Tribal government, or an accredited veterinarian, certifying the inspection of animals in preparation for interstate movement.

(1) The ICVI must show:

(i) The species of animals covered by the ICVI;

(ii) The number of animals covered by the ICVI;

(iii) The purpose for which the animals are to be moved;

(iv) The address at which the animals were loaded for interstate movement;

(v) The address to which the animals are destined; and

(vi) The names of the consignor and the consignee and their addresses if different from the address at which the animals were loaded or the address to which the animals are destined.

(vii) Additionally, unless the species-specific requirements for ICVIs provide an exception, the ICVI must list the official identification number of each animal, except as provided in paragraph (2) of this definition, or group of animals moved that is required to be officially identified, or, if an alternative form of identification has been agreed upon by the sending and receiving States, the ICVI must include a record of that identification. If animals moving under a GIN also have individual official identification, only the GIN must be listed on the ICVI. An ICVI may not be issued for any animal that is not officially identified if official identification is required. If the animals are not required by the regulations to be officially identified, the ICVI must state the exemption that applies (*e.g.,* the cattle and bison do not belong to one of the classes of cattle and bison to which the official identification requirements of this part apply). If the animals are required to be officially identified but the identification number does not have to be recorded on the ICVI, the ICVI must state that all animals to be moved under the ICVI are officially identified.

(2) As an alternative to recording individual animal identification on an ICVI, if agreed to by the receiving State or Tribe, another document may be attached to provide this information, but only under the following conditions:

(i) The document must be a State form or APHIS form that requires individual identification of animals, or a printout of official identification numbers generated by computer or other means;

(ii) A legible copy of the document must be attached to the original and each copy of the ICVI;

(iii) Each copy of the document must identify each animal to be moved with

the ICVI. The document must not contain any information pertaining to other animals; and

(iv) The following information must be included in the identification column on the original and each copy of the ICVI:

(A) The name of the document; and

(B) Either the unique serial number on the document or both the name of the person who prepared the document and the date the document was signed.

\*    \*    \*    \*    \*

*Official Animal Identification Device Standards (OAIDS).* A document providing further information regarding the official identification device recordkeeping requirements of this part, and technical descriptions, specifications, and details under which APHIS would approve identification devices for official use. Updates or modifications to the Standards document will be announced to the public by means of a notice published in the **Federal Register**.

*Official eartag.* An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal.

\*    \*    \*    \*    \*

(Approved by the Office of Management and Budget under control number 0579–0327)

■ 9. Revise § 86.2 to add an OMB citation at the end of the section to read as follows:

### § 86.2    General requirements for traceability.

\*    \*    \*    \*    \*

(Approved by the Office of Management and Budget under control number 0579–0327)

■ 10. Revise § 86.3 to read as follows:

### § 86.3    Recordkeeping requirements.

(a) Any State, Tribe, accredited veterinarian, or other person or entity who distributes official identification devices must maintain for 5 years a record of the names and addresses of anyone to whom the devices were distributed. Official identification device distribution records must be entered by the person distributing the devices into the Tribal, State, Federal, or other database acceptable to each government entity. Additional guidance on meeting these recordkeeping requirements is found in the OAIDS.

(b) Records of official identification devices applied by a federally

AR-000025

accredited veterinarian to a client animal must be kept in a readily accessible record system.

(c) Approved livestock facilities must keep any ICVIs or alternate documentation that is required by this part for the interstate movement of covered livestock that enter the facility on or after March 11, 2013. For poultry and swine, such documents must be kept for at least 2 years, and for cattle and bison, sheep and goats, cervids, and equids, 5 years.

(d) Records required under paragraphs (a) through (c) of this section must be maintained by the responsible person or entity and must be of sufficient accuracy, quality, and completeness to demonstrate compliance with all conditions and requirements under this part. During normal business hours, APHIS must be allowed access to all records, to include visual inspection and reproduction (*e.g.,* photocopying, digital reproduction). The responsible person or entity must submit to APHIS all reports and notices containing the information specified within 48 hours of receipt of request, or earlier if warranted by an emergency disease response.

(Approved by the Office of Management and Budget under control number 0579–0327)

■ 11. Amend § 86.4 by:
■ a. Revising paragraphs (a) introductory text and (a)(1)(i);
■ b. In paragraphs (a)(2)(i) and (iv), removing the word ''equine'' and adding in its place the word ''equid'' wherever it appears;
■ c. In paragraph (a)(2)(iii), removing the words ''to the equine'' and adding in their place the words ''into the equid'';
■ d. In paragraph (a)(2)(v), removing the word ''equines'' and adding in its place the word ''equids'';
■ e. Adding paragraph (b)(1)(ii)(D);
■ f. Revising paragraphs (b)(1)(iii)(B), (b)(4) introductory text, and (c)(3);
■ g. Removing paragraph (c)(4);
■ h. Revising paragraphs (e)(1)(iii) and (iv);
■ i. Adding in paragraph (e)(2)(iv) the words ''or other EID'' between the words ''RFID'' and ''eartag''; and
■ j. Adding an OMB citation at the end of the section.

The additions and revisions read as follows:

### § 86.4   Official identification.

(a) *Official identification devices and methods.* The Administrator has approved the following official identification devices or methods for the species listed. The Administrator may authorize the use of additional devices

or methods for a specific species if he or she determines that such additional devices or methods will provide for adequate traceability. Additional guidance on official identification devices, methods, and the approval process is found in the Official Animal Identification Device Standards (OAIDS) document.

(1) * * *

(i) For an official eartag, beginning November 5, 2024, all official eartags sold for or applied to cattle and bison must be readable both visually and electronically (EID);

*        *        *        *        *

(b) * * *
(1) * * *
(ii) * * *
(D) Cattle and bison leaving a slaughter establishment may only be moved to another recognized slaughter establishment or approved feedlot and can only be sold/re-sold as slaughter cattle, and they must be accompanied by an owner-shipper statement in accordance with § 86.5(c)(1). Information listed on the document must include the name and address of the slaughter establishment from which the animals left, the official identification numbers, as defined in § 86.1, correlated with the USDA backtag number (if available), the name of the destination slaughter establishment, or approved feedlot (as defined in § 77.5 of this subchapter) to which the animals are being shipped.

(iii) * * *
(B) All dairy cattle;

*        *        *        *        *

(4) *Horses and other equids.* Horses and other equids moving interstate must be officially identified prior to the interstate movement, using an official identification device or method listed in paragraph (a)(2) of this section unless:

*        *        *        *        *

(c) * * *
(3) A visually and electronically readable eartag may be applied to an animal that is already officially identified with one or more non-EID official eartags and/or a non-EID official vaccination eartag used for brucellosis. The person applying the new visually and electronically readable eartag must record the date the eartag is applied to the animal and the official identification numbers of both official eartags and must maintain those records for 5 years.

*        *        *        *        *

(e) * * *
(1) * * *
(iii) Malfunction of the electronic component of an electronically readable (EID) device; or
(iv) Incompatibility or inoperability of the electronic component of an EID

device with the management system or unacceptable functionality of the management system due to use of an EID device.

*        *        *        *        *

(Approved by the Office of Management and Budget under control number 0579–0327)

■ 12. Revise § 86.5 to read as follows:

### § 86.5   Documentation requirements for interstate movement of covered livestock.

(a) *Responsible persons and required documentation.* The persons responsible for animals leaving a premises for interstate movement must ensure that the animals are accompanied by an interstate certificate of veterinary inspection (ICVI) or other document required by this part for the interstate movement of animals.

(b) *Forwarding of documents.* (1) The APHIS representative, State or Tribal representative, or accredited veterinarian issuing an ICVI or other document required for the interstate movement of animals under this part, must forward a copy of the ICVI or other document to the State or Tribal animal health official of the State or Tribe of origin within 7 calendar days from the date on which the ICVI or other document is issued. The State or Tribal animal health official in the State or Tribe of origin must forward a copy of the ICVI or other document to the State or Tribal animal health official in the State or Tribe of destination within 7 calendar days from date on which the ICVI or other document is received.

(2) The animal health official or accredited veterinarian issuing or receiving an ICVI or other interstate movement document in accordance with paragraph (b)(1) of this section must keep a copy of the ICVI or alternate documentation. For poultry and swine, such documents must be kept for at least 2 years, and for cattle and bison, sheep and goats, cervids, and equine species, 5 years.

(c) *Cattle and bison.* Cattle and bison moved interstate must be accompanied by an ICVI unless:

(1) They are moved directly to a recognized slaughtering establishment, or directly to an approved livestock facility and then directly to a recognized slaughtering establishment, and they are accompanied by an owner-shipper statement.

(2) They are moved directly to an approved livestock facility with an owner-shipper statement and do not move interstate from the facility unless accompanied by an ICVI.

(3) They are moved from the farm of origin for veterinary medical examination or treatment and returned

AR-000026

to the farm of origin without change in ownership.

(4) They are moved directly from one State through another State and back to the original State.

(5) They are moved as a commuter herd with a copy of the commuter herd agreement or other document, as agreed to by the States or Tribes involved in the movement.

(6) Additionally, cattle and bison may be moved between shipping and receiving States or Tribes with documentation other than an ICVI, *e.g.,* a brand inspection certificate, as agreed upon by animal health officials in the shipping and receiving States or Tribes.

(7) The official identification number of cattle or bison must be recorded on the ICVI or alternate documentation unless:

(i) The cattle or bison are moved from an approved livestock facility directly to a recognized slaughtering establishment; or

(ii) The cattle and bison are sexually intact cattle or bison under 18 months of age or steers or spayed heifers; except that this paragraph (c)(7)(ii) does not apply to dairy cattle of any age or to cattle or bison used for rodeo, exhibition, or recreational purposes.

(d) *Horses and other equine species.* Horses and other equine species moved interstate must be accompanied by an ICVI unless:

(1) They are used as the mode of transportation (horseback, horse and buggy) for travel to another location and then return direct to the original location; or

(2) They are moved from the farm or stable for veterinary medical examination or treatment and returned to the same location without change in ownership; or

(3) They are moved directly from a location in one State through another State to a second location in the original State.

(4) Additionally, equids may be moved between shipping and receiving States or Tribes with documentation other than an ICVI, *e.g.,* an equine infectious anemia test chart, as agreed to by the shipping and receiving States or Tribes involved in the movement.

(5) Equids moving commercially to slaughter must be accompanied by documentation in accordance with part 88 of this subchapter. Equine infectious anemia reactors moving interstate must be accompanied by documentation as required by part 75 of this subchapter.

(e) *Poultry.* Poultry moved interstate must be accompanied by an ICVI unless:

(1) They are from a flock participating in the National Poultry Improvement Plan (NPIP) and are accompanied by the documentation required under the NPIP regulations (parts 145 through 147 of this chapter) for participation in that program; or

(2) They are moved directly to a recognized slaughtering or rendering establishment; or

(3) They are moved from the farm of origin for veterinary medical examination, treatment, or diagnostic purposes and either returned to the farm of origin without change in ownership or euthanized and disposed of at the veterinary facility; or

(4) They are moved directly from one State through another State and back to the original State; or

(5) They are moved between shipping and receiving States or Tribes with a VS Form 9–3 or documentation other than an ICVI, as agreed upon by animal health officials in the shipping and receiving States or Tribes; or

(6) They are moved under permit in accordance with part 82 of this subchapter.

(f) *Sheep and goats.* Sheep and goats moved interstate must be accompanied by documentation as required by part 79 of this subchapter.

(g) *Swine.* Swine moved interstate must be accompanied by documentation in accordance with § 71.19 of this subchapter or, if applicable, with part 85 of this subchapter.

(h) *Captive cervids.* Captive cervids moved interstate must be accompanied by documentation as required by part 77 of this subchapter.

(Approved by the Office of Management and Budget under control number 0579–0327)

Done in Washington, DC, this 26th day of April 2024.

**Jennifer Moffitt,**

*Under Secretary for Marketing and Regulatory Programs.*

[FR Doc. 2024–09717 Filed 5–8–24; 8:45 am]

**BILLING CODE 3410–34–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 25**

**[Docket No. FAA–2024–0566; Special Conditions No. 25–861–SC]**

**Special Conditions: The Boeing Model 737–8 Airplane; Dynamic Test Requirements for Single-Occupant Oblique Seats With 3-Point Seat Belt With Pretensioner**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final special conditions; request for comments.

**SUMMARY:** These special conditions are issued for The Boeing Company (Boeing) Model 737–8 series airplane. This airplane, as modified by HAECO Cabin Solutions, LLC. (HAECO), will have a novel or unusual design feature when compared to the state of technology envisioned in the airworthiness standards for transport-category airplanes. This design feature is single-occupant oblique (side-facing) seats equipped with a 3-point seat belt with pretensioner. The applicable airworthiness regulations do not contain adequate or appropriate safety standards for this design feature. These special conditions contain the additional safety standards that the Administrator considers necessary to establish a level of safety equivalent to that established by the existing airworthiness standards.

**DATES:** This action is effective on HAECO on May 9, 2024. Send comments on or before June 24, 2024.

**ADDRESSES:** Send comments identified by Docket No. FAA–2024–0566 using any of the following methods:

• *Federal eRegulations Portal:* Go to *www.regulations.gov* and follow the online instructions for sending your comments electronically.

• *Mail:* Send comments to Docket Operations, M–30, U.S. Department of Transportation, 1200 New Jersey Avenue SE, Room W12–140, West Building Ground Floor, Washington, DC 20590–0001.

• *Hand Delivery or Courier:* Take comments to Docket Operations in Room W12–140 of the West Building Ground Floor at 1200 New Jersey Avenue SE, Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

• *Fax:* Fax comments to Docket Operations at 202–493–2251.

*Docket:* Background documents or comments received may be read at *www.regulations.gov* at any time. Follow the online instructions for accessing the docket or go to Docket Operations in Room W12–140 of the West Building Ground Floor at 1200 New Jersey Avenue SE, Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** John Shelden, Cabin Safety Section, AIR–624, Technical Policy Branch, Policy and Standards Division, Aircraft Certification Service, Federal Aviation Administration, 2200 South 216th Street, Des Moines, Washington 98198; telephone and fax (206) 231–3214; email *john.shelden@faa.gov.*

**SUPPLEMENTARY INFORMATION:** The substance of these special conditions has been published in the **Federal**

AR-000027