# Exhibit 2

88 Fed. Reg. 3,320 (Jan. 19, 2023)
AR-000028–38

**3320**

# Proposed Rules

Federal Register

Vol. 88, No. 12

Thursday, January 19, 2023

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## DEPARTMENT OF AGRICULTURE

### Animal and Plant Health Inspection Service

**9 CFR Parts 71, 77, 78, and 86**

[Docket No. APHIS–2021–0020]

**RIN 0579–AE64**

### Use of Electronic Identification Eartags as Official Identification in Cattle and Bison

**AGENCY:** Animal and Plant Health Inspection Service, USDA.

**ACTION:** Proposed rule.

**SUMMARY:** We are proposing to amend the animal disease traceability regulations to require that eartags applied on or after a date 6 months (180 days) after publication in the **Federal Register** of a final rule following this proposed rule be both visually and electronically readable in order to be recognized for use as official eartags for interstate movement of cattle and bison covered under the regulations. We are also proposing to clarify certain record retention and record access requirements and revise some requirements pertaining to slaughter cattle. These proposed changes would enhance the ability of Tribal, State and Federal officials, private veterinarians, and livestock producers to quickly respond to high-impact diseases currently existing in the United States, as well as foreign animal diseases that threaten the viability of the U.S. cattle and bison industries.

**DATES:** We will consider all comments that we receive on or before March 20, 2023.

**ADDRESSES:** You may submit comments by either of the following methods:

• *Federal eRulemaking Portal:* Go to *www.regulations.gov.* Enter APHIS–2021–0020 in the Search field. Select the Documents tab, then select the Comment button in the list of documents.

• *Postal Mail/Commercial Delivery:* Send your comment to Docket No. APHIS–2021–0020, Regulatory Analysis and Development, PPD, APHIS, Station 3A–03.8, 4700 River Road, Unit 118, Riverdale, MD 20737–1238.

Supporting documents and any comments we receive on this docket may be viewed at *www.regulations.gov* or in our reading room, which is located in room 1620 of the USDA South Building, 14th Street and Independence Avenue SW, Washington, DC. Normal reading room hours are 8 a.m. to 4:30 p.m., Monday through Friday, except holidays. To be sure someone is there to help you, please call (202) 799–7039 before coming.

**FOR FURTHER INFORMATION CONTACT:** Dr. Aaron Scott, Director, National Animal Disease Traceability and Veterinary Accreditation Center, Strategy & Policy, Veterinary Services, APHIS, 2150 Centre Ave, Fort Collins, CO 80526; *traceability@usda.gov;* (970) 494–7249.

**SUPPLEMENTARY INFORMATION:**

### Background

The Animal and Plant Health Inspection Service's (APHIS') Animal Disease Traceability (ADT) framework was established to improve the ability to trace animals back from slaughter and forward from premises where the animals are officially identified, in addition to tracing animals' interstate movements. Knowing where diseased and exposed animals are, as well as where they have been and when, is indispensable to emergency response and ongoing disease control and eradication programs. The ability to trace animals accurately and rapidly does not prevent disease epidemics, but does allow Tribal, State, and Federal veterinarians to contain potentially devastating disease outbreaks before they can do substantial damage to the U.S. cattle and bison industries. A comprehensive animal disease traceability system is the best protection against a devastating disease outbreak.

Tracing of animals has multiple components, including identification of the animal, tracking its movements, discovering other exposed animals, and finding the associated records quickly enough to implement mitigations to the impact of the disease. Time to find records is critical for diseases, such as foot and mouth disease (FMD), that may transmit from animal to animal in as little as 24 to 48 hours. For other diseases that can have prolonged latency periods and may result in a significant number of exposed animals, such as bovine tuberculosis and brucellosis, accuracy of data collection and data retrieval is important. In either case, consequences of late or inaccurate records may result in large financial losses.

Foreign animal diseases such as FMD have been largely excluded from the United States; however, exclusion of every high impact disease through every pathway of introduction is likely an unachievable task. Costs of incursions vary, but even a small outbreak of FMD would have multi-billion dollar impacts on U.S. livestock producers' access to export markets with additional losses to production, reproduction, and animal population. Other diseases, such as bovine tuberculosis, move slowly but may infect many herds before detection. The financial consequences of this insidious and incurable disease, which can also affect other animals and people, as well as intangible impacts related to consequences or loss of a family farm, can be high.

Jurisdiction and responsibility for controlling diseases that can cause significant damage to the livestock industry is divided among State, Tribal, and U.S. Department of Agriculture (USDA) animal health officials. Interstate movement of cattle and bison falls under the responsibility of USDA, APHIS, while movements within the State and Tribal boundaries fall under their respective governments. There are approximately 100 million cattle and bison in the United States, and they are likely to make multiple movements through their lifetimes. Rapid and accurate recordkeeping for this volume of animals and movement is not achievable without electronic systems.

Eartags are an essential component for animal health officials to identify and track the movement of animals that are diseased or exposed to disease. Official eartags are approved by APHIS to identify certain classes of animals that move interstate or are part of Federal disease control and eradication programs. USDA records show that approximately 11 million official visually readable only, *i.e.,* non-electronic identification (EID) eartags were used per year in fiscal years 2017 through 2021, which corresponds to 11 percent of the national population of cattle and bison.

Official identification tags may be placed on the animal by the animal owner but are more frequently placed at livestock markets or by veterinarians who create the movement documents required for the interstate travel of the animals. In either case, EID eartags offer a number of advantages over non-EID eartags. With non-EID eartags, the animal must be physically restrained to allow the eartag number to safely be read and transcribed. Often, the eartag must be cleaned before the number can accurately be read. Visual eartag numbers may be recorded on paper, or manually entered in a database. Errors can occur while reading, transcribing, or entering the eartag number into a database. Costs to the producers may include that of the tags as well as the time for restraining the animals and reading the numbers. Alternatively, for EID tags, the numbers may be read visually, similarly to the non-EID tags, or may be read without restraint as the animal goes past an electronic reader. Once the reader scans the tag, the electronically collected tag number can be rapidly and accurately transmitted from the reader to a connected electronic database. Since the eartag number does not need to be manually read, transcribed, or entered in a database, the risk of errors at these steps is eliminated. Electronic identification numbers are stored in electronic data systems, whereas visual identification numbers may be stored in electronic data systems after entry or filed as paper records. Disease investigations that involve tracing an animal with electronic records take only minutes to hours, while searching paper records for a visual eartag number can take days to weeks or longer. Shorter disease investigations minimize the impact on individual producers, herds, businesses, and communities.

Currently, the livestock industry uses APHIS-approved EID tags as well as other EID tags intended for production management. Official EID eartag numbers are read on the same radio frequency as other electronic eartags and are quality-tested to last the lifetime of an animal. Hence, they serve a dual purpose whether official identification is needed or when integrated into production systems.

APHIS has primary regulatory responsibility to control and eradicate communicable diseases of livestock and to prevent the introduction and dissemination of any pest or disease of livestock into the United States. The animal disease traceability regulations,

which were set forth in a final rule [1] published on January 9, 2013 (78 FR 2040–2075, Docket No. APHIS–2009–0091), provide the requirements for identification and documentation for certain classes of cattle and bison to move interstate. These regulations establish minimum national official identification and documentation requirements for the traceability of livestock moving interstate. The species covered in the regulations include cattle and bison, sheep and goats, swine, horses and other equids, captive cervids (*e.g.,* deer and elk), and poultry.

Since the enactment of these regulations, APHIS has worked with stakeholders to enhance its traceability capacity within the ADT program. In January 2017, APHIS staff officers met with State officials and APHIS Veterinary Services field officers to gather input on what was working well in the traceability program and what gaps remained. A report of our findings was published in April 2017 (*https:// www.aphis.usda.gov/traceability/ downloads/adt-assessment.pdf*). Among other findings, the report discussed gaps in tracing animals due to the challenges of reading and recording numbers from non-EID eartags. A similar gap identified was the need for greater efficiency in collecting AINs or other official identification numbers of individual animals at slaughter and removing those identification numbers from future tracing efforts. Eliminating this gap was determined not to be feasible with visual-only eartags, but could be achieved at a future time with EID eartags.

On April 4, 2017, we published in the **Federal Register** (82 FR 16336, Docket No. APHIS–2017–0016) a notice [2] announcing a series of public meetings aimed at soliciting comment on the animal disease traceability program. A total of nine public meetings were hosted by APHIS between April and July of that year, and an additional meeting was hosted by the Kansas Department of Agriculture. As discussed in the April 2017 notice, the purpose of the meetings paralleled the prior discussion with State officials and APHIS field officers: To "hear from the public about the successes and challenges of the current ADT framework." We specifically solicited attendance from cattle and bison

industry members, as well as impacted States and Tribes.

The notice and meetings generated 462 written public comments. A working group formed in March of 2017 to plan and attend the public meetings was further tasked with listening to the discussions and preparing a final report summarizing input from the meetings and proposing directions to address gaps in the traceability system. The report was presented at the National Institute for Agriculture fall public forum in September of 2017 and published in April of 2018 (*https:// www.aphis.usda.gov/publications/ animal_health/adt-summary-program-review.pdf*).

During the remainder of 2017, 2018, and 2019, APHIS personnel frequently met with stakeholders to discuss questions and topics that arose during the 2017 outreach meetings. In addition to individual and industry organization meetings, APHIS officers met with State officials as well as industry stakeholders at national public forums including the United States Animal Health Association and the National Institute for Animal Agriculture forum.

During this period, cattle and bison organizations provided significant and ongoing input on the animal disease traceability program. Although not everyone agreed, many stakeholders commented that electronic records and electronic identification were of significant value and were needed to protect the industry from diseases with potential for high economic impacts.

Under the regulations, official identification devices or methods are determined by the APHIS Administrator. An *official identification device or method* is defined in 9 CFR 86.1 of the regulations as "[a] means approved by the Administrator of applying an official identification number to an animal of a specific species or associating an official identification number with an animal or group of animals of a specific species or otherwise officially identifying an animal or group of animals."

One of the approved identification methods for cattle and bison covered by part 86 is an official eartag. An *official eartag* is defined in § 86.1 of the regulations as "[a]n identification tag approved by APHIS that bears an official identification number for individual animals. Beginning March 11, 2014, all official eartags manufactured must bear an official eartag shield. Beginning March 11, 2015, all official eartags applied to animals must bear an official eartag shield. The design, size, shape, color, and other characteristics of the official

[1] To view the final rule, the proposed rule, and the comments we received on the proposed rule, go to *www.regulations.gov* and enter APHIS–2009–0091 in the Search field.

[2] To view the notice, go to *www.regulations.gov* and enter APHIS–2017–0016 in the Search field.

AR-000029

eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal." The other methods of official identification of cattle and bison include "brands registered with a recognized brand inspection authority and accompanied by an official brand inspection certificate, when agreed to by the shipping and receiving State or Tribal animal health authorities; or tattoos and other identification methods acceptable to a breed association for registration purposes, accompanied by a breed registration certificate, when agreed to by the shipping and receiving State or Tribal animal health authorities; or Group/lot identification when a group/lot identification number (GIN) may be used." (See 9 CFR 86.4(a)).

Historically, APHIS has used non-EID (metal) tags for animal identification in disease programs for many decades and has approved both non-EID and radio frequency identification (RFID) tags for use as official eartags in cattle and bison since 2008.

While APHIS focuses on interstate movements of livestock, States and Tribal Nations remain responsible for the traceability of livestock within their jurisdictions. APHIS partners with State veterinary officials each year to test the performance of States' animal disease traceability systems. (Tribes are free to request such test exercises on a voluntary basis and APHIS will report to the Tribes the results of any such exercise.) Results of these test exercises, which can be viewed on APHIS's traceability web page,[3] indicate that when State veterinary officials are provided an identification number from an animal that has been identified with an official identification eartag, whether non-EID (*e.g.,* metal or plastic) or electronic, and the number has been entered accurately into a data system, States can trace animals to any one of these four locations in less than 1 hour: The State where an animal was officially identified, the location in-State where an animal was officially identified, the State from which an animal was shipped out of, and the location in-State that an animal was shipped out-of-State from. However, lengthy times or failed traces in the test exercises resulted when numbers from non-EID tags were transcribed inaccurately, movement records were not readily available, or information was

only retrievable from labor-intensive paper filing systems. Electronic tags and electronic record systems provide a significant advantage over non-EID tags by enabling rapid and accurate reading and recording of tag numbers and retrieval of traceability information.

In support of greater efficiency in traceability and in furtherance of the above-listed program goals, on July 6, 2020, we published in the **Federal Register** (85 FR 40184–40185, Docket No. APHIS–2020–0022) a notice [4] in which we announced our proposal to approve only RFID tags as the official eartag for use in interstate movement of cattle and bison that are covered under the regulations. Specifically, the notice proposed that:

• Beginning January 1, 2022, USDA would no longer approve vendors to use the official USDA shield in production of visual eartags or other eartags that do not have RFID components.

• On January 1, 2023, RFID tags would become the only identification devices approved as an official eartag for cattle and bison pursuant to § 86.4(a)(1)(i).

• For cattle and bison that have official USDA visual (metal) tags in place before January 1, 2023, APHIS would recognize the visual (metal) tag as an official identification device for the life of the animal.

The notice further clarified that we were proposing no changes to the regulations pertaining to, nor proposing to restrict the use of, other official identification methods authorized by those regulations (such as the use of tattoos and brands when accepted by State Officials in the sending and receiving states).

We solicited comments on the notice for 90 days ending on October 5, 2020. We received 935 comments by that date from industry groups, producers, veterinarians, State departments of agriculture, and individuals.

Many of the commenters representing industry organizations and State department of agriculture regulatory officials were supportive of the transition and agreed with APHIS that RFID allowed for greater efficiency than non-electronic means of identification and furthered the goals of the ADT program with regard to animal traceability. We also received many comments expressing opposition to the proposal, however.

Many of the commenters opposed to the proposal were concerned with the perceived costs imposed on producers

and livestock markets of having to purchase electronic reading equipment and computer systems. We do not agree with the commenters regarding the magnitude of costs to the domestic cattle and bison industry. Many of these commenters were not aware that the official RFID tags are easily read visually and therefore could be used as they are currently using non-EID tags without the added expense of purchasing reading equipment. Also, large categories of cattle, such as feeder cattle or cull cattle going to slaughter, are not subject to the official identification requirements and would not require official eartags. We address the costs in greater detail in the regulatory impact analysis accompanying this proposed rule.

Other commenters expressed concern about the retention time on the animals of RFID eartags, claiming that non-EID eartags were superior in that regard. These commenters, however, did not differentiate between USDA-approved official tags that must meet quality standards for long-term retention and other RFID tags intended for unofficial uses. Prior to approval by APHIS, official RFID tag manufacturers are required to provide data that supports high long-term retention in cattle including laboratory testing, field trials, and/or sales data from approvals in other countries. Reports of tag retention failures of official tags are followed up and may result in removal of the company's approval for the tag. From the period between 2013 and 2022, only one company has had approval removed due to tag failure. Tags that are not USDA-approved for use as official eartags are often intended for feedlot cattle and do not require long-term retention. Livestock producers that place the short-term tags in cattle other than feeders can expect high loss of tags.

Other commenters who opposed the transition to RFID eartags questioned our legal authority under the Administrative Procedure Act (5 U.S.C. 500 *et seq.*) to change the eartag requirements using a notice-based procedure rather than rulemaking. Some of these commenters suggested that implementing the proposed RFID requirement would effectively change the regulations in part 86, as well as the domestic animal disease-program regulations in other parts of the Code of Federal Regulations, none of which specify that RFID eartags are the only eartags that we recognize as official for interstate movement of cattle and bison. Some commenters expressed opposition to mandatory animal identification and government regulations in general.

---

[3] See ADT Trace Performance Metric Report 2013–2022. *https://www.aphis.usda.gov/ traceability/downloads/adt-trace-perf-report-2013-2022.pdf.*

[4] To view the notice, the assessment, and the comments we received, go to *www.regulations.gov* and enter APHIS–2020–0022 in the Search field.

Our proposal to implement the transition through a notice-based process was informed by our view that we did not need to amend the regulations. As noted above, we define, in § 86.1 and elsewhere in the regulations, an *official eartag* as "an identification tag approved by APHIS that bears an official identification number for individual animals." The definition also states that the "design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator." In our view at the time, that definition provided sufficient flexibility to enable us to require the use of RFID eartags when moving cattle and bison interstate.

After reviewing the comments on the July 2020 notice, however, we determined that withdrawing our recognition of visual-only (non-EID) eartags as official eartags for cattle and bison moving interstate would constitute a change in the application of our regulatory requirements of sufficient magnitude to merit rulemaking rather than the notice-based process we originally envisioned. We also determined that the goal of maximizing transparency and public participation would also best be served through rulemaking in this instance. Therefore, on March 23, 2021, we issued a stakeholder announcement indicating that we would not finalize the notice, and that we "would use the rulemaking process for further action related to the proposal." [5] Should we propose another change of similar magnitude and scope to our requirements for official eartags for cattle and bison that move interstate at some future date, we would likewise use rulemaking for that proposal.

This proposed rule supersedes the July 2020 notice. In the notice's stead, we are proposing to amend the regulations to recognize as official eartags for cattle and bison that currently require them for interstate movement only those eartags that are readable both visually and electronically. To allow adequate time for producers to comply with the proposed requirements, the new proposed effective date would be a date 6 months (180 days) after the publication date in the **Federal Register** of a final rule following this proposed rule. As we stated in the notice, non-EID (metal) tags applied to cattle and bison before that date would continue to be recognized as official identification for

the life of the animals. We believe that allowing 6 months (180 days) after publication of a final rule for implementation is appropriate for the following reasons: The primary change proposed is the use of EID eartags rather than non-EID tags for official use. Because all EID tags are readable visually, however, no modifications are necessary to facilities or equipment currently in use. We would also note that animals that would not be impacted by the transition to EID constitute about 89 percent of the national herd of approximately 100 million cattle and bison. Animals not impacted would include animals that do not cross State lines or those already tagged with official EID, as well as animals exempted under the rule such as beef cattle and bison under the age of 18 months and animals going to slaughter or through an APHIS-approved market and then to slaughter.

There are a few aspects of this proposed rule that differ from the July 2020 notice, however. In this proposed rule, as opposed to the July 2020 notice and the existing regulations in part 86, we refer to electronic identification (EID) tags rather than to RFID tags. Currently, the only official electronically readable identification tags are RFID tags; however, at some future time there may be other electronically readable technology. APHIS' goal is to rapidly and accurately collect the tag numbers and be able to adapt to technological developments, not to codify RFID technology as the only technology option for traceability.

We are also proposing several other changes to part 86 aimed at clarifying the regulations. These include revising the definition of dairy cattle and amending certain provisions pertaining to recordkeeping, and the disposition of slaughter cattle. The specific changes we are proposing are discussed in detail below.

**Definitions**

The current definition of an *approved tagging site* is: "A premises, authorized by APHIS, State, or Tribal animal health officials, where livestock may be officially identified on behalf of their owner or the person in possession, care, or control of the animals when they are brought to the premises." We would revise the definition of *approved tagging site* to read as follows: "A premises, authorized by APHIS, State, or Tribal animal health officials, where livestock without official identification may be transferred to have official identification applied on behalf of their owner or the person in possession, care, or control of the animals when they are brought to

the premises." This proposed definition, while very similar to the existing one, offers greater clarity regarding the nature of an approved tagging site, specifying that such sites are where official identification tags are physically applied to animals.

The current definition of dairy cattle is: "All cattle, regardless of age or sex or current use, that are of a breed(s) used to produce milk or other dairy products for human consumption, including, but not limited to, Ayrshire, Brown Swiss, Holstein, Jersey, Guernsey, Milking Shorthorn, and Red and Whites." We are proposing to revise the definition of dairy cattle to read as follows: "All cattle, regardless of age or sex, breed, or current use, that are born on a dairy farm or are of a breed(s) used to produce milk or other dairy products for human consumption, or cross bred calves of any breed that are born to dairy cattle including, but not limited to, Ayrshire, Brown Swiss, Holstein, Jersey, Guernsey, Milking Shorthorn, and Red and Whites. This proposed definition differs from the existing one in that it includes not only certain breeds that are reared specifically to produce milk or other dairy products but also other cattle that are reared under the same management practices as purebred dairy cattle. Under part 86, dairy cattle have different requirements for official identification and movement documentation from beef cattle because of the increased risks that dairy animals have for contracting diseases early in life. Dairy farm management practices result in higher risk of disease transmission and include practices such as pooling colostrum from multiple cows for many calves, commingling calves at different locations during their lifetimes, and movement to many destinations. Because the increased disease risk is due to the management of the cattle rather than their genetic makeup as a dairy breed, it is necessary to change the definition accordingly. We welcome comments from the public on this issue.

We are proposing some editorial and formatting changes to the definition of *interstate certificate of veterinary inspection (ICVI)*. The existing definition contains requirements pertaining only to paper ICVIs, but electronic ICVIs are now commonly used and accepted across the United States for animal movement. Our proposed editorial changes would account for electronic ICVIs as well as paper ones. The proposed formatting changes would make the definition clearer and easier for users to understand. Substantively, however, the

[5] See *https://www.aphis.usda.gov/aphis/newsroom/news/sa_by_date/sa-2021/rfid-traceability-rulemaking.*

revised definition would not otherwise change the definition.

We are proposing to add to § 86.1 a definition of *Official Animal Identification Device Standards (OAIDS).* The proposed definition would state that the OAIDS is a document providing further information regarding official identification device recordkeeping requirements contained in the regulations. The definition would also indicate that when APHIS updates or modifies the standards, an announcement will be made to the public by means of a notice published in the **Federal Register**. The notice-based process would provide the regulatory flexibility needed to account for rapid advances in EID technology. The OAIDS replaces the old title for the document, the Animal Disease Traceability General Standards document. In our view, the new title more accurately reflects the content of the document, which focuses on official identification devices. There would also be some substantive changes to the document, as discussed below.

In broad terms, the proposed OAIDS, like the existing Standards document, would provide guidelines, technical standards, and specifications for tag manufacturers requesting APHIS approval of new official identification devices. The requirements contained in both documents reflect our recognition of the importance of quality in tag design, safety, and retention. We have determined, however, that some of our current requirements may be burdensome and inhibit manufacturers seeking APHIS approval of new official identification devices. Therefore, the proposed OAIDS would streamline the process for approval of new EID tags and reduce the burden for development of new tags. Specific changes would include the following:

• Accepting EID device testing equivalent to International Committee for Animal Recording (ICAR) testing and allowing APHIS to consider requests, on a case-by-case basis, for approval of alternative field trials or eartags with previously generated verifiable data if equivalency to the standards is demonstrated;

• Modifying the field trial requirements by reducing timelines for the three approval statuses (trial, preliminary, and conditional), reducing the number of required field trial locations, and reducing the number of cattle and bison required for field trials; and

• Reducing the timeframe before allowing unlimited sales of devices from a minimum of 24 months to a minimum of 12 months if devices meet the required performance standards.

In addition, the OAIDS would be updated to correspond with the changes in this proposed rule. These updates would include removing some language that no longer applies pertaining to National Uniform Eartagging Standards (NUES) metal tags, which are non-EID tags, and adding a new section on USDA backtags. There would be additional, nonsubstantive edits made to clarify wording and to format tables consistently.

We are proposing to revise the definition of *official eartag* to read as "An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal." This proposed definition is largely the same as the existing one, except for the removal of the following language: "Beginning March 11, 2014, all official eartags manufactured must bear an official eartag shield. Beginning March 11, 2015, all official eartags applied to animals must bear an official eartag shield." Those dates are no longer relevant. There are still many eartags in use that were grandfathered in under the January 2013 final rule because they were applied to animals prior to then; however, all eartags that have been applied to cattle and bison since the implementation dates provided in the current regulations meet the above requirements. A list of currently approved eartags is available at *https://www.aphis.usda.gov/traceability/downloads/ADT_device_ain.pdf.*

**Recordkeeping**

The existing recordkeeping requirements in § 86.3 do not address such issues as record accuracy, quality, completeness, availability, and accessibility. In the case of a fast-moving disease, records that are not readily available to enable the tracing of diseased or exposed animals in adequate time to contain the outbreak provide little value. We are therefore proposing to revise § 86.3 to address these deficiencies. The proposed changes are discussed in detail below.

Current § 86.3(a) states that any State, Tribe, accredited veterinarian, or other person or entity who distributes official identification devices must maintain for 5 years a record of the names and addresses of anyone to whom the devices were distributed. To address the issues of availability and accessibility, we are proposing to add a requirement to that paragraph that official identification device distribution records must be entered by the person distributing the devices into the Tribal, State, or Federal databases designated by each government entity to meet their tag tracing requirements. States and Tribal governments and accredited veterinarians may also use APHIS' tag manager database at no cost. The revised paragraph would also include a statement indicating that OAIDS would contain more specific details on how to meet the requirements of § 86.3 and which parties would be responsible for meeting them.

The requirements contained in current paragraph (b), pertaining to record retention requirements for ICVIs or alternate documentation, would appear under paragraph (c) in this proposed rule. We are proposing to add a new paragraph (b), which would state that records of official identification devices applied by a federally accredited veterinarian to a client animal must be recorded in a readily accessible record system. This may be the veterinarian's medical records system or comparable means of record management. Alternately, the veterinarian may use APHIS' tag management database at no cost to record tag distributions. This proposed requirement would help to ensure that such records are available to APHIS when needed for traceback investigations.

Finally, we would add a new paragraph (d) to § 86.3 stating that records required under paragraphs (a) through (c) of the section would have to be maintained by the responsible person or entity and be of sufficient accuracy, quality, and completeness to demonstrate compliance with all conditions and requirements under part 86. The paragraph would further state that, during normal business hours, APHIS must be allowed access to all records, to include visual inspection and reproduction (*e.g.,* photocopying, digital reproduction). Because disease tracing may involve multiple movements of animals among many locations and persons, prolonged retrieval of tracing information can create significant delays in the containment of serious threats to the livestock industry. For this reason, the responsible person or entity must submit to APHIS all reports and notices containing the information specified within 48 hours of receipt. We welcome comments from the public on this proposed timeline.

AR-000032

**Official Identification**

We are proposing to revise § 86.4(a) introductory text by adding a sentence stating that additional information on official identification devices, methods, and the approval process can be found in the OAIDS.

We are proposing to revise § 86.4(a)(1)(i) to add the requirement, discussed above, that beginning 6 months (180 days) after the publication date of a final rule following this proposed rule, all official eartags sold for or applied to cattle and bison must be readable both visually and electronically. This requirement would enhance our traceback investigation capabilities because, as discussed in greater detail above, EID eartags and electronic recordkeeping allow for greater efficiency and accuracy than do non-EID eartags and paper records. EID tags enable producers or officials to capture accurately animal identification numbers almost instantly, without the need for animal restraint, and to transmit those numbers to a connected electronic database. The use of such tags, therefore, facilitates electronic recordkeeping, which, however, would not be required under this proposed rule.

The existing regulations in § 86.4(b)(1)(ii) allow cattle to move interstate to an approved livestock market and then to slaughter or directly to slaughter without official identification. Current § 86.4(b)(1)(ii)(C) stipulates that the cattle or bison must be identified if held for more than 3 days. The existing regulations are silent on identification requirements for slaughter cattle or bison that are not held at slaughter or held at slaughter for 3 or fewer days and then move to a new location. As noted earlier, difficulties in tracking animals leaving slaughter channels have been identified by State officials as a major gap in traceability, because cattle and bison may move to slaughter without official identification or ICVIs. If they leave the slaughter channel, they may become untraceable.

We are therefore proposing to add paragraph (b)(1)(ii)(D) to § 86.4. The paragraph would read as follows:

• Cattle and bison leaving a slaughter establishment may only be moved to another recognized slaughter establishment or approved feedlot and can only be sold/re-sold as slaughter cattle and must be accompanied by an owner-shipper statement in accordance with § 86.5(c)(1). Information listed on the owner-shipper statement must include the name and address of the slaughter establishment from which the animals left, the official identification

numbers, as defined in § 86.1, correlated with the USDA backtag number (if available), the name of the destination slaughter establishment, or approved feedlot (as defined in 9 CFR 77.5) to which the animals are being shipped.

These proposed requirements clarify that the animals must stay within the intended terminal slaughter channels but may be moved to an additional slaughter plant or approved feedlot with appropriate documentation and identification.

Current § 86.4(b)(1)(iii) lists the following categories of cattle and bison as covered by the official identification requirements for interstate movement:

• All sexually intact cattle and bison 18 months of age or over;

• All female dairy cattle of any age and all dairy males born after March 11, 2013;

• Cattle and bison of any age used for rodeo or recreational events; and

• Cattle and bison of any age used for shows or exhibitions.

Because, as described earlier, we are proposing to amend the definition of *dairy cattle* to reflect the management practices of the premises on which the animals are raised, we would revise paragraph (b)(1)(iii)(B) so that the official identification requirements would apply to all dairy cattle, including offspring of dairy cattle, rather all females and all males born after March 11, 2013. There exists the possibility that as a result of these proposed changes, more animals may by subject to the official identification requirements for interstate movement than are currently. As we note in the economic analysis accompanying this proposed rule, we are seeking public comment on this issue.

Currently, paragraph (c)(3) of § 86.4 allows the application of either a non-EID or an RFID eartag with an animal identification number (AIN) having an 840 prefix to animals already tagged with National Uniform Eartagging System (NUES) tags and/or brucellosis vaccination eartags. We are proposing to revise that paragraph to state that a visually and electronically readable official eartag may be applied to animals currently identified with non-EID official eartags or vaccination tags. Our proposed revision would codify the EID eartag requirement and provide the regulatory flexibility to allow us to account for the development of new EID technologies. In order to allow for the possibility that different numbering systems may be developed and used in the future on EID eartags, the revised paragraph would not specify that the visually and electronically readable eartag would have to have an AIN with

an 840 prefix and would not refer specifically to NUES eartags.

We are proposing to remove § 86.4(c)(4), which states that a brucellosis vaccination visual eartag with a NUES number may be applied in accordance with the regulations in 9 CFR part 78 to an animal that is already officially identified with one or more official eartags under this part. As a result of this rulemaking, the visual, *i.e.,* non-EID, brucellosis NUES tag would no longer be allowed as official identification under part 86, which eliminates the need for the paragraph.

Throughout current § 86.4(e), there are references to RFID devices. For reasons discussed above, proposed § 86.4(e) would refer to EID devices instead.

**Documentation**

Current § 86.5(c)(7)(ii) states that, with certain exceptions, the official identification numbers of cattle or bison moving interstate must be recorded on the ICVI or alternate documentation unless the cattle and bison that are sexually intact and under 18 months of age or are steers or spayed heifers. One of those exceptions covers sexually intact dairy cattle, *i.e.,* recording of official identification numbers is required when such cattle are moved interstate. We are proposing to amend that paragraph by removing the qualifier "sexually intact." This proposed change accords with the change we are proposing to the definition of *dairy cattle,* as discussed earlier, and our view of the risks associated with such cattle.

We are not proposing to make any other substantive changes to § 86.5, but we would reorganize the section such that the documentation requirements, which are listed by species, would be ordered in a manner consistent with other sections of part 86. We are also proposing to update the terminology in this section, as discussed under the heading Miscellaneous below.

**Changes to Other Parts of the Regulations**

In 9 CFR parts 71, 77, and 78, respectively, we are proposing to revise definitions of *official eartag* and *interstate certificate of veterinary inspection (ICVI)* to correspond with the changes to the definitions that we are proposing for part 86.

**Miscellaneous**

Sections 86.3, 86.4, and 86.5 contain numerous references to "equines." To make our terminology consistent with current usage, we propose to substitute "equids" or "equine species," as appropriate, in each of those instances.

AR-000033

**Executive Orders 12866, 13563, and Regulatory Flexibility Act**

This proposed rule has been determined to be significant for the purposes of Executive Order 12866 and, therefore, has been reviewed by the Office of Management and Budget.

We have prepared an economic analysis for this rule. The economic analysis provides a cost-benefit analysis, as required by Executive Orders 12866 and 13563, which direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The economic analysis also provides an initial regulatory flexibility analysis that examines the potential economic effects of this rule on small entities, as required by the Regulatory Flexibility Act. The economic analysis is summarized below. Copies of the full analysis are available by contacting the person listed under **FOR FURTHER INFORMATION CONTACT** or on the *Regulations.gov* website (see **ADDRESSES** above for instructions for accessing *Regulations.gov*).

We are proposing to amend the animal disease traceability regulations to recognize only eartags that are both visually and electronically readable as official eartags for use for interstate movement of cattle and bison that are covered under the regulations. We are also proposing to clarify certain record retention and record access requirements. These proposed changes would enhance the ability of State, Federal, and private veterinarians, and livestock producers to quickly respond to high-impact diseases currently existing in the United States, as well as foreign animal diseases that threaten the viability of the U.S. cattle and bison industries. The benefits of animal disease traceability include: Enhancing the ability of the United States to regionalize and compartmentalize animal health issues, minimizing the costs of disease outbreaks, and enabling the reestablishment of foreign and domestic market access with minimum delay following an animal disease event.

APHIS conducted a benefit-cost analysis to determine how the transition to electronic identification (EID) tags would affect the cattle and bison industries. Our analysis suggests that approximately 11 million cattle are currently tagged with official non-EID eartags per year. The proposed rule would not change the number of cattle tagged, but it would increase the costs associated with tagging. The estimated total average annual cost of purchasing approximately 11 million EID tags, instead of the non-EID tags, is approximately $26.1 million dollars per year, or $30.45 per cattle or bison operation.

RFID technology, a type of electronic identification, has been available in the livestock industry for many years. APHIS has evaluated the cost structure of different RFID technologies, commonly known as FDX and HDX. Both technologies work well and have similar qualities. This report describes the cost structure of these EID eartags. We provide 10 years of historic population levels for cattle and bison in order to provide the reader with a range of cost estimates based upon a fluctuating cattle and bison population.

EID technology is a vital component to efficient and accurate traceability of cattle and bison. It benefits stakeholders by significantly reducing the numbers of animals and response time involved in a disease investigation.

One of the most significant benefits of the proposed rule would be the enhanced ability of the United States to regionalize and compartmentalize animal disease outbreaks more quickly. Regionalization is the concept of separating subpopulations of animals in order to maintain a specific health status in one or more disease-free regions or zones. This risk-based process can help to mitigate the adverse economic effects of a disease outbreak. Traceability of animals is necessary to form these zones that facilitate reestablishment of foreign and domestic market access with minimum delay in the wake of an animal disease event. Having an EID system in place would, therefore, minimize not only the spread of disease but also the trade impacts an outbreak may have.

**Executive Order 12372**

This program/activity is listed in the Catalog of Federal Domestic Assistance under No. 10.025 and is subject to Executive Order 12372, which requires intergovernmental consultation with State and local officials. (See 2 CFR chapter IV.)

**Executive Order 12988**

This proposed rule has been reviewed under Executive Order 12988, Civil Justice Reform. If this proposed rule is adopted: (1) All State and local laws and regulations that are in conflict with this rule will be preempted; (2) no retroactive effect will be given to this rule; and (3) administrative proceedings will not be required before parties may file suit in court challenging this rule.

**Executive Order 13175**

This proposed rule has been reviewed in accordance with the requirements of Executive Order 13175, ''Consultation and Coordination with Indian Tribal Governments.'' Executive Order 13175 requires Federal agencies to consult and coordinate with Tribes on a government-to-government basis on policies that have tribal implications, including regulations, legislative comments or proposed legislation, and other policy statements or actions that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

APHIS has determined that this proposed rule, if finalized, may have substantial direct effects on one or more Tribes, and that affording Tribes an opportunity for consultation is therefore warranted. Accordingly, APHIS provided a webinar to Tribal nations on October 27, 2021, to notify Tribes of this rulemaking and solicit consultation. The Tribal leaders welcomed the presentation and requested a follow up webinar, which was presented June 23, 2022. APHIS met in person with representatives of the Indian Nation Conservation Alliance (INCA) in October 2022, to give additional updates. INCA is an alliance of Tribal conservation districts covering most of the western half of the United States. APHIS will work with the Office of Tribal Relations to ensure that additional outreach occurs in 202.

**Paperwork Reduction Act**

In accordance with section 3507(d) of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*), the reporting, recordkeeping, and third-party disclosure requirements described in this proposed rule are currently approved by the Office of Management and Budget (OMB) under OMB control number 0579–0327.

The trace/test exercises referenced on earlier in this document are conducted as part of APHIS' ADT cooperative agreements with State, territorial, and Tribal governments. The existing collection referenced above (0579–0327) covers the cooperative agreements, including associated recordkeeping. Under the cooperative agreements, State, territorial, and Tribal governments must, each quarter, report successful completion of the goals and

AR-000034

objectives outlined in the agreements. This includes evaluating performance, acknowledge current tracing capabilities, and identifying traceability risks within the State, Tribe, or territory; governments must conduct test exercises to evaluate performance and identify risks. Governmental entities must also submit cooperative agreement "road maps" that outline at least four animal disease traceability performance measures. APHIS tracks governmental entity recordkeeping for cooperative agreement paperwork as part of 0579–0327.

## E-Government Act Compliance

The Animal and Plant Health Inspection Service is committed to compliance with the E-Government Act to promote the use of the internet and other information technologies, to provide increased opportunities for citizen access to Government information and services, and for other purposes. For information pertinent to E-Government Act compliance related to this proposed rule, please contact Mr. Joseph Moxey, APHIS' Paperwork Reduction Act Coordinator, at (301) 851–2483.

## Lists of Subjects

### 9 CFR Part 71

Animal diseases, Livestock, Poultry and poultry products, Quarantine, Reporting and recordkeeping requirements, Transportation.

### 9 CFR Part 77

Animal diseases, Bison, Cattle, Reporting and recordkeeping requirements, Transportation, Tuberculosis.

### 9 CFR Part 78

Animal diseases, Bison, Cattle, Quarantine, Reporting and recordkeeping requirements, Swine, Transportation.

### 9 CFR Part 86

Animal diseases, Bison, Cattle, Livestock, Reporting and recordkeeping requirements.

Accordingly, we propose to amend 9 CFR parts 71, 77, 78, and 86 as follows:

## PART 71—GENERAL PROVISIONS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 7 U.S.C. 8301–8317; 7 CFR 2.22, 2.80, and 371.4.

■ 2. Amend § 71.1 by revising the definition of "Official eartag" to read as follows:

### § 71.1 Definitions.

\*    \*    \*    \*    \*

*Official eartag.* An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal.

\*    \*    \*    \*    \*

## PART 77—TUBERCULOSIS

■ 3. The authority citation for part 77 continues to read as follows:

**Authority:** 7 U.S.C. 8301–8317; 7 CFR 2.22, 2.80, and 371.4.

■ 4. Amend § 77.2, by revising the definitions of "Interstate certificate of veterinary inspection (ICVI)" and "Official eartag" to read as follows:

### § 77.2 Definitions.

\*    \*    \*    \*    \*

*Interstate certificate of veterinary inspection (ICVI).* An official document issued by a Federal, State, Tribal, or accredited veterinarian certifying the inspection of animals in preparation for interstate movement.

(1) The ICVI must show:

(i) The species of animals covered by the ICVI;

(ii) The number of animals covered by the ICVI;

(iii) The purpose for which the animals are to be moved;

(iv) The address at which the animals were loaded for interstate movement;

(v) The address to which the animals are destined; and

(vi) The names of the consignor and the consignee and their addresses if different from the address at which the animals were loaded or the address to which the animals are destined.

(vii) Additionally, unless the species-specific requirements for ICVIs provide an exception, the ICVI must list the official identification number of each animal, except as provided in paragraph (2) of this definition, or group of animals moved that is required to be officially identified, or, if an alternative form of identification has been agreed upon by the sending and receiving States, the ICVI must include a record of that identification. If animals moving under a GIN also have individual official identification, only the GIN must be listed on the ICVI. An ICVI may not be issued for any animal that is not officially identified if official identification is required. If the animals are not required by the regulations to be officially identified, the ICVI must state the exemption that applies (*e.g.,* the cattle and bison do not belong to one of the classes of cattle and bison to which the official identification requirements of this part apply). If the animals are required to be officially identified but the identification number does not have to be recorded on the ICVI, the ICVI must state that all animals to be moved under the ICVI are officially identified.

(2) As an alternative to recording individual animal identification on an ICVI, if agreed to by the receiving State or Tribe, another document may be attached to provide this information, but only under the following conditions:

(i) The document must be a State form or APHIS form that requires individual identification of animals or a printout of official identification numbers generated by computer or other means;

(ii) A legible copy of the document must be attached to the original and each copy of the ICVI;

(iii) Each copy of the document must identify each animal to be moved with the ICVI. The document must not contain any information pertaining to other animals; and

(iv) The following information must be included in the identification column on the original and each copy of the ICVI:

(A) The name of the document; and

(B) Either the unique serial number on the document or both the name of the person who prepared the document and the date the document was signed.

\*    \*    \*    \*    \*

*Official eartag.* An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal.

\*    \*    \*    \*    \*

## PART 78—BRUCELLOSIS

■ 5. The authority citation for part 78 continues to read as follows:

**Authority:** 7 U.S.C. 8301–8317; 7 CFR 2.22, 2.80, and 371.4.

■ 6. Amend § 78.1 by revising the definitions of "Interstate certificate of veterinary inspection (ICVI)" and "Official eartag" to read as follows:

### § 78.1 Definitions.

\*    \*    \*    \*    \*

*Interstate certificate of veterinary inspection (ICVI).* An official document

AR-000035

**3328**    **Federal Register**/Vol. 88, No. 12/Thursday, January 19, 2023/Proposed Rules

issued by a Federal, State, Tribal, or accredited veterinarian certifying the inspection of animals in preparation for interstate movement.

(1) The ICVI must show:

(i) The species of animals covered by the ICVI;

(ii) The number of animals covered by the ICVI;

(iii) The purpose for which the animals are to be moved;

(iv) The address at which the animals were loaded for interstate movement;

(v) The address to which the animals are destined; and

(vi) The names of the consignor and the consignee and their addresses if different from the address at which the animals were loaded or the address to which the animals are destined.

(vii) Additionally, unless the species-specific requirements for ICVIs provide an exception, the ICVI must list the official identification number of each animal, except as provided in paragraph (2) of this definition, or group of animals moved that is required to be officially identified, or, if an alternative form of identification has been agreed upon by the sending and receiving States, the ICVI must include a record of that identification. If animals moving under a GIN also have individual official identification, only the GIN must be listed on the ICVI. An ICVI may not be issued for any animal that is not officially identified if official identification is required. If the animals are not required by the regulations to be officially identified, the ICVI must state the exemption that applies (*e.g.,* the cattle and bison do not belong to one of the classes of cattle and bison to which the official identification requirements of this part apply). If the animals are required to be officially identified but the identification number does not have to be recorded on the ICVI, the ICVI must state that all animals to be moved under the ICVI are officially identified.

(2) As an alternative to recording individual animal identification on an ICVI, if agreed to by the receiving State or Tribe, another document may be attached to provide this information, but only under the following conditions:

(i) The document must be a Tribal or State form or APHIS form that requires individual identification of animals or a printout of official identification numbers generated by computer or other means;

(ii) A legible copy of the document must be attached to the original and each copy of the ICVI;

(iii) Each copy of the document must identify each animal to be moved with the ICVI. The document must not

contain any information pertaining to other animals; and

(iv) The following information must be included in the identification column on the original and each copy of the ICVI:

(A) The name of the document; and

(B) Either the unique serial number on the document or both the name of the person who prepared the document and the date the document was signed.

\*    \*    \*    \*    \*

*Official eartag.* An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal.

\*    \*    \*    \*    \*

## PART 86—ANIMAL DISEASE TRACEABILITY

■ 7. The authority citation for part 86 continues to read as follows:

**Authority:** 7 U.S.C. 8301–8317; 7 CFR 2.22, 2.80, and 371.4.

■ 8. Amend § 86.1 by:
■ a. Revising the definitions of "Approved tagging site", "Dairy cattle", and "Interstate certificate of veterinary inspection (ICVI)";
■ b. Adding in alphabetical order the definition for "Official Animal Identification Device Standards (OAIDS)"; and
■ c. Revising the definition of "Official eartag".

The revisions and addition read as follows:

### § 86.1  Definitions.

\*    \*    \*    \*    \*

*Approved tagging site.* A premises, authorized by APHIS, State, or Tribal animal health officials, where livestock without official identification may be transferred to have official identification applied on behalf of their owner or the person in possession, care, or control of the animals when they are brought to the premises.

\*    \*    \*    \*    \*

*Dairy cattle.* All cattle, regardless of age or sex, breed, or current use, that are born on a dairy farm or of a breed(s) used to produce milk or other dairy products for human consumption, or cross bred calves of any breed that are born to dairy cattle including, but not limited to, Ayrshire, Brown Swiss, Holstein, Jersey, Guernsey, Milking Shorthorn, and Red and Whites.

\*    \*    \*    \*    \*

*Interstate certificate of veterinary inspection (ICVI).* An official document issued by a Federal, State, or Tribal government, or an accredited veterinarian, certifying the inspection of animals in preparation for interstate movement.

(1) The ICVI must show:

(i) The species of animals covered by the ICVI;

(ii) The number of animals covered by the ICVI;

(iii) The purpose for which the animals are to be moved;

(iv) The address at which the animals were loaded for interstate movement;

(v) The address to which the animals are destined; and

(vi) The names of the consignor and the consignee and their addresses if different from the address at which the animals were loaded or the address to which the animals are destined.

(vii) Additionally, unless the species-specific requirements for ICVIs provide an exception, the ICVI must list the official identification number of each animal, except as provided in paragraph (2) of this definition, or group of animals moved that is required to be officially identified, or, if an alternative form of identification has been agreed upon by the sending and receiving States, the ICVI must include a record of that identification. If animals moving under a GIN also have individual official identification, only the GIN must be listed on the ICVI. An ICVI may not be issued for any animal that is not officially identified if official identification is required. If the animals are not required by the regulations to be officially identified, the ICVI must state the exemption that applies (*e.g.,* the cattle and bison do not belong to one of the classes of cattle and bison to which the official identification requirements of this part apply). If the animals are required to be officially identified but the identification number does not have to be recorded on the ICVI, the ICVI must state that all animals to be moved under the ICVI are officially identified.

(2) As an alternative to recording individual animal identification on an ICVI, if agreed to by the receiving State or Tribe, another document may be attached to provide this information, but only under the following conditions:

(i) The document must be a State form or APHIS form that requires individual identification of animals or a printout of official identification numbers generated by computer or other means;

(ii) A legible copy of the document must be attached to the original and each copy of the ICVI;

(iii) Each copy of the document must identify each animal to be moved with

the ICVI. The document must not contain any information pertaining to other animals; and

(iv) The following information must be included in the identification column on the original and each copy of the ICVI:

(A) The name of the document; and

(B) Either the unique serial number on the document or both the name of the person who prepared the document and the date the document was signed.

\*    \*    \*    \*    \*

*Official Animal Identification Device Standards (OAIDS).* A document providing further information regarding the official identification device recordkeeping requirements of this part, and technical descriptions, specifications, and details under which APHIS would approve identification devices for official use. Updates or modifications to the Standards document will be announced to the public by means of a notice published in the **Federal Register.**

*Official eartag.* An identification tag approved by APHIS that bears an official identification number for individual animals. The design, size, shape, color, and other characteristics of the official eartag will depend on the needs of the users, subject to the approval of the Administrator. The official eartag must be tamper-resistant and have a high retention rate in the animal.

\*    \*    \*    \*    \*

■ 9. Revise § 86.3 to read as follows:

### § 86.3   Recordkeeping requirements.

(a) Any State, Tribe, accredited veterinarian, or other person or entity who distributes official identification devices must maintain for 5 years a record of the names and addresses of anyone to whom the devices were distributed. Official identification device distribution records must be entered by the person distributing the devices into the State or Federal database designated by APHIS. Additional guidance on meeting these recordkeeping requirements is found in the OAIDS.

(b) Records of official identification devices applied by a federally accredited veterinarian to a client animal must be kept in a readily accessible record system.

(c) Approved livestock facilities must keep any ICVIs or alternate documentation that is required by this part for the interstate movement of covered livestock that enter the facility on or after March 11, 2013. For poultry and swine, such documents must be kept for at least 2 years, and for cattle

and bison, sheep and goats, cervids, and equids, 5 years.

(d) Records required under paragraphs (a) through (c) of this section must be maintained by the responsible person or entity and must be of sufficient accuracy, quality, and completeness to demonstrate compliance with all conditions and requirements under this part. During normal business hours, APHIS must be allowed access to all records, to include visual inspection and reproduction (*e.g.,* photocopying, digital reproduction). The responsible person or entity must submit to APHIS all reports and notices containing the information specified within 48 hours of receipt of request or earlier if warranted by an emergency disease response.

■ 10. Amend § 86.4 by:

■ a. Revising paragraphs (a) introductory text and (a)(1)(i);

■ b. Removing in paragraphs (a)(2)(i) and (iv) the word ''equine'' each time it appears and adding in its place the word ''equid'';

■ c. Removing in paragraph (a)(2)(iii) the words ''to the equine'' and adding in their place the words ''into the equid'';

■ d. Removing in paragraph (a)(2)(v)the word ''equines'' and adding in their place the word ''equids'';

■ e. Adding paragraph (b)(1)(ii)(D);

■ f. Revising paragraphs (b)(1)(iii)(B), (b)(4) introductory text, and (c)(3);

■ g. Removing paragraph (c)(4);

■ h. Revising paragraphs (e)(1)(iii) and (iv); and

■ i. Adding in paragraph (e)(2)(iv), by adding the words ''or other EID'' between the words ''RFID'' and ''eartag''.

The addition and revisions read as follows:

### § 86.4   Official identification.

(a) *Official identification devices and methods.* The Administrator has approved the following official identification devices or methods for the species listed. The Administrator may authorize the use of additional devices or methods for a specific species if he or she determines that such additional devices or methods will provide for adequate traceability. Additional guidance on official identification devices, methods, and the approval process is found in the Official Animal Identification Device Standards (OAIDS) document.

(1) \*    \*    \*

(i) For an official eartag, beginning [*Date 180 days after the date of publication of a final rule in the* **Federal Register**], all official eartags sold for or applied to cattle and bison must be

readable both visually and electronically (EID);

\*    \*    \*    \*    \*

(b) \*    \*    \*

(1) \*    \*    \*

(ii) \*    \*    \*

(D) Cattle and bison leaving a slaughter establishment may only be moved to another recognized slaughter establishment or approved feedlot and can only be sold/re-sold as slaughter cattle, and must be accompanied by an owner-shipper statement in accordance with § 86.5(c)(1). Information listed on the document must include the name and address of the slaughter establishment from which the animals left, the official identification numbers, as defined in § 86.1, correlated with the USDA backtag number (if available), the name of the destination slaughter establishment, or approved feedlot (as defined in § 77.5 of this subchapter) to which the animals are being shipped.

(iii) \*    \*    \*

(B) All dairy cattle;

\*    \*    \*    \*    \*

(4) *Horses and other equids.* Horses and other equids moving interstate must be officially identified prior to the interstate movement, using an official identification device or method listed in paragraph (a)(2) of this section unless:

\*    \*    \*    \*    \*

(c) \*    \*    \*

(3) A visually and electronically readable eartag may be applied to an animal that is already officially identified with one or more non-EID official eartags and/or a non-EID official vaccination eartag used for brucellosis. The person applying the new visually and electronically readable eartag must record the date the eartag is applied to the animal and the official identification numbers of both official eartags and must maintain those records for 5 years.

\*    \*    \*    \*    \*

(e) \*    \*    \*

(1) \*    \*    \*

(iii) Malfunction of the electronic component of an electronically readable (EID) device; or

(iv) Incompatibility or inoperability of the electronic component of an EID device with the management system or unacceptable functionality of the management system due to use of an EID device.

\*    \*    \*    \*    \*

■ 11. Revise § 86.5 to read as follows:

### § 86.5   Documentation requirements for interstate movement of covered livestock.

(a) *Responsible persons and required documentation.* The persons responsible for animals leaving a premises for interstate movement must

ensure that the animals are accompanied by an interstate certificate of veterinary inspection (ICVI) or other document required by this part for the interstate movement of animals.

(b) *Forwarding of documents.* (1) The APHIS representative, State or Tribal representative, or accredited veterinarian issuing an ICVI or other document required for the interstate movement of animals under this part must forward a copy of the ICVI or other document to the State or Tribal animal health official of the State or Tribe of origin within 7 calendar days from the date on which the ICVI or other document is issued. The State or Tribal animal health official in the State or Tribe of origin must forward a copy of the ICVI or other document to the State or Tribal animal health official the State or Tribe of destination within 7 calendar days from date on which the ICVI or other document is received.

(2) The animal health official or accredited veterinarian issuing or receiving an ICVI or other interstate movement document in accordance with paragraph (b)(1) of this section must keep a copy of the ICVI or alternate documentation. For poultry and swine, such documents must be kept for at least 2 years, and for cattle and bison, sheep and goats, cervids, and equine species, 5 years.

(c) *Cattle and bison.* Cattle and bison moved interstate must be accompanied by an ICVI unless:

(1) They are moved directly to a recognized slaughtering establishment, or directly to an approved livestock facility and then directly to a recognized slaughtering establishment, and they are accompanied by an owner-shipper statement.

(2) They are moved directly to an approved livestock facility with an owner-shipper statement and do not move interstate from the facility unless accompanied by an ICVI.

(3) They are moved from the farm of origin for veterinary medical examination or treatment and returned to the farm of origin without change in ownership.

(4) They are moved directly from one State through another State and back to the original State.

(5) They are moved as a commuter herd with a copy of the commuter herd agreement or other document as agreed to by the States or Tribes involved in the movement.

(6) Additionally, cattle and bison may be moved between shipping and receiving States or Tribes with documentation other than an ICVI, *e.g.,* a brand inspection certificate, as agreed upon by animal health officials in the shipping and receiving States or Tribes.

(7) The official identification number of cattle or bison must be recorded on the ICVI or alternate documentation unless:

(i) The cattle or bison are moved from an approved livestock facility directly to a recognized slaughtering establishment; or

(ii) The cattle and bison are sexually intact cattle or bison under 18 months of age or steers or spayed heifers; *Except that:* This exception does not apply to dairy cattle of any age or to cattle or bison used for rodeo, exhibition, or recreational purposes.

(d) *Horses and other equine species.* Horses and other equine species moved interstate must be accompanied by an ICVI unless:

(1) They are used as the mode of transportation (horseback, horse and buggy) for travel to another location and then return direct to the original location; or

(2) They are moved from the farm or stable for veterinary medical examination or treatment and returned to the same location without change in ownership; or

(3) They are moved directly from a location in one State through another State to a second location in the original State.

(4) Additionally, equids may be moved between shipping and receiving States or Tribes with documentation other than an ICVI, *e.g.,* an equine infectious anemia test chart, as agreed to by the shipping and receiving States or Tribes involved in the movement.

(5) Equids moving commercially to slaughter must be accompanied by documentation in accordance with part 88 of this subchapter. Equine infectious anemia reactors moving interstate must be accompanied by documentation as required by part 75 of this subchapter.

(e) *Poultry.* Poultry moved interstate must be accompanied by an ICVI unless:

(1) They are from a flock participating in the National Poultry Improvement Plan (NPIP) and are accompanied by the documentation required under the NPIP regulations (parts 145 through 147 of this chapter) for participation in that program; or

(2) They are moved directly to a recognized slaughtering or rendering establishment; or

(3) They are moved from the farm of origin for veterinary medical examination, treatment, or diagnostic purposes and either returned to the farm of origin without change in ownership or euthanized and disposed of at the veterinary facility; or

(4) They are moved directly from one State through another State and back to the original State; or

(5) They are moved between shipping and receiving States or Tribes with a VS Form 9–3 or documentation other than an ICVI, as agreed upon by animal health officials in the shipping and receiving States or Tribes; or

(6) They are moved under permit in accordance with part 82 of this subchapter.

(f) *Sheep and goats.* Sheep and goats moved interstate must be accompanied by documentation as required by part 79 of this subchapter.

(g) *Swine.* Swine moved interstate must be accompanied by documentation in accordance with § 71.19 of this subchapter or, if applicable, with part 85 of this subchapter.

(h) *Captive cervids.* Captive cervids moved interstate must be accompanied by documentation as required by part 77 of this subchapter.

Done in Washington, DC, this 5th day of January 2023.

**Jennifer Moffitt,**

*Under Secretary for Marketing and Regulatory Programs.*

[FR Doc. 2023–00505 Filed 1–18–23; 8:45 am]

**BILLING CODE 3410–34–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2023–0016; Project Identifier MCAI–2022–00416–R]**

**RIN 2120–AA64**

**Airworthiness Directives; Airbus Helicopters**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Notice of proposed rulemaking (NPRM).

---

**SUMMARY:** The FAA proposes to adopt a new airworthiness directive (AD) for all Airbus Helicopters Model EC120B, EC130B4, and EC130T2 helicopters. This proposed AD was prompted by a report of corrosion detected on certain part-numbered landing gear assemblies. This proposed AD would require, for helicopters with certain part-numbered landing gear assemblies installed, visually inspecting for cracks and corrosion; borescope inspecting; and if required, removing corrosion, measuring thickness, interpreting results of the measurements, applying chemical conversion coating and primer, and removing affected parts

AR-000038