# Exhibit 3

Excerpts from comments for Docket No. APHIS-2021-0020
AR-001899–1933; Comment No. APHIS-2021-0020-1947;
Comment No. APHIS-2021-0020-1955

An official website of the United States Government.

‹  Back to Document Comments (/document/APHIS-2021-0020-0001/comment)

Share ▾

  **PUBLIC SUBMISSION**

# Comment from R-CALF USA

Posted by the **Animal and Plant Health Inspection Service** on Jan 30, 2023

Docket (/docket/APHIS-2021-0020)  / Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001)
 / Comment

Comment

See attached file(s)

Attachments  ⓵

  230130 Letter to Secretary Vilsack re Origin of RFID Tags

⬇  Download  (https://downloads.regulations.gov/APHIS-2021-0020-0089/attachment_1.pdf)

**Comment ID**

APHIS-2021-0020-0089

  **Tracking Number**

Give Feedback

AR-001899

**Document Subtype**

Public Comment

---

**Received Date**

Jan 30, 2023

---



*Your Voice in Federal Decision Making*

About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)    Reports (/dotreports)    FAQ (/faq)    Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    API Requests (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

AR-001900



**R-CALF USA**
PO Box 30715
Billings, MT 59107
Phone: 406-252-2516
Fax: 406-252-3176
Email: r-calfusa@r-calfusa.com
www.r-calfusa.com

January 30, 2023

The Honorable Tom Vilsack
Secretary of Agriculture
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, D.C. 20250

*FILED CONTEMPORANEOUSLY IN DOCKET NO. APHIS-2021-0022*

> **Re:** **R-CALF USA's Request for Factual Information Pursuant to Docket No. APHIS-2021-0020 and Request for a Comment Deadline Extension Following Receipt of the Requested Information**

Dear Secretary Vilsack:

On Thursday, January 19, 2023, the U.S. Department of Agriculture (USDA) Animal and Plant Health Inspection Service (APHIS) published a proposed rule: Docket No. APHIS-2021-0020, *Use of Electronic Identification Eartags as Official Identification in Cattle and Bison*. The proposed rule compels United States cattle producers to purchase from certain manufacturers, and affix to their adult U.S.-origin cattle moving interstate, an official radio frequency identification (RFID) eartag at a cost ranging from $2.01 to $3.65 per head. Collectively, the proposed rule envisions that United States cattle produces will be compelled to purchase approximately 11 million official RFID eartags at an estimated annual cost ranging from approximately $25 to $30 million.

Members of R-CALF USA are concerned that most, if not all, of the official RFID eartag manufacturers that APHIS has approved pursuant to the proposed rule may be sourcing either the electronic chip within the official eartag or the entire official eartag from foreign countries such as the Peoples Republic of China (PRC), which is ruled exclusively by the Communist Party of China (CPC).

On July 6, 2020, R-CALF USA issued an industry-wide public news release titled, *COVID-19 Pandemic Reveals USDA Is Not Buying RFID Cattle Eartags from American Manufacturers*. The news release disclosed that the COVID-19 pandemic disrupted foreign shipments of millions of RFID cattle eartags the USDA had purchased from foreign manufacturers. It further disclosed that the USDA had planned to distribute the millions of foreign-made RFID eartags free-of-charge to United States cattlemen and cattlewomen to bait them into using the foreign-made RFID eartags on their U.S.-origin cattle. Thus, at that time R-CALF USA publicly proclaimed its opposition to any administrative action that would coax its members to affix foreign-made devices to their U.S.-origin cattle.

R-CALF USA members remain fundamentally averse to any administrative mandate that would compel them to support the Communist Party of China or any other foreign regime through their business purchases, or that would forcibly relegate them to a dependency on the CPC or some other foreign regime to lawfully conduct their farming and ranching operations. Further, if R-CALF USA's concern is correct and USDA-APHIS' intention is to compel U.S. cattle producers to purchase RFID

AR-001901

The Honorable Tom Vilsack
January 30, 2023
Page 2

eartags manufactured in whole or in part in China or any other foreign country, then USDA-APHIS' proposed rule is at least violative of the spirit of, if not in direct contravention to, President Biden's January 25, 2021 Executive Order 14005 entitled *Ensuring the Future Is Made in All of America by All of America's Workers,* and his February 24, 2021 Executive Order 14017 entitled *America's Supply Chains.* Together, these orders direct administrative agencies to begin supporting United States manufacturers, workers, and domestic supply chains.

R-CALF USA's concern arises from its efforts to ascertain the country-of-origin of the official RFID eartag manufacturers and official RFID eartags APHIS has approved pursuant to the proposed rule. The proposed rule at page 3,324 directs readers to APHIS' list of currently approved eartags – to a document entitled *Official Animal Identification Number (AIN) Devices with the '840' Prefix.*[1] The document includes eight cattle-purposed RFID eartag manufacturers approved by APHIS, including widely known Allflex USA, Inc. and Y-Tex Corporation.

My review of Allflex USA, Inc.'s website identified no origin declaration for its official electronic identification eartags, its eartag applicators, or its electronic reader offerings.[2] Similarly, though my review of Y-Tex Corporation's website identified a prominent "Proudly made in the USA" logo for its non-RFID eartag offerings (non-official eartags pursuant to the proposed rule), I could not identify any origin declaration whatsoever in its description of its *USDA Animal Disease Traceability Compliant Tags 840 Prefix HDX Technology.*[3]

As a prerequisite for soliciting comments on the proposed rule, it is imperative that USDA-APHIS publicly disclose in an official notice i) the origins of the official RFID eartag manufacturers; ii) whether the APHIS approved RFID eartags offered by each approved manufacturer are exclusively made in the USA, or if they are sourced in whole or in part from a particular foreign country; iii) whether the applicators and electronic readers offered by each approved manufacturer are exclusively made in the USA, or if they are sourced in whole or in part from a particular foreign country; and iv) a list of the approved manufacturers and their electronic eartags, applicators, and readers that are exclusively sourced from and manufactured in the United States of America. Meaning the final product and all its internal components are exclusively sourced from factories located within the United States.

R-CALF USA respectfully requests an extension of the March 20, 2023, comment deadline for the proposed rule of not less than 90 days from the date that USDA-APHIS officially issues its notice identifying the origin-specific information requested above.

Thank you for your consideration of our request and we look forward to your response. If any additional information is needed, please contact me at 406-670-8157.

Sincerely,

Bill Bullard, CEO

---

[1] *See* https://www.aphis.usda.gov/traceability/downloads/ADT_device_ain.pdf.
[2] *See, e.g.*, https://www.allflex.global/na/product_cat/electronic-identification/.
[3] *See, e.g.,* https://www.y-tex.com/resource/product-information-sheets.

An official website of the United States Government.

‹ Back to Document Comments (/document/APHIS-2021-0020-0001/comment)

Share ▾

 **PUBLIC SUBMISSION**

# Comment from R-CALF USA

Posted by the **Animal and Plant Health Inspection Service** on Apr 20, 2023

Docket (/docket/APHIS-2021-0020)  / Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001)
 / Comment

Comment

See attached file(s)

Attachments  ( 1 )

  230419 R-CALF USA Comments re Use of Electronic Identification Eartags

⬇ Download  (https://downloads.regulations.gov/APHIS-2021-0020-2006/attachment_1.pdf)

Give Feedback

**Comment ID**
APHIS-2021-0020-2006

 **Tracking Number**

AR-001903

**Document Subtype**

Public Comment

---

**Received Date**

Apr 19, 2023

---



*Your Voice in Federal Decision Making*

About Bulk Data Download  Agencies  Learn  Reports  FAQ  Commenting Guidance

(/about)  (/bulkdownload)  (/agencies)  (/learn)  (/dotreports)  (/faq)  (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)  |  User Notice (/user-notice)  |
Accessibility Statement (/accessibility)  |  API Requests (https://open.gsa.gov/api/regulationsgov/)  |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

AR-001904



**R-CALF USA**
PO Box 30715
Billings, MT 59107
Phone: 406-252-2516
Fax: 406-252-3176
Email: r-calfusa@r-calfusa.com
www.r-calfusa.com

April 19, 2023

APHIS–2021–0020, Regulatory Analysis
and Development, PPD, APHIS, Station
3A–03.8, 4700 River Road, Unit 118,
Riverdale, MD 20737–1238.

**Sent via regulations.gov**

Re:    **R-CALF USA's Comments in Docket No. APHIS–2021–0020:  Use of Electronic
Identification Eartags as Official Identification in Cattle and Bison.**

Dear Sir or Madam:

The Ranchers Cattlemen Action Legal Fund United Stockgrowers of America (R-CALF USA)
appreciates this opportunity to comment to the U.S. Department of Agriculture Animal and Plant
Health Inspection Service (APHIS) regarding the above captioned proposed rule *Use of Electronic
Identification Eartags as Official Identification in Cattle and Bison*, available at 88 Fed. Reg., 3,320-
30 (Jan. 19, 2023).

R-CALF USA is the largest trade association that exclusively represents United States cattle farmers
and ranchers within the multi-segmented beef supply chain. Its thousands of members reside in 44
states and include cow-calf operators, cattle backgrounders and stockers, and feedlot owners, as well
as sheep producers.

For the reasons set forth below, R-CALF USA urges APHIS to withdraw its proposed rule that
generally requires the exclusive use of electronic identification (EID) eartags in adult cattle shipped
interstate.

### A.  The Proposed Rule Is Not Designed to Improve Animal Disease Traceability

The proposed rule contemplates the use of EID eartags on approximately 11% of the nation's cattle
herd and APHIS's only basis for asserting that such a low percentage of cattle is nevertheless
sufficient to appreciably improve animal disease traceability is the Agency's belief that "the
proposed rule will help State and Federal veterinarians trace potentially infected and exposed
animals more rapidly and accurately;"[1] that it "will lead to more accurate traceability and record
retention;"[2] and its contention "that increases in the use of electronic identification devices can
further improve the speed at which an animal can be traced."[3] The Agency, however, provides no
analysis or evidence supporting its beliefs and contention, rendering them baseless.

---

[1] Regulatory Impact Analysis & Initial Regulatory Flexibility Analysis (RIA), APHIS, Nov. 9, 2022, at 1.
[2] *Id.*, at 4.
[3] *Id.*, at 7.

Case 5:24-cv-05085-ECS    Document 36-3    Filed 03/05/26    Page 9 of 55 PageID #: 490

April 19, 2023
Page 2

a. The proposed rule does not correct identified traceback deficiencies.

The Agency attributes the remarkable reductions in disease traceability timeframes achieved after implementation of the 2013 regulations not to EID eartags, but rather, "to the transition from paper to electronic records and sustained educational outreach by staff in APHIS Veterinary Services."[4]

The Agency laments that while disease investigations involving tracebacks with electronic records take only minutes to hours, searching paper records for a visual eartag number can take days to weeks or longer.[5] Indeed, the Agency's current definition of the interstate certificate of veterinary inspection (ICVI) contains requirements pertaining only to paper ICVIs, suggesting that electronic ICVIs are not widely used. It would therefore be expected that APHIS could continue making reductions in disease traceback timeframes by exclusively focusing its resources on transitioning ICVIs and other pertinent paperwork to electronic format and by conducting additional training and outreach, without the need for imposing additional costs on U.S. cattle producers pursuant to the proposed requirement that they purchase and use EID eartags on their cattle. Surprisingly, the proposed does not prescribe such commonsense improvements.

The proposed rule, in fact, takes no measures to ensure that the serious problems identified with tracebacks using paper records will be alleviated. APHIS describes the occurrence of these serious problems as 1) when numbers from non-EID tags were transcribed inaccurately, 2) when movement records were not readily available, or 3) when information was only retrievable from labor-intensive paper filing systems.[6] But the only one of these three problems that could potentially be alleviated by an EID eartag requirement – that of incorrectly transcribing eartag numbers – is not addressed at all as the Agency instead is promoting its proposed rule based on the fact that the EID eartags must also be visually readable, with no attendant requirement that they be read electronically.

More specifically, the problems the Agency identifies with non-EID eartags involve errors associated with visually reading, transcribing, or entering the eartag number in a database. The Agency laments that when non-EID eartags are used the animal must be restrained, the eartag must often be cleaned before the number can accurately be read and then the numbers must be recorded on paper or manually entered in a database.[7] But all these perceived deficiencies are both promoted and memorialized in the proposed rule because, as the Agency explains, "for EID tags, the numbers may be read visually, similarly to the non-EID tags;"[8] "the official RFID tags are easily read visually and therefore could be used as they are currently using non-EID tags without the added expense of purchasing reading equipment;"[9] and, "[b]ecause all EID tags are readable visually, however, no modifications are necessary to facilities or equipment currently in use."[10]

It is undeniable that the proposed rule does not require any action to rectify the problems APHIS identifies in achieving faster and more accurate tracebacks because the Agency does not require the electronic reading of any of the 11 million or so eartags it wants to force upon American cattle farmers and ranchers. This deficiency is fatal: the Agency cannot legitimately quantify any expected

---

[4] *Id.*, at 7.
[5] *See* 88 Fed. Reg., at 3,321.
[6] *See id.*, at 3,322.
[7] *See id.*, at 3,321.
[8] *Id.*, at 3,321
[9] *Id.*, at 3,322.
[10] *Id.*, at 3,323.

AR-001906

R-CALF USA's Comments in Docket No. APHIS-2021-0020
April 19, 2023
Page 3

improvements in disease traceback with the use of expensive EID eartags when the EID component of the tag is not required to be used at any time by anyone.

> b. The Government States that a High Percentage of Premises and Cattle Must Be Traced to Accomplish the Goal of Rapid and Effective Animal Disease Traceback.

APHIS contemplates that 11% of the U.S. cattle herd would be officially identified with an EID eartag pursuant to the proposed rule. The department is silent on the number of premises expected to be registered. Given the low percentage of EID-tagged cattle, it is reasonable to assume that the number of premises registered under the proposed rule would likewise represent only a low percentage. However, as discussed below, the expected low percentages of both participating cattle and registered premises are far too low to enable APHIS to accomplish the goal of rapid and effective animal disease traceback.

A July 2007 Government Accountability Report (GAO) reported that the majority of its panel of animal identification experts determined that "81 percent to 100 percent of producers, livestock markets, and slaughter facilities would need to register their premises to achieve the program's goal of rapid and effective traceback."[11] The report further reveals that 97% of the majority of its experts determined that at least 70% of the nation's cattle herd must be identified to achieve rapid animal disease traceback.[12]

Former Deputy Administrator for Veterinary Services, Dr. John Clifford, testified before Congress that:

> In order for NAIS [National Animal Identification System] to be successful, we need a minimum critical mass of producers on board, which we estimate would be 70 percent of the animals in a specific species/sector that could be identified and traceable to their premises of origin. While 70 percent would provide some measure of traceability, I must emphasize that we really need to achieve higher participation rates, perhaps as high as 90 percent, to ensure the benefits of the system.[13]

The USDA was even more explicit in explaining why a 70% level of cattle participation was needed, and how the 70% minimum threshold was scientifically established in its comprehensive business plan for animal disease traceability:

> In order to achieve critical mass, USDA estimates that 70 percent of the animals in a specific species/sector need to be identified and traceable to their premises of origin. This 70 percent level was derived by:
>
> - Reviewing epidemiological reports from the past 5 years involving a variety of animal diseases and species;
> - Reviewing published scientific literature regarding animal disease traceability;

---

[11] USDA Needs to Resolve Several Key Implementation Issues to Achieve Rapid and Effective Disease Traceback, Government Accountability Office (GAO), GAO-07-592, July 2007, at 15, available at https://www.gao.gov/products/gao-07-592.

[12] See id. at 52.

[13] Congressional Testimony of Dr. John Clifford, Deputy Administrator for Veterinary Services, APHIS, May 5, 2009, at 13, available at 5_5_09_Clifford_Dep_Admin_for_Vet_Services_APHIS_National_Animal_ID.pdf (usda.gov).

AR-001907

Case 5:24-cv-05085-ECS    Document 36-3    Filed 03/05/26    Page 11 of 55 PageID #: 492

- Using a land-grant-university-developed animal disease traceability computer model;
- Assessing USDA National Agricultural Statistics Service (NASS) data involving all reported species and industries relative to animal numbers and operations;
- Reviewing best available participation data in present animal disease control and eradication programs; and
- Projecting a practical and achievable level needed to facilitate animal disease traceability among all species/sectors/livestock industries as the next logical step.[14]

The proposed rule contains not a scintilla of scientific evidence or analysis explaining how an animal disease traceability program, which the USDA has consistently stated would require the participation of 70% of the nation's cattle herd to be effective, would be improved in any way by the imposition of a mandatory EID requirement on only 11% of the nation's cattle herd. Indeed, the proposed rule's assertion that appreciable improvements would nevertheless be achieved even with such a small population of participating cattle stands in direct contradiction to the Agency's well documented scientific evidence and analysis.  And, as discussed above, this omission of scientific evidence and analysis is further aggravated by the fact that the proposed rule does not attempt to digitalize the other paper documents essential to improving traceback investigations. This omission renders the proposed rule arbitrary and capricious.

**B.  The Proposed Rule Would Impose an Untenable Financial Burden on Independent Cattle Producers**

Each year the USDA reports regional and national production costs and returns for the nation's cow/calf producers, on a per cow basis.  For the Northern Great Plains region – a region commonly referred to as cattle country – the USDA calculated that in 2021 cattle producers lost $70.38 per cow when only operating costs were considered, and they lost $837.88 per cow when the total costs of operating their ranches was considered.[15] The average returns per cow in that region for the past five years (2017-21) based only on operating costs was a loss of $0.68 per cow per year, and when total costs are included, an average annual loss of $703.36 per cow was incurred. These data reveal that cattle producers in the Northern Great Plains were unable to recover even their costs of production from the marketplace and, hence, were unable to pay basic household costs such as for food, clothing, and electricity from their cattle operation proceeds.

On a national basis, the USDA calculates for 2021 a paltry $28.69 return per cow based only on operating costs, but an alarming $866.45 loss per cow when total costs are considered.[16]

Earlier this year University of Nebraska-Lincoln released representative cattle operation budgets, including for Nebraska cattle ranches with cow herd sizes of 50 head and 600 head. The budgets

---

[14] A Business Plan To Advance Animal Disease Traceability, Draft, Dec. 12, 2007, at 11-12, available at file:///C:/Users/14066/AppData/Local/Microsoft/Windows/INetCache/Content.Outlook/1MMG1V6T/NAIS_Business_Plan.pdf.
[15] Commodity Costs and Returns, USDA Economic Research Service (ERS), Recent Costs and Returns, available at https://www.ers.usda.gov/data-products/commodity-costs-and-returns/.
[16] Id.

AR-001908

Case 5:24-cv-05085-ECS    Document 36-3    Filed 03/05/26    Page 12 of 55 PageID #: 493

revealed that the 50- head operation in southeast Nebraska lost $171.39 per calf raised,[17] while the 600- head unit in central Nebraska lost $296.56 per calf raised.[18]

The foregoing data reflecting the dismal financial condition of the U.S. cattle industry is substantiated by the USDA's reporting of farm business average net cash income. The Agency reports that in 2021 the average annual net cash income for cattle and calf operations was only $18,200, which is the lowest income level since at least 2010.[19] The USDA's 2022 projection is only slightly higher at $23,600. And despite being the largest segment of American agriculture (generating nearly $73 billion in cash receipts in 2021),[20] the average annual net cash income for cattle and calf operations is far lower than any other specified agricultural commodity reported by the USDA (except for the nondescript category of "Other livestock").[21]

Under the proposed rule, U.S. cattle producers would be saddled with the initial cost of purchasing $29.3 million in EID eartags annually. The Agency estimates the per head cost of the EID eartags would range from $2.00 to $3.65 per head depending on the type of technology used. The Agency further estimates that cattle producers with smaller herds would bear the highest costs while those with a herd size of 5,000 head or more would incur a lesser per head cost. In fact, the proposed rule discriminates against cattle operations with smaller herd sizes by forcing them to pay between $1.33 and $1.45 more per EID tag than would be incurred by the very largest of cattle operations running 5,000 or more head (comparing costs of a 20-head herd to a 5,000-head herd).

The USDA can neither rationalize nor justify forcing cattle producers to add the high costs of EID eartags to their cost of production when the contemporary marketplace, as discussed above for many cattle producers, provides no opportunity to recover even their preexisting costs of production. Given the dire financial circumstances faced by untold numbers of U.S. cattle producers caused by the industry's prolonged lack of profitability, the proposed rule would be expected to accelerate the ongoing exodus of U.S. cattle ranchers, thus fostering further industry consolidation and concentration.

**C. The Proposed Rule Poses a Likely Threat to National Security, Violates the President's Directives to Strengthen Domestic Food Supply Chains, and Creates a New Oligopoly.**

a. The Proposed Rule Threatens National Security.

On January 30, 2023, R-CALF USA wrote the Secretary of Agriculture asking for the origin information for the chips used by all the official manufacturers of EID eartags approved by USDA

---

[17] Breeding Herd Cash Budget, Cow Herd System Budget, Representative Economic Budget for Southeast Nebraska - 50 Head Cow Herd, Updated 10/22, available at https://cap.unl.edu/budgets/2022/50-Cow-Herd-Southeast-Neb-story-budget-1022.pdf.

[18] Breeding Herd Cash Budget, Cow Herd System Budget, 600 Head Cow Herd – Central Nebraska Representative Budget Updated September 2021, at 11, available at https://cap.unl.edu/budgets/600-cow-herd-budget-Central-NE-092921.pdf.

[19] See Farm business average net cash income, Economic Research Service (ERS) U.S. Department of Agriculture (USDA) available at Farm business average net cash income (usda.gov).

[20] See U.S. Department of Agriculture (USDA) Economic Research Service (ERS), Cash Receipts by Commodity, available at https://data.ers.usda.gov/reports.aspx?ID=17845.

[21] See Farm business average net cash income, Economic Research Service (ERS) U.S. Department of Agriculture (USDA) available at Farm business average net cash income (usda.gov).

and listed in the *Official Animal Identification Number (AIN) Devices with the '840' Prefix*.[22] The Secretary refused to respond to our request and R-CALF USA's follow-up call to the office number the Secretary included in his non-reply was not returned, hence likewise non-responsive. Consequently, and despite our best efforts, we are relegated to submitting these comments without even the basic facts for which to address the potential national security concerns embodied in the proposed rule. That said, we will lay down our argument presuming the anecdotal information we have received regarding the origin of the electronic chips used by all the manufacturers the USDA has approved, and from which U.S. cattle producers will be forced to source their mandatory EID eartags.

The information we are relegated to rely on because of the Secretary's non-response to our request – anecdotal information – indicates that all the chips used by all the officially approved EID eartag manufacturers are manufactured in China and the manufacture(s) of those chips are under the control of the Communist Party of China (CPC). Our sources further inform us that at least one of the handful of official eartag manufacturers (AllFlex) is already experiencing a shortage of chips and/or EID eartags with chips.

The risk to the United States' national security became crystal clear when the U.S. military shot down a Chinese surveillance balloon after it had surveilled cattle production areas and other food production areas from Montana to South Carolina. What detailed food production data the Chinese captured is unknown but could include the locations of facilities where cattle are aggregated, the number of grazing cattle and where their populations are most dense, and the transportation routes where cattle are trucked to market, to feedlots, or to packing plants. The capture of such information by an adversary like China increases the vulnerability of the United States live cattle supply chain to sabotage.

Given the advances in nano and other surveillance-related technology, it is unknown but possible that the EID eartag chips manufactured under the control of the CPC are capable of receiving and sending digitized information regarding the scope, nature and location of critical cattle supply chain components. And even if they are not so capable, our political and economic adversary – China – would be well positioned to disrupt some or all cattle commerce simply by refusing to provide chips (or running short of the requisite number of chips as appears the case with at least Allflex). The unavailability of chips, should the proposed rule be finalized, would render interstate cattle commerce in the United States unlawful as cattle producers would be unable to meet the rules EID requirements.

On even a more basic level, it is fundamentally un-American for the federal government to force U.S. cattle producers to purchase EID eartags containing chips manufactured by a United States' adversary and to subsequently force U.S. cattle producers to affix those foreign chips to their United States cattle, all for the privilege of raising and selling cattle in the United States, or otherwise participating in the U.S. cattle industry.

> b. <u>The Proposed Rule Violates the President's Directives to Strengthen Domestic Food Supply Chains.</u>

---

[22] *See* Official Animal Identification Number (AIN) Devices with the '840' Prefix, USDA-APHIS, available at https://www.aphis.usda.gov/traceability/downloads/ADT_device_ain.pdf.

If R-CALF USA's concern is correct and USDAs' intention is to compel U.S. cattle producers to purchase EID eartags manufactured in whole or in part in China or any other foreign country, then APHIS' proposed rule is at least violative of the spirit of, if not in direct contravention to, President Biden's January 25, 2021 Executive Order 14005 entitled *Ensuring the Future Is Made in All of America by All of America's Workers,* and his February 24, 2021 Executive Order 14017 entitled *America's Supply Chains*. Together, these orders direct administrative agencies to begin supporting United States manufacturers, workers, and domestic supply chains.

The purpose of these two directives is to reduce the United States' reliance on foreign inputs in critical U.S. supply chains, including for food, thus increasing the United States' self-sufficiency in producing the food produced by those supply chains. The proposed rule, however, flies in the face of this national objective by artificially creating a regulatory dependency on a critical input to the live cattle supply chain for the production of beef. It would make the privilege of ranching in the United States contingent upon the availability of foreign EID eartags and chips, and in many instances would render it impossible for a rancher to comply with the regulatory requirement if the rancher could not first acquire the requisite chips and eartags from a foreign country.

   c. <u>The Proposed Rule Creates a New Oligopoly Upon Which U.S. Ranchers Are Forced to Rely.</u>

The proposed rule intends to create a new oligopoly upon which U.S. cattle producers must rely if they wish to ranch in the United States. Only a handful – approximately eight – manufacturers of official EID eartags are approved by APHIS and the Agency provides no analysis suggesting there would be more, or that those already approved will not themselves consolidate through mergers and acquisitions, a process that would make U.S. ranchers susceptible to price gouging, favoritism, retaliation, and other nefarious conduct.

Because the proposed rule likely threatens our national security, forces U.S. ranchers to concede their patriotism, creates a dependency on foreign manufacturers that could disrupt our domestic beef supply chain, and creates a new oligopoly upon which the domestic supply chain must rely, the proposed rule should be immediately withdrawn.

  **D. The Proposed Rule Constitutes an Insurance Policy Scheme for Multinational Beef Packers with the Annual Premium Paid Exclusively by Independent Cattle Producers.**

The proposed rule makes clear that the driving force behind it is to protect the multinational beef packers export market access should the United States encounter a disease outbreak. In fact, APHIS states, without evidence, that one of the most significant benefits of the proposed rule is quicker regionalization and compartmentalization of a disease outbreak, which APHIS asserts will minimize trade impacts.[23]  In its economic analysis, the Agency touts the proposed rule for how it will "protect[] our international trade markets."[24]

However, the entire cost of the proposed rule is imposed not on beef exporters (i.e., multinational beef packers) that directly benefit from exports; but rather, on independent U.S. cattle producers

---

[23] *See* 88 Fed. Reg., at 3,326.
[24] Regulatory Impact Analysis & Initial Regulatory Flexibility Analysis (RIA), APHIS, Nov. 9, 2022, at 22.

AR-001911

R-CALF USA's Comments in Docket No. APHIS-2021-0020
April 19, 2023
Page 8

without providing any analysis of the value of the export market to them. In fact, the Agency makes claims that trade restrictions can cause an oversupply of domestic beef intended for export that would reduce domestic prices and lower cattle producers' profits.[25] In its sole support of this claim, the Agency cites trade restrictions imposed following the 2003 BSE outbreak, which it claims caused a "$3.2 billion to $4.7 billion ($4.9 to $7.1 billion in inflation adjusted terms) in losses to the U.S. **beef industry"** (emphasis added).[26]

While the APHIS claims the beef industry suffered losses (i.e., the multinational beef packers whose exports were restricted), it cites to no evidence demonstrating that independent cattle producers, who will be saddled with the entire cost of the proposed rule, were harmed by the BSE-related trade restrictions. Indeed, it could not because cattle prices and producer profits increased significantly following the 2003 restrictions.

For example, USDA data shows cash receipts from the sale of cattle and calves increased from $45.3 billion in 2003 to $47.4 billion in 2004, to $49.3 billion in 2005, representing a $4 billion increase in cash receipts from 2003 to 2005.[27] It is not by accident that the increased cash receipts paid to cattle producers falls mid-range in the estimated loss for beef packers. And the reason is obvious – the beef packers had to pay more for domestic cattle when the BSE-related trade restrictions were in place.

USDA data also show that returns to cow/calf producers increased during the same period, increasing from a paltry $18.70 per cow in 2003 to $86.00 per cow in 2004, and $108.71 per cow in 2005.[28] Of course, fed cattle prices also increased during the same period, with the 5-area steer price increasing from $83.83 per cwt in 2003 to $84.79 per cwt in 2004, to $88.02 per cwt in 2005.[29]

The USDA has long supported the misguided notion that the cattle industry and the beef industry have identical economic and financial interests when in fact there is often an inverse relationship between profits at the cattle producer stage and the profits received by packers, which has been noticeably pronounced since 2015 during and after which the relationship between cattle prices and beef prices was severed.

The principal reasons the USDA errors in assuming cattle prices and cattle producer profitability is directly tied to export volume is because United States cattle producers underproduce for the domestic market. In 2022, e.g., total U.S. beef production from domestic cattle was only about 26 billion pounds while domestic beef consumption was about 28 billion pounds, reflecting an underproduction of over 2 billion pounds.[30] And, at about 12.5%, exports in 2022 comprised but a

---

[25] *Id.*, 19.

[26] *See id.*

[27] *See* Cash receipts by selected commodity, 1910-2023F, Nominal (current dollars), USDA-ERS, available at https://data.ers.usda.gov/reports.aspx?ID=17832.

[28] Commodity Costs and Returns, USDA Economic Research Service (ERS), Historical Costs and Returns, available at https://www.ers.usda.gov/data-products/commodity-costs-and-returns/.

[29] Choice Beef Values and Spreads and the all-fresh retail value, USDA-ERS, available at https://www.ers.usda.gov/data-products/meat-price-spreads/.

[30] *See* How Much U.S. Meat Comes From Foreign Sources?, Amber Waves, USDA-ERS, Sept. 20, 2012, (Stating approximately 8.1% of U.S. beef production is derived from imported cattle), available at https://www.ers.usda.gov/amber-waves/2012/september/how-much-us-meat/#:~:text=Nearly%20all%20hogs%20imported%20into%20the%20United%20States,U.S.%20beef%20production%20over%20the%20last%2013%20years; *see also* Beef: Supply and disappearance (carcass weight, million pounds) and per capita disappearance (pounds), USDA-ERS, available at

R-CALF USA's Comments in Docket No. APHIS-2021-0020
April 19, 2023
Page 9

small percentage of total beef production (includes domestic beef and beef from imported cattle).[31] Consequently, the impact of exports on domestic cattle producers is relatively small…far too small to justify the proposed rule's costly EID mandate.[32] Clear evidence of the export market's small if any impact on domestic cattle prices is that year-to-year beef exports between 2017 and 2018 increased by nearly 11% while year-to-year cattle prices during the same period fell nearly 4%, and cattle prices continued falling for another two years.[33]

The USDA's assertion that independent cattle producers (i.e., cow/calf producers and feeders) would be beneficiaries of the proposed EID program that they would be forced to exclusively fund to purportedly protect international trade markets is belied by the above-mentioned historical evidence. Instead, that historical evidence shows that the beef industry (i.e., multinational beef packers) are the intended beneficiaries of the proposed rule. As such, the proposed rule constitutes an insurance policy scheme for multinational beef packers with the annual premium to be paid exclusively by independent cattle producers. Another way to look at this is that the proposed rule shifts the costs of maintaining export markets considered lucrative to multinational beef packers to independent U.S. cattle producers, the vast majority of which are not involved in the export market.

**E. The Proposed Rule Violates the Tenth Amendment to the U.S. Constitution.**

Implementation of the proposed rule would violate the Tenth Amendment to the United States Constitution. The State of Wyoming and the State of South Dakota, for example, have both codified into state law a wide range of identification options that work well for the independent cattle producers in those states.[34]

**F. The USDA Has Neither Statutory Nor Constitutional Authority to Mandate EID Eartags.**

The proposed rule cites to no legal authority to force independent U.S. cattle producers to affix EID eartags to their cattle. Indeed, the USDA has no such statutory or constitutional authority to do so.

    a. The EID Mandate Under the Proposed Rule Is Not Authorized by Statute.

---

https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ers.usda.gov%2Fwebdocs%2FDataFiles%2F104360%2FMeatSDRecent.xlsx%3Fv%3D4061&wdOrigin=BROWSELINK.

[31] *See* Beef: Supply and disappearance (carcass weight, million pounds) and per capita disappearance (pounds), USDA-ERS, available at
https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ers.usda.gov%2Fwebdocs%2FDataFiles%2F104360%2FMeatSDRecent.xlsx%3Fv%3D4061&wdOrigin=BROWSELINK.

[32] It is important to note the exception: a relatively small group of cattle producers who produce under a certified export program and who already are using EID eartags. These producers are likely to lose some or all of the premiums they now receive should the proposed rule be finalized as exporters would have little incentive to continue paying a premium for EID tagged cattle when the government eventually mandates that all cattle be EID identified.

[33] *See* Beef: Supply and disappearance (carcass weight, million pounds) and per capita disappearance (pounds), USDA-ERS, available at
https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.ers.usda.gov%2Fwebdocs%2FDataFiles%2F104360%2FMeatSDRecent.xlsx%3Fv%3D4061&wdOrigin=BROWSELINK, *see also*, Choice Beef Values and Spreads and the all-fresh retail value, USDA-ERS, available at https://www.ers.usda.gov/data-products/meat-price-spreads/.

[34] Wyo. Stat. 11-19-117 and S. Dak. Stat. 40-3-27.

AR-001913

R-CALF USA's Comments in Docket No. APHIS-2021-0020
April 19, 2023
Page 10

While the proposed rule cites no legal authority for a regulatory action to mandate EID eartags on U.S. cattle, the USDA previously referred to authority purportedly conferred under the Animal Health Protection Act (AHPA, 7 U.S.C. 8301 et seq.) when it finalized its 2013 rule, *Traceability for Livestock Moving Interstate.* [35] The Agency specifically asserted authority "to prevent the introduction into the United States and the dissemination within the United States of any pest or disease of livestock," as well as to "establish requirements for the interstate movement of livestock to prevent the dissemination of diseases of livestock within the United States."[36]

Those assertions have been taken completely out of context. Under 7 U.S.C. 8308 the USDA is authorized to "carry out operations and measures to detect, control, or eradicate any pest or disease of livestock (including the drawing of blood and diagnostic testing of animals), including animals at a slaughterhouse, stockyard, or other point of concentration."

The statutory examples of "operations and measures" are of overt action by USDA, such as drawing of blood and diagnostic testing, all directly intended to "detect, control, or eradicate" pests or diseases. Proper statutory construction doctrines require the general terms "operations and measures" to be construed in light of the specific terms "drawing of blood and diagnostic testing."

The language does not confer broad authority to mandate overt action by producers in the form of purchasing and affixing EID eartags to their cattle. The proposed EID mandate does not directly and actively "detect, control, or eradicate" pests or diseases nor is it an operation or measure such as "drawing of blood and diagnostic testing."

Nor does 7 U.S.C. 8305 – Interstate Movement, confer broad authority to mandate overt action by producers in the form of purchasing and affixing EID eartags to their cattle. The proposed EID mandate cannot be countenanced under the limited authority conferred by the statute to "prohibit or restrict":

> (1) the movement in interstate commerce of any animal, article, or means of conveyance if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction or dissemination of any pest or disease of livestock; and

> (2) the use of any means of conveyance or facility in connection with the movement in interstate commerce of any animal or article if the Secretary determines that the prohibition or restriction is necessary to prevent the introduction or dissemination of any pest or disease of livestock.

Indeed, the imposition of a mandate upon independent cattle producers to both purchase and affix EID eartags cannot be construed as either a prohibition or restriction in interstate commerce as it is an overt encumbrance upon independent cattle producers for the mere privilege of moving their cattle interstate.

---

[35] 78 Fed. Reg, at 2,040.
[36] *Id*.

AR-001914

Any fair reading of the Act does not permit the previous 2013 assertion of authority by APHIS to require cattle producers to purchase and affix EID eartags to their cattle, and certainly does not permit such a requirement under the proposed rule wherein the Agency has failed to cite to any legal authority whatsoever in support of its mandate.

### b. The EID Mandate Under the Proposed Rule Is Not Authorized by the Constitution.

Any assertion of broad authority to mandate EID eartags likewise cannot be countenanced under the United States Constitution. The powers of Congress are not implied, plenary, and inherent, but rather express, limited and enumerated.

USDA's assertion that Congress has delegated and granted it broad powers which are implied, plenary and inherent flies in the face of the clear intent of Article 1, Section 8, of the U.S. Constitution.

USDA is an administrative Agency under the Executive branch of the federal government and enjoys no powers beyond those expressly granted it by Congress, acting in turn under the express, limited, and enumerated powers granted under Article 1, Section 8.

Congress has not mandated an electronic animal identification scheme and as an administrative Agency, USDA cannot legislate such a scheme by regulatory fiat.

Or perhaps the Agency believes, though it does not state, that the Commerce Clause of the U.S. Constitution somehow grants it powers of regulatory fiat to mandate EID eartags for cattle moving in interstate commerce, notwithstanding that Congress has not implemented such a program.

The purpose of the Commerce Clause was not one of conferring broad regulatory authority upon Congress over items moving interstate but rather that America should be a national common market without individual states imposing and assessing duties on commerce between states. Any argument that the Commerce Clause gives USDA regulatory authority to require cattle to be EID eartagged in order to cross state lines is not supported by the clear intent of that Clause.  Such a broad interpretation of the Commerce Clause emasculates the strict limitations placed on Congress by Article I, Section 8.

### G. The Proposed Rule Likely Violates the Fourth and Fifth Amendments to the U.S. Constitution.

As evidenced by the financial premiums certain cattle producers presently receive for using EID eartags on their cattle when participating in value-added programs, the origin and ownership information correlated to the numbering system contained in and on mandatory EID eartag constitutes a separate value that is added to the market value of the animal if it did not contain such origin and ownership information.[37] By virtue of the proposed rule's mandate that cattle producers affix EID eartags to their cattle, which eartags are correlated to the cattle producer's value-added information, the proposed rule violates the Fourth Amendment to the U.S. Constitution by unconstitutionally seizing the cattle producers value-added information without compensation.

---

[37] *See*, e.g., *supra*, fn 32.

The value-added information associated with the mandatory EID eartags further constitutes the private property of the owner of the cattle. Because the proposed rule claims the value-added information is for public use (i.e., to protect international trade), the mandatory nature of the proposed rule likely constitutes a taking in violation of the Fifth Amendment to the U.S. Constitution.

**H.  The Proposed Rule Violates Cattle Producers' Expectations of Privacy Conferred by the U.S. Constitution.**

The proposed rule expressly includes the term "premises," inferring that the term has a specific meaning replete with certain criteria that must be met, including the registration of a premises by cattle producers who purchase mandatory EID eartags. But the term remains ominously undefined in the proposed rule. In previous USDA documents, the Agency makes clear that a premises is different than simply the "street address, city, State, and ZIP code where the tags are distributed" as the premises, instead, is the location "where the animals that are being tagged reside."[38]

As a result of the proposed rule's omission of any of the information that cattle producers would be required to provide in order to comply with the mandatory EID mandate, it is unknown as to what happens to the private information that would be collected under the proposed rule. Who will be allowed access to it? And how, if at all, can confidentiality be assured?

R-CALF USA is concerned that disclosure of such private and confidential information could subject cattle producers to liability should the animal bearing their EID eartag contract a disease or otherwise cause harm after the animal is sold to some downstream entity in the domestic live cattle supply chain. In addition, disclosure of such information could subject cattle producers to discrimination or retaliation.

The proposed rules omission of any discussion regarding the scope and nature of private and confidential information cattle producers would be required to provide to comply with the proposed mandate is fatal and reason enough for the Agency to immediately withdraw the proposed rule.

**I.  The Proposed Rule Will Render Certain Cattle Producers Less Competitive than Other Cattle Producers.**

The mandatory EID proposal will render cattle producers who must ship cattle across state lines for feeding or other purposes less competitive than cattle producers in states where all downstream markets are readily available. This is because those in states with adequate downstream markets will enjoy lower production costs than those subject to the costly EID mandate.

**J.  The Proposed Rule Is a Self-Serving, Bureaucratic, Big Government Solution In Search of a Nonexistent Problem.**

Mandatory EID is not needed. The U.S. has successfully prevented the spread of diseases using current animal identification devices including containing the 1929 foot and mouth disease (FMD)

---

[38] Animal Disease Traceability, General Standards (Draft), USDA, April 15, 2019, at 12, available at https://www.aphis.usda.gov/traceability/downloads/ADT_standards.pdf.

AR-001916

outbreak in California, the 2003 mad cow disease case identified an a cow imported from Canada in Mabton, Washington, brucellosis outbreaks in the Greater Yellowstone Area, and bovine tuberculosis outbreaks in Michigan. And, USDA continues to knowingly allow the importation of cattle with a high-risk of bovine tuberculosis from Mexico – a practice USDA would not continue doing if it did not already believe it had the capacity and capability of controlling disease spread in the United States.

The USDA should focus its resources on preventing the introduction of foreign animal diseases at our U.S. borders. USDA reports show the U.S. continually introduces bovine tuberculosis (TB) from imported Mexican cattle. For example, despite having full and complete knowledge of a 2006 report by USDA's Office of Inspector General (OIG) that states 75 percent of bovine TB cases detected in U.S. slaughtering plants originated in Mexico;[39] and, despite the OIG's other findings that, "These infected animals were identified in 12 different States" and "animals of Mexican origin spent up to 14 months at U.S. farms before going to slaughter, with each case potentially spreading the disease;"[40] and, despite the USDA's own report that states "From 2001 through February 2009, 236 out of 329 slaughter cases [of TB] were traced to Mexico," which means nearly 72 percent of all TB cases detected at slaughter were caused by the USDA's inadequate import restrictions for Mexican cattle imports;[41] and, despite APHIS' own finding that states, "Each year 1-2 infected animals per 100,000 animals imported from Mexico are identified [as bovine TB-infected] through slaughter detection or epidemiologic investigations."[42]

U.S. cattle producers should not be shouldered with the burden of containing other country's diseases that the USDA knowingly allows into the United States as would occur if the proposed rule were to be implemented as a final rule.

### K. Conclusion.

For the foregoing reasons, R-CALF USA urges the USDA to immediately withdraw the proposed rule.

Sincerely,

Bill Bullard, CEO

---

[39]*See* Audit Report:  Animal and Plant Health Inspection Service's Control Over the Bovine Tuberculosis Eradication Program, USDA, Office of Inspector General, Report No. 50601-0009-Ch, September 2006, at 19-20, available at https://www.usda.gov/sites/default/files/50601-09-CH.pdf.

[40] *Id*., at iii.

[41] Assessment of Pathways for the Introduction and Spread of Mycobacterium bovis in the United States, 2009, USDA-APHIS, March 2011, at 62, available at https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1170&context=zoonoticspub.

[42] *Id*., at 1.

AR-001917

An official website of the United States Government. 🇺🇸

‹ Back to Document Comments (/document/APHIS-2021-0020-0001/comment)

Share ▾

 **PUBLIC SUBMISSION**

# Comment from Farm and Ranch Freedom Alliance

Posted by the **Animal and Plant Health Inspection Service** on Feb 21, 2023

---

Docket (/docket/APHIS-2021-0020) / Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001) / Comment

| Comment |
| --- |

The Farm and Ranch Freedom Alliance (FARFA) is a nonprofit advocacy organization that supports independent family farmers and protects a healthy and productive food supply for American consumers. FARFA promotes common sense policies for local, diversified agricultural systems.

FARFA respectfully requests a 90-day extension of the March 20, 2023 comment deadline on the proposed rule.

The proposal to mandate electronic identification for cattle has wide-ranging repercussions. Not only does it affect cattle owners, it also significantly impacts sale barns, veterinarians, and ultimately consumers, by affecting the structure of the market.

This Administration has expended significant resources to try to address the consolidation of our food supply, particularly in livestock and meat, and to build a more resilient agricultural and food system. If the agency wishes to build resilient, diversified supply chains, it needs to take steps to avoid regulations and policies that are prejudiced against small- and mid-scale producers. It makes no sense to provide grant funds and specialty programs to promote diversification if the agency simultaneously adopts regulations and policies that unduly burden small-scale, diversified producers or closes off markets to them.

At a minimum, the agency needs to provide sufficient time for small producers, related businesses, and the consumers to provide thoughtful input on this proposed rule. For those primarily impacted, namely cattle

Give Feedback

AR-001918



**Comment ID**

APHIS-2021-0020-0153

**Tracking Number**

le9-0h3p-e82q

| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**

Public Comment

**Received Date**

Feb 17, 2023



*Your Voice in Federal Decision Making*

About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)    Reports (/dotreports)    FAQ (/faq)    Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    API Requests (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

AR-001919

According to article on 6-2-2020, the aphis.usda.gov site states

Internationally, APHIS supports the cattle and bison industry through programs that prevent the entry of foreign animal diseases into the U.S. and that address trade concerns.

The cattle and bison health program has been successful in protecting the U.S. cattle industry from economic loss by rapidly detecting foreign, emerging, re-emerging, or domestic program diseases and in preventing their spread.

 Mandatory Animal Identification:

Is a pro-corporate proposal that would unreasonably burden farmers and ranchers while giving corporate multinational meatpackers yet another market advantage.

Will be used to satisfy monopolistic meatpacker interests to increase their export markets, their profits, and their control of the U.S. cattle industry.

Creates yet another undue economic burden on Missouri's independent family farm cattle producers.

Does not include the identification of imported meats.

Does nothing to increase consumer choice or confidence.

Has no food safety benefits.

Has the potential to push liability for food safety issues created at corporate meatpacking plants onto family farm producers.

AR-001920



‹ Back to Document Comments (/document/APHIS-2021-0020-0001/comment)

Share ▾

 **PUBLIC SUBMISSION**

# Comment from Farm and Ranch Freedom Alliance

Posted by the **Animal and Plant Health Inspection Service** on Feb 21, 2023

---

Docket (/docket/APHIS-2021-0020) / Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001) / Comment

> Comment

The Farm and Ranch Freedom Alliance (FARFA) is a nonprofit advocacy organization that supports independent family farmers and protects a healthy and productive food supply for American consumers. FARFA promotes common sense policies for local, diversified agricultural systems.

FARFA respectfully requests a 90-day extension of the March 20, 2023 comment deadline on the proposed rule.

The proposal to mandate electronic identification for cattle has wide-ranging repercussions. Not only does it affect cattle owners, it also significantly impacts sale barns, veterinarians, and ultimately consumers, by affecting the structure of the market.

This Administration has expended significant resources to try to address the consolidation of our food supply, particularly in livestock and meat, and to build a more resilient agricultural and food system. If the agency wishes to build resilient, diversified supply chains, it needs to take steps to avoid regulations and policies that are prejudiced against small- and mid-scale producers. It makes no sense to provide grant funds and specialty programs to promote diversification if the agency simultaneously adopts regulations and policies that unduly burden small-scale, diversified producers or closes off markets to them.

At a minimum, the agency needs to provide sufficient time for small producers, related businesses, and the consumers to provide thoughtful input on this proposed rule. For those primarily impacted, namely cattle

Give Feedback

AR-001921

**Comment ID**

APHIS-2021-0020-0153



**Tracking Number**

le9-0h3p-e82q

| Comment Details | Submitter Info |
|---|---|

**Document Subtype**

Public Comment

**Received Date**

Feb 17, 2023



*Your Voice in Federal Decision Making*

| About (/about) | Bulk Data Download (/bulkdownload) | Agencies (/agencies) | Learn (/learn) | Reports (/dotreports) | FAQ (/faq) | Commenting Guidance (/commenting-guidance) |
|---|---|---|---|---|---|---|

Privacy & Security Notice (/privacy-notice) | User Notice (/user-notice) |
Accessibility Statement (/accessibility) | API Requests (https://open.gsa.gov/api/regulationsgov/) |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Give Feedback

Support (/support)

AR-001922



‹  Back to Document Comments (/document/APHIS-2021-0020-0001/comment)

| Share ▾ |
|---|

  **PUBLIC SUBMISSION**

# Comment from Fox, Kenny

Posted by the **Animal and Plant Health Inspection Service** on Apr 18, 2023

---

Docket (/docket/APHIS-2021-0020)  / Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001)
 / Comment

| Comment |
|---|

Thank you for the opportunity to comment on this proposed rule. I am a third generation cattle producer from South Dakota. My family has been in the cattle business for a 106 years in SD. I support the 2013 ADT rule as it allows for multiple forms of official ID which makes for a much stronger animal health traceback system for when one type fails another type prevails. When cattle producers are mandated to one specific official ID we are left with a system that is ripe for error.

I strongly demand that USDA/APHIS withdraw this poorly written proposed rule for the following reasons stated below:

1.      This rule violates the 4th amendment by attaching electronic tracking devises to my property without probable cause and a search warrant.

2.      This proposed rule also violates the 10th amendment to the US Constitution as South Dakota has a codified law that allows cattle producers the right to choose the type of official ID that they want to use.

3.      The proposed rule will do nothing to prevent or control an FMD outbreak as FMD spreads to rapidly. The incubation period for FMD is 2-14 days , meanwhile the virus is spreading throughout the incubation period before it is known to be FMD, therefore it has spread all across the United States before it is known to exist. Livestock are transported all across the US from border to border and coast to coast in 24hours so the disease is in epidemic proportions. Also the FMD virus can travel upon the wind in humid climates up to

Give Feedback

AR-001923

are saying that the 15 digit number on the EID tags will have to be readable from 30 inches away. This is redundant and is contrary to USDA/APHIS's statements in the past. If we are going to visually read EID tags we might as well stay with orange metal clip brucellosis and the NUES or brite metal clip tags and save the government and the cattle producers millions of dollars.

6. EID tag retention and read rate error are yet more reasons to withdraw this proposed rule. 10% / year tag loss and a 7% error read rate failure leaves a big hole in tracking a disease outbreak. For instance with a loss of 10% of EID tags/year at the end of 10 years there will be no cattle left to track in the event of an animal health disease outbreak. The metal clip tags have a 99% retention rate and are much mor reliable than EID tags. Using metal clips tags, paper back tags, register brands when accompanied by a brand inspection certificate from a recognized brand inspection authority and breed registration tatoos have given the USA the most healthy cattle herd in the history.

7. It is apparent that the proposed RFID program would invite limitless incremental regulation from other agencies as is evidenced by the Securities and Exchange Commission's so-called E.S.G. requirements and the Food and Drug Agency's rules for antibiotic usage (being just two examples of how regulatory mandates begat more and more regulatory mandates, all of which are designed to put the independent and small producer out of business). It will be just one more situation where "government is always trying to fix its last solution."

8. Lastly EID ear tags have been proposed numerous times over the last decade and have been met with tremendous opposition. I would like to know what part of NO does UDSA/APHIS understand? Look up the word no in the dictionary and stop harassing cattle producers with this erroneous ,foolish and redundant system!

**Comment ID**

APHIS-2021-0020-1807

 **Tracking Number**

lgm-hzn2-7n5h

| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**

Public Comment

**Received Date**

Apr 18, 2023

Give Feedback

AR-001924

Regulations.gov

*Your Voice in Federal Decision Making*

About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)    Reports (/dotreports)    FAQ (/faq)    Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    API Requests (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

AR-001925


‹  Back to Document Comments (/document/APHIS-2021-0020-0001/comment)

Share ▾

  **PUBLIC SUBMISSION**

# Comment from Fox, Roxie

Posted by the **Animal and Plant Health Inspection Service** on Mar 13, 2023

Docket (/docket/APHIS-2021-0020)  / Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001) / Comment

| Comment |
| --- |

When I read through USDA mission statement, the one that sticks out is they are to protect our borders from disease, it's not to force the American people to do it. We have programs that work great already. No one in USDA is elected, they are ALL appointed, therefore they do not represent me, they work for me. No to MANDATORY RFID TAGS.

**Comment ID**
APHIS-2021-0020-0370

  **Tracking Number**
lf4-979s-8o6f

| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**
Public Comment

Give Feedback

AR-001926



*Your Voice in Federal Decision Making*

About    Bulk Data Download    Agencies    Learn    Reports    FAQ    Commenting Guidance
(/about)        (/bulkdownload)    (/agencies)    (/learn)    (/dotreports)    (/faq)    (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |
Accessibility Statement (/accessibility)    |    API Requests (https://open.gsa.gov/api/regulationsgov/)    |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

AR-001927

An official website of the United States Government.

‹ Back to Document Comments (/document/APHIS-2021-0020-0001/comment)

Share ▾

 **PUBLIC SUBMISSION**

# Comment from Fox, Roxie

Posted by the **Animal and Plant Health Inspection Service** on Apr 20, 2023

Docket (/docket/APHIS-2021-0020) / Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001) / Comment

| Comment |
|---|

The people have repeatedly said no to USDA's RFID program. Our government is supposed to listen to it's citizens or that government is not a free government but a regime.

| **Comment ID** |
|---|
| APHIS-2021-0020-1937 |

 **Tracking Number**
lgn-x8y7-lycf

| **Comment Details** | **Submitter Info** |
|---|---|

**Document Subtype**

Public Comment

**Received Date**

Give Feedback

AR-001928



*Your Voice In Federal Decision Making*

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)   Reports (/dotreports)   FAQ (/faq)   Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   API Requests (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

AR-001929

‹ Back to Document Comments (/document/APHIS-2021-0020-0001/comment)

Share ▾

 **PUBLIC SUBMISSION**

# Comment from Fox, Rick

Posted by the **Animal and Plant Health Inspection Service** on Apr 20, 2023

Docket (/docket/APHIS-2021-0020)  / Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001)  / Comment

| Comment |
| --- |

The use of a mandatory RFID tracking system is doomed for failure. The majority of comments that cattle ranchers and feeders throughout the years have opposed a mandated electronic ID. USDA has pushed and pushed for close to 20 years to achieve this goal for the main benefit of the global meat packers. In 2005, or so, head veterinarian John Clifford spoke at the South Dakota Stockgrowers Association's annual meeting about a proposed National Animal Identification 'Scheme' (NAIS). His main push was for foreign trade! How inappropriate for the US head veterinarian to push the world trade agenda, his title was that of supposedly being a veterinarian not a trade representative. He never mentioned Animal Disease Traceability, probably because the term had not been coined yet. Later on in 2007 a South Dakota producer, Jan Van Dyke, sold some fat cattle that he purchased as feeder calves at a Huron, SD sale barn. The meat Packer condemned 7 or 8 head because they had Canadian RFID ear tags, Canada was banned from selling feeder in the US (which they did) at the time because of BSE. USDA steps in and within 2 to 3 weeks pays Mr. Van Dyke for his cattle with a cover up that those cattle were never at his place. One specific animal had a visual tag with the word HORN hand printed on the tag that was definitely fed by him and was condemned. John Clifford was very abrupt with me when I called him out and said this case was resolved and I needed to shut up, something I will not forget. What good is a RFID tracking system/scheme if the ones in charge (USDA) will only enforce the rules they see fit! Corruption in government is by far the worse we have ever seen, we don't need anymore. NO to your proposed rule! Thank you and have a nice day, Rick Fox Hermosa, SD rancher

Give Feedback

**Tracking Number**

lgn-7v3e-ow5d

|              Comment Details              |               Submitter Info               |

**Document Subtype**

Public Comment

**Received Date**

Apr 19, 2023



*Your Voice In Federal Decision Making*

About | Bulk Data Download | Agencies | Learn | Reports | FAQ | Commenting Guidance
(/about) | (/bulkdownload) | (/agencies) | (/learn) | (/dotreports) | (/faq) | (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   API Requests (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

AR-001931

An official website of the United States Government.

‹  Back to Document Comments (/document/APHIS-2021-0020-0001/comment)

Share ▾

 **PUBLIC SUBMISSION**

# Comment from Fox, Theresa

Posted by the **Animal and Plant Health Inspection Service** on Mar 22, 2023

Docket (/docket/APHIS-2021-0020)  / Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001) / Comment

| Comment |
| --- |

The abuse of power by government agencies is ridiculous! The federal government wants to know every little iota of information about everything! This is over reaching and erroneous since it doesn't trace, doesn't stop, doesn't distinguish, any disease what so ever. It is about control, more control and MONEY! Self-employed ranchers cannot afford to keep these things in an animals ear, let alone document them. This Rule is BS and will knock more and more struggling farmers and ranchers out of business, you'll just end up importing more foreign beef and meat products into the US to feed. Thanks so much for this lousy piece of disease ridden Rule. We expect more from our government! Your nothing but paper pushers trying to break an industry for absolutely nothing but MONEY

**Comment ID**

APHIS-2021-0020-0838

 **Tracking Number**

lfb-pbw8-2a5x

Give Feedback

AR-001932

Observation:

Mar 16, 2023



*Your Voice in Federal Decision Making*

About (/about)   Bulk Data Download (/bulkdownload)   Agencies (/agencies)   Learn (/learn)   Reports (/dotreports)   FAQ (/faq)   Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)   |   User Notice (/user-notice)   |
Accessibility Statement (/accessibility)   |   API Requests (https://open.gsa.gov/api/regulationsgov/)   |
FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Support (/support)

Give Feedback

AR-001933

An official website of the United States Government. 🇺🇸

🇺🇸

‹  Back to Document Comments (/document/APHIS-2021-0020-0001/comment?filter=Farm%20and%20Ranch%20Freedom%20Alliance)

 **PUBLIC SUBMISSION**

Share ▾

# Comment from Farm and Ranch Freedom Alliance

Posted by the **Animal and Plant Health Inspection Service** on Apr 20, 2023

Docket (/docket/APHIS-2021-0020)  /  Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001)  /  Comment

| Comment |
| --- |

The proposed rule to require electronic ID tags on cattle crossing state lines is an illogical, ineffective proposal that will unfairly burden small-scale producers and therefore undermine the Administration's stated goal of making our meat supply more resilient. The 2,070 undersigned organizations, farms, ranches, livestock- and food-related business, and individuals urge the agency to withdraw this meatpacker-driven proposal and instead assemble a stakeholder group with significant representation of small- and mid-scale producers to discuss the reforms needed to better protect both animal health and the security of our domestic food supply.

I. Executive Summary

The 2013 Animal Disease Traceability rule requires that all dairy cattle and adult beef cattle that cross state lines have some form of "official identification." The rule specifically provides that people can use either electronic or low-tech, traditional forms of ID. Now the agency is proposing to make electronic ID the only form of official ID allowed for cattle crossing state lines under the ADT rule.

The proposed rule to mandate electronic ID is an illogical, ineffective proposal that will unfairly burden small-scale farmers and ranchers. This rule should be withdrawn for multiple reasons:

1. It will be ineffective in improving animal traceability.

Based on the agency's own analysis, the proposed rule will be ineffective. The agency estimates that it will impact only 11% of cattle in the country;

Give Feedback

yet an earlier congressional analysis concluded that 18% was too low of a participation rate to make traceability programs effective. In addition, by increasing the number of digits in the ID number, the agency is actually increasing the probable error rate.

2. The agency has failed to show a need to impose more expensive requirements.

Prior to imposing any new regulatory requirements and costs, an agency should conduct an analysis to determine the need for new regulations and whether the new requirements actually address that need. Despite numerous requests, the USDA has failed to conduct such an analysis for mandatory electronic animal ID.

3. The proposed rule disproportionately harms small farmers and ranchers.

Moving to a completely electronic ID system carries significant costs, not only from the cost of the tag itself but also associated infrastructure costs. This impacts not only farmers, but also sales barns and large-animal veterinarians. Large corporate-controlled operations will not only benefit from economies of scale, but could structure their operations to avoid individual ID requirements altogether.

4. It ignores the extensive stakeholder work that went into the Animal Disease Traceability rule.

The ADT rule, and in particular the decision to include low-tech traditional forms of ID, was the result of extensive work and negotiations between the agency and numerous stakeholders. In proposing to mandate electronic ID, the agency is working contrary to the carefully negotiated consensus.

5. Mandating electronic ID undermines the agency's goal to promote a resilient food system.

If the agency wishes to build resilient, diversified supply chains, it needs to take steps to avoid regulations and policies that are prejudiced against small- and mid-scale producers, such as mandatory electronic Animal ID.

These issues are discussed in greater detail in the attached letter.

[See attachment for body of letter]

VII.    Conclusion

The 2,070 undersigned organizations, farms, ranches, related businesses, and individuals thus urge the USDA to withdraw the proposed rule. Mandatory electronic ID is driven by the interests of large meatpackers, not American farmers and consumers. The proposed rule will push our livestock and meat industry towards greater consolidation, which is precisely the opposite of what is needed for the security and welfare of our country.

Attachments ( 1 )

 230419 Comments on mandatory electronic ID from 2070 orgs and individuals

⬇ Download  (https://downloads.regulations.gov/APHIS-2021-0020-1947/attachment_1.pdf)

**Comment ID**

APHIS-2021-0020-1947

 **Tracking Number**

lgn-yrzb-qiga

| Comment Details | Submitter Info |
|---|---|

**Document Subtype**

Public Comment

**Received Date**

Apr 19, 2023

Give Feedback

*Your Voice in Federal Decision Making*

About    Bulk Data Download    Agencies    Learn    Reports    FAQ    Commenting Guidance

(/about)    (/bulkdownload)    (/agencies)    (/learn)    (/dotreports)    (/faq)    (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |                                    Support (/support)

Accessibility Statement (/accessibility)    |

API Requests (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Give Feedback

April 19, 2023

Re: Comments on Use of Electronic Identification Eartags as Official Identification in Cattle and Bison

The proposed rule to require electronic ID tags on cattle crossing state lines is an illogical, ineffective proposal that will unfairly burden small-scale producers and therefore undermine the Administration's stated goal of making our meat supply more resilient. **The 2,070 undersigned organizations, farms, ranches, livestock- and food-related business, and individuals urge the agency to withdraw this meatpacker-driven proposal and instead assemble a stakeholder group with significant representation of small- and mid-scale producers to discuss the reforms needed to better protect both animal health and the security of our domestic food supply.**

I. **Executive Summary**

The 2013 Animal Disease Traceability rule requires that all dairy cattle and adult beef cattle that cross state lines have some form of "official identification." The rule specifically provides that people can use either electronic or low-tech, traditional forms of ID. Now the agency is proposing to make electronic ID the only form of official ID allowed for cattle crossing state lines under the ADT rule.

The proposed rule to mandate electronic ID is an illogical, ineffective proposal that will unfairly burden small-scale farmers and ranchers. **This rule should be withdrawn for multiple reasons:**

1. **It will be ineffective in improving animal traceability.**

   Based on the agency's own analysis, the proposed rule will be ineffective. The agency estimates that it will impact only 11% of cattle in the country; yet an earlier congressional analysis concluded that 18% was too low of a participation rate to make traceability programs effective. In addition, by increasing the number of digits in the ID number, the agency is actually increasing the probable error rate.

2. **The agency has failed to show a need to impose more expensive requirements.**

   Prior to imposing any new regulatory requirements and costs, an agency should conduct an analysis to determine the need for new regulations and whether the new requirements actually address that need. Despite numerous requests, the USDA has failed to conduct such an analysis for mandatory electronic animal ID.

3. **The proposed rule disproportionately harms small farmers and ranchers.**

Moving to a completely electronic ID system carries significant costs, not only from the cost of the tag itself but also associated infrastructure costs. This impacts not only farmers, but also sales barns and large-animal veterinarians. Large corporate-controlled operations will not only benefit from economies of scale, but could structure their operations to avoid individual ID requirements altogether.

4.      **It ignores the extensive stakeholder work that went into the Animal Disease Traceability rule.**

The ADT rule, and in particular the decision to include low-tech traditional forms of ID, was the result of extensive work and negotiations between the agency and numerous stakeholders. In proposing to mandate electronic ID, the agency is working contrary to the carefully negotiated consensus.

5.      **Mandating electronic ID undermines the agency's goal to promote a resilient food system.**

If the agency wishes to build resilient, diversified supply chains, it needs to take steps to avoid regulations and policies that are prejudiced against small- and mid-scale producers, such as mandatory electronic Animal ID.

These issues are discussed in greater detail below.

## I.      Background

It is important to place the proposed rule in context.

In 2005, the USDA proposed the National Animal Identification System (NAIS), which would have required premises registration, electronic animal identification, and tracking of all movements for all livestock in the country.  In response to widespread opposition, the agency withdrew the plan in 2010.  The USDA then spent two years on an intensive stakeholder process and, in 2013, adopted the Animal Disease Traceability rule.  ADT requires that all dairy cattle and adult beef cattle that cross state lines have some form of "official identification."  The 2013 rule **specifically** provides options for both electronic and traditional forms of ID.

Starting in 2020, the USDA began to push electronic ID again after working with informal groups made up of large meatpackers, technology companies, and the trade associations that they dominate.  Independent producers were not part of the discussions, nor was the Federal Advisory Committee Act followed. USDA issued a "fact sheet" in which it simply announced that only electronic ID would qualify as official identification. After public outcry, including a court challenge for violations of the Administrative Procedures Act, the agency withdrew the fact sheet.

Now the agency is formally proposing a rule to make electronic ID the only form of official ID allowed for cattle crossing state lines under the ADT rule.  While this

2

addresses the procedural objections to the 2020 action, it does <u>not</u> address the substantive reasons that farmers, ranchers, and many others have objected to mandatory electronic ID ever since the original plans for NAIS.

## II.    The Proposed Rule Will be Ineffective

Based on the agency's own analysis, the proposed rule will be ineffective for two reasons: extremely low participation and high error rates.  (Note that we contends that mandatory electronic ID will be ineffective for multiple reasons; these are just the reasons that are apparent **on the face** of the agency's publication.)

First, the agency is estimating that the new rule will impact just 11 million cattle per year, or approximately 11% of the cattle in the country.

In a Congressional Research Service Report in 2010, the CRS noted that 18% participation by cattle producers in the National Animal Identification System (NAIS) was too low to be effective:

> Participation in the initial phase of NAIS, premises registration, reflected this same degree of interest, as very high percentages of eligible premises were registered for most animal species … **with the exception of cattle (18%).  USDA stated that such a low participation rate for cattle rendered NAIS ineffective as a tool for controlling animal disease,** and that a much higher participation rate would be necessary to respond effectively to an animal disease outbreak."[1]

If 18% was too low for premises registration to be effective, then 11% of cattle being tagged will certainly be ineffective.

It is unlikely that the rule will actually only impact 11 million cattle per year.  Previously, USDA had estimated that the ADT Rule would impact 30 million cattle that cross state lines annually, and this proposed rule would thus impact at least that many. Its true impact is likely to be even higher, since many in-state programs are connected to the USDA definition of "official identification"; thus, many individuals will be required to tag their cattle with electronic ID even for in-state movements if this proposed rule is finalized.

While we do not know why the USDA would try to understate the scope of the rule, the outcome is that the agency has avoided doing a full cost-benefit analysis by claiming such low anticipated numbers.  Yet, if the USDA's estimate is indeed accurate, then this new regulation will make no real difference to the traceability of the national herd – and is thus a completely unnecessary cost.  Either way, the proposed rule should be withdrawn.

---

[1] Congressional Research Service, Animal Identification and Traceability: Overview and Issues (Nov. 29, 2010), Summary (emphasis added)

3

Second, the proposed rule will be ineffective because the probable error rate will make the conversion to EID tags counter-productive. As have previously pointed out, converting to EID tags involves not only the costs of the EID tag, but all the associated infrastructure, particularly readers and the ongoing costs of keeping up with technological changes. In an effort to address that objection, the proposed rule provides that the EID tags will include visual ID numbers so that they can be read either electronically or visually.

Yet the agency's justification for shifting to EID is that there are too many errors when individuals transcribe the current visual-read tags. Notably, the metal brite tags that are allowed under the current ADT rule have a 9-digit alphanumeric code. In contrast, the EID tags have a 14-digit code. Whatever error rate occurs transcribing a 9-digit code will be far less than the error rate in transcribing 14-digit codes.

**In other words, the visual read option significantly multiplies the very problem that USDA claims to be trying to solve with the proposed rule.**

It's intuitive that a farmer would make more mistakes entering a 14-digit code than he would when entering a 9-digit one. Instead of having 9 opportunities to get mis-read or mis-write the digit, there are now 14 different opportunities for error.

Mathematically, the way to calculate a probability of someone entering a 9-digit code correctly is to multiply the probability of entering one digit correctly times itself 9 times. Similarly, that probability of entering a 14-digit code correctly is the probability of entering one digit correctly multiplies by itself 14 times. Since the probability of entering a number correctly is always less than 1 (it's 1 only when absolutely no mistake is ever made), this means that the probability of entering a 14-digit code **correctly** is inherently **smaller** than that of entering a 9-digit code correctly, *i.e* there are necessarily going to be **more** mistakes when entering the **longer** code.

To visualize how this would play out in real life, we'll use 10,000 head of cattle whose tags are being read by small farmers or sale barns through which they pass through. Even if the farmers and workers have a near-perfect level of accuracy and read each individual digit correctly 99.99% of the time, the mistake rate would go up by nearly two thirds if they are forced to switch from the 9-digit tag to the 14-digit one.

If the farmers and workers gets it right "only" 99% of the time, which is still a high accuracy rate, forcing them to switch to a 14-digit tag would result in 449 more mistakes than under the current system with metal brite tags.

The full comparison is summarized in the table below:

4

| Probability of Entering Single Digit Correctly | Probability of Entering 9-Digit Tag incorrectly | Probability of Entering 14-Digit Tag Incorrectly | Difference Per 10,000 Animals | % difference |
|---|---|---|---|---|
| 99.99% | 0.09% | 0.14% | 5 | 64.3% |
| 99.9% | 0.9% | 1.39% | 50 | 64.4% |
| 99.7% | 2.67% | 4.12% | 145 | 64.8% |
| 99.5% | 4.41% | 6.78% | 237 | 65.1% |
| 99.2% | 6.98% | 10.63% | 365 | 65.6% |
| 99% | 8.64% | 13.13% | 449 | 65.9% |

Collectively, this will result in significantly more problems. According to the 2017 Census of agriculture, there as 717,635 small farms with fewer than 100 head of cattle that collectively own over **18 million head**. Many of these farms will not purchase expensive electronic readers and will instead continue to hand-transcribe numbers, now with much higher error rates.

Note that these calculations assume that a farmer entering a multi-digit code is going to make mistakes at the same frequency (same average number of mistakes per 100 digits), whether he's entering a 9-digit tag or a 14-digit one. In reality, the error rate for entering the 14-digit strings is likely to be even higher due to fatigue, carelessness, and the trouble involved in memorizing longer strings of digits.

The proposed rule thus fails **on its face** to make any meaningful improvement to traceability, and it should be withdrawn.

III.    **The agency has failed to show that there is a need to impose more expensive requirements on cattle owners and related businesses.**

Prior to imposing any new regulatory requirements and costs, an agency should conduct an analysis to identify (1) the goal, and (2) what is necessary to reach that goal. Despite numerous requests over the last 15 years, the USDA has failed to conduct that analysis, or, if it has been conducted, the agency has not shared it with the public.

First, what is the goal? The agency appears to be continuing to set "traceability" as a goal in and of itself. **Yet traceability is a tool, not a goal**. The goal is animal health and controlling disease. Whether or not there is sufficient traceability should be judged based on its effectiveness in meeting those goals; and the costs of enhancing traceability should be compared to the costs of alternative steps that would help meet the goals of animal health and controlling disease.

Over the last fifteen years, the agency has repeatedly referred to a goal of being able to trace an animal from birth to death within 24 hours. As justification, the agency has said that such traceability is needed to address highly contagious, fast-moving disease such as Foot & Mouth Disease. But that justification has two major flaws. First, such fast-moving diseases do not require birth to death traceability, but merely the ability to trace

5

where an animal has been within the last few days.  In contrast, diseases with long incubation periods, such as tuberculosis, do call for birth-to-death traceability – but there is little harm if the traceback takes longer than 24 hours for such slow-moving diseases.

Second, the agency has failed to show that traceability of domestic livestock is the "weak link" in the ability to address FMD and similar diseases.  To the contrary, early diagnosis and good animal husbandry are far more important to disease control. Consider that the confinement pork industry already has premises ID and electronic ID, yet it had no apparent effect on the number of sick, dead, or euthanized pigs during the porcine epidemic diarrhea outbreak in 2013.  The same is true for the highly consolidated poultry industry and the current avian flu outbreak.

Second, even if one designates traceability (as opposed to animal disease control) as the goal, the next question is what is necessary to reach that goal?  The agency has claimed that the state exercises show weaknesses in the current traceability system, but has not identified what those weaknesses actually are – nor how switching to electronic forms of ID will solve them.  Were the slow or failed tracebacks due to the type of ID the cow had?  A lack of ID, either because the owner never tagged the cow or the tag fell out (a problem that is greater with RFID tags than with the metal brite tags that USDA proposes to eliminate)? Problems with state agency personnel?  Database or other technology flaws?  Messy data from the failure of slaughterhouses to report "retired" ID numbers? There are numerous things that can slow tracebacks or make them impossible to complete, many of which do not vary with the type of ID tag.  The USDA has provided no evidence that eliminating low-tech forms of ID will actually address the alleged problems.

### IV.   The costs of the program will disproportionately harm small farmers and ranchers.

While providing only questionable benefits, if any, an electronic ID mandate carries significant costs.

The agency has failed to provide a cost-benefit analysis for its proposal, but the cost-benefit analyses conducted in the past on the National Animal Identification System (NAIS) proposal showed that a system of electronic ID and tracking would impose very high costs on small-scale farmers and ranchers.

The agency may respond that NAIS involved tracking as well as the ID itself.  Yet the costs of the currently proposed mandatory EID requirement goes beyond the costs of the tag itself. Moving to an all-electronic ID system carries associated costs: electronic tag readers, computers, etc.  As discussed above, the agency has not accounted for these associated costs, claiming that the tags will still be able to be read visually and hand-recorded. But since the proponents' main argument in favor of electronic ID is that too many mistakes occur when people hand-transcribe the **nine (9) digit** numbers on metal brite tags, it is disingenuous and misleading to say that it will work for people to hand transcribe the **fourteen (14) digit** numbers that are used on RFID tags.

6

**Moreover, we have a real-world example of the impacts of mandatory electronic ID without the full NAIS program.** In 2007, the State of Michigan began to require electronic ID tags on cattle for in-state movements. The Farm and Ranch Freedom Alliance submitted a FOIA request to the Michigan Department of Agriculture and Rural Development, seeking to determine the costs imposed by the program on the state, farmers, sale barns, veterinarians, and related businesses. MDARD's response was that it would cost over \$1,724[2] to produce such documents because it would take high-level employees many hours to compile the information. In other words, Michigan imposed this requirement 15 years ago, and it still doesn't know what it actually cost to implement it.

Thus, the only way for the public to judge the costs of an electronic ID mandate is to look at the outcome. Based on the USDA Agricultural Census from 2007 (the same year Michigan implemented mandatory electronic ID for cattle) and 2012:

- Michigan saw a 3% decrease in the number of very small cattle operations (fewer than 10 head), even though nationally the number of such farms *increased* by 4%.
- Both Michigan and the entire country saw similar decreases in the number of small to mid-size farms.
- Michigan saw a 16% increase in the number of large cattle farms (500 to 999 cows), while nationally the number only increased 7%.
- Michigan saw a 35% increase in the number of very large cattle farms (over 1,000 head), even though the number of those operations *decreased* slightly nationally.
- Michigan saw a 50% increase in the number of cattle on those large farms, even though the number of cattle in large operations stayed basically steady nationally.

These numbers reflect a significant loss in small farms and a significant consolidation of the industry, far worse than the national trends. What is different about Michigan? Electronic cattle ID, which the USDA now proposes to impose on the entire country.

V. **The proposed rule is in direct contradiction of the carefully negotiated 2013 rule.**

In 2013, the USDA published the Animal Disease Traceability (ADT) rule. This rule was the result of extensive work and negotiations between the agency and numerous stakeholders. Several representatives for small farmers and ranchers served on the Secretary's Advisory Committee on Animal Health during that time. The Committee had multiple, extensive discussions on the proposed rule, as did many others who provided input to USDA.

The ADT rule explicitly provides that cattle owners can use non-electronic forms of official identification when they are required to identify their animals under the program.

---

[2] MDARD revised the charge to \$1,624 when challenged, still reflecting its inability to provide a response to what should have been a simple request to identify the costs imposed by its electronic ID requirements.

Specifically, "official identification devices and methods" include an "official ear tag," properly registered brands accompanied by an official brand inspection certificate, tattoos and other identification methods acceptable to breed associations, "group/lot" identification numbers, backtags, *or* other forms of identification as agreed to by the shipping and receiving states.  The 2013 rule was designed to "encourage" the use of low-cost technology, specifically metal eartags.[3]  It allowed producers to use a variety of "official identification numbers" and "official ear tags," based upon the National Uniform Eartagging System (NUES), an Animal Identification Number (AIN), *or* a location-based number system.[4]

Indeed, the 2013 rule explicitly **<u>forbids</u>** states from mandating the use of RFID technology as part of the interstate requirements.  The USDA's fact sheet stated:

> While [] producers may elect to use official eartags with radio frequency (RF), no state or tribe may require official RF tags for cattle moving into their jurisdiction.  This ensures that all producers using the low cost official eartags may move their cattle to any other State or Tribal land using that method of official identification.[5]

**The ability to use low-cost, low-tech methods of identification was a key point during the discussions around the rulemaking.  The ability to use either RFID or non-RFID tags was absolutely critical to many stakeholders, as was recognized by USDA at that time:**

> One of the USDA's priorities when it designated the framework for animal disease traceability was to ensure that producers were not adversely impacted by the cost of the program by focusing on low-cost technologies. USDA plans to provide the NUES tag (metal eartags) available at no cost to producers to the extent funds are available.  The final rule also allows for a variety of official identification methods that have been approved by APHIS, so the producer can choose a format that works best for their operation.[6]

The proposal to change this carefully negotiated position is inappropriate, particularly as the agency has not involved small producers and other stakeholders in the manner in which it did in 2013.  Rather, since 2020, the agency has signaled that its intent is to make this change based on its ongoing close collaboration with large meatpackers, technology companies, and their trade associations.

---

[3] *APHIS Factsheet, Questions and Answers: Animal Disease Traceability Final Rule* (Dec. 2012) at 3.
[4] *APHIS Factsheet, Questions and Answers: Animal Disease Traceability Final Rule*  (Dec. 2012) at 2.
[5] *APHIS Factsheet, Questions and Answers: Animal Disease Traceability Final Rule*  (Dec. 2012) at 3.
[6] *APHIS Factsheet, Questions and Answers: Animal Disease Traceability Final Rule* (Dec. 2012) at 5.

8

**VI.    The proposed rule undermines the agency's goal to promote a resilient food system**

If the agency wishes to build resilient, diversified supply chains, it needs to take steps to avoid regulations and policies that are prejudiced against small- and mid-scale producers. It makes no sense to provide grant funds and specialty programs to promote diversification if the agency simultaneously adopts regulations and policies that unduly burden small-scale, diversified producers.

Regulations in general have a greater impact on small business, disadvantaging them.  A study from the U.S. Chamber of Commerce Foundation found that the costs of federal regulation to small businesses (50 or fewer employees) are nearly 20% higher than average for all firms.  Moreover, every $1 increase in per capita regulatory expenditures is directly correlated with decreases in the smallest firms (those employing between one and four people) by 0.0156%, "a figure whose burden quickly adds up."[7]

**Before getting into any discussion of the specific costs, however, it is vital to recognize that the structure of the ADT rule makes it uniquely beneficial for the largest, most consolidated portion of the industry.**  Under the ADT rule, animals that would normally be required to have an ear tag or other individual form of official identification can instead by identified by group numbers if they are managed together as a group from birth to death.  *See*  9 C.F.R. section 86.1 ("Group/Lot identification number (GIN).  The identification number used to uniquely identify a 'unit of animals' of the same species that is managed together as a group throughout the preharvest production chain.  When a GIN is used, it is recorded on documents accompanying the animals moving interstate; it is not necessary to have the GIN attached to each animal.")  In other words, vertically integrated operations, in which an entity owns the animal through its entire lifetime, can save large sums of money as compared to independent producers (even mid-size and large independent producers).  With the higher costs of EID compared to the traditional forms of identification, this will create incentives for vertical integration and consolidation in the cattle industry – pushing it towards a model similar to hogs and poultry, in which meatpackers own the animals and farmers are effectively hired labor.

Moreover, in supporting that diversity of scale, **the issue is not just how much a regulation might cost a given business, but the *comparative* costs -- how much more it costs small entities than large ones.  Related to that is the question of who benefits from the regulation.**

---

[7] U.S. Chamber of Commerce Foundation, The Regulatory Impact on Small Business: Complex. Cumbersome. Costly at p.4.  (March 2017), available at https://www.uschamberfoundation.org/smallbizregs/assets/files/Small_Business_Regulation_Study.pdf

Even without the provision for group identification, the costs of the mandatory electronic ID are clearly much higher on small businesses,[8] yet the overwhelming majority of the benefits (through increased export markets) flow to the large entities. That disconnect between who bears the greatest costs and who reaps the majority of the benefits is a key driver of consolidation.

First, consider the **cost portion of the equation**. A 2006 Kansas State University report found that costs of an RFID-based system are significantly higher for people with smaller herds due to the expense of the electronic infrastructure.[9] USDA's 2009 analysis affirmed this finding that significantly greater costs would be imposed on small producers. Specifically, the agency found that large operations would pay $2.48/head as compared to $7.17/head for what the agency termed the "smallest operations."[10]

That's almost three times as high a cost for small operations – and the agency significantly underestimated the real costs to small producers. First, the so-called "smallest operations" included up to 50 head of cattle, even though USDA's NASS Census has classifications for cattle operations with 1-9 head, 10-19, and 20-49 head. Lumping all these operations together disguised the true (higher) cost for very small cattle operations, who provide important diversity and resiliency to the cattle and beef supply chains.

Second, the agency's assumptions as to how a small operation would be able to comply were unrealistic. For example, the USDA analysis recognized that the cost of RFID readers will not be economical for small producers, so it advanced the premise that a new business will spring up, to do custom reading.[11] It assumed that there would be custom tag reader businesses within 25 miles of each small farm, even though ranches in the West and Southwest may encompass more than 25 miles of territory each. It also assumed that the cost of RFID reading would be comparable to the cost of brand inspections, even though brand inspections do not require expensive equipment, unlike RFID tagging and reading. These demonstrably flawed assumptions, and other flaws in the 2009 cost estimate, mean that small producers would pay far more than 3 times the amount to comply with an electronic ID mandate, compared with the largest operations.

Next, consider the **benefits portion of the equation.** While agency and industry representatives have repeatedly claimed that electronic animal ID is about animal health

---

[8] In the USDA's 2009 cost analysis, the agency found that the cost increased as herd size decreased, to the point that it would be uneconomical for the smallest producers to do the tagging and reading themselves. Benefit-Cost Analysis of the National Animal Identification System, NAIS Benefit-Cost Research Team (Jan. 14, 2009) (hereinafter "Cost-Benefit Analysis") at page 23.

[9] RFID Cost.xls – A spreadsheet to estimate the economic costs of a radio frequency identification (RFID) system, K.C. Dhuyvetter and D. Blasi, Version 7.6.06.

[10] Benefit-Cost Analysis of the National Animal Identification System, NAIS Benefit-Cost Research Team (Jan. 14, 2009) (hereinafter "Cost-Benefit Analysis") at page 28.

[11] Benefit-Cost Analysis of the National Animal Identification System, NAIS Benefit-Cost Research Team (Jan. 14, 2009) (hereinafter "Cost-Benefit Analysis") at Table 4.2 & 4.3, page 23.

10

generally, no one has produced any data or analysis to show that the current system – which includes more affordable, low-tech options for producers – is insufficient to address animal disease. Rather, the real driver of the program is the export market and the desire to develop a uniform, international system that makes it easier for companies such as JBS and Tyson to ship products around the world and maximize their profits. In the 1980s, farmers were promised that the benefits of such exports would trickle down to the producers; four decades of experience has proven that this is false, and that such reliance on export markets has merely helped fuel the "get big or get out" approach that has led us to such a fragile agricultural and food system.

Moreover, when you impact a small business, you not only affect that business, but its suppliers and purchasers. By impacting small ranchers, a mandatory electronic ID requirement would also impact sales barns, feed stores, and large-animal veterinarians -- all of which are essential to the continuation of the supply chains and rebuilding a resilient, secure food supply.

## VII.    Conclusion

The 2,070 undersigned organizations, farms, ranches, related businesses, and individuals thus urge the USDA to withdraw the proposed rule. Mandatory electronic ID is driven by the interests of large meatpackers, **not** American farmers and consumers. The proposed rule will push our livestock and meat industry towards greater consolidation, which is precisely the opposite of what is needed for the security and welfare of our country.

For more information, please contact Judith McGeary, Farm and Ranch Freedom Alliance, Judith@FarmAndRanchFreedom.org.

Signed:

Organizations

American Grassfed Association - National
Ashtabula, Geauga, Lake Counties Farmers Union - OH
Austin Organic Gardeners – TX
Banner Grange, Grass Valley - CA
Community Farm Alliance - KY
The Cornucopia Institute - National
Dakota Rural Action – SD
Family Farm Defenders - National
Farm Aid - National
Farm and Ranch Freedom Alliance - National
Floyd Agricultural Research Sustainable Environmental Education - TX
Food Integrity Campaign - National
Foundation for Advancement in Cancer Therapy - NY
Health Freedom Defense Fund - ID
Homemade Texas - TX

11

Independent Cattlemen of Wyoming - WY
League of Independent Voters of Texas - TX
Missouri Rural Crisis Center - MO
Nebraska Women Involved in Farm Economics - NE
Organic Consumers Association – USA and International
Organic Eye - WI
Regeneration International – USA and International
Rural Vermont - VT
South Dakota Stockgrowers Association - SD
The Virginia Land Rights Coalition - VA
The Weston A. Price Foundation - National
Three Aunties - FL
Virginia Independent Consumers and Farmers Association - VA


Farms, Ranches, and Related Businesses

| | | | |
|---|---|---|---|
| 1984 farms | MO | Chaganra Farm LLC | PA |
| Abundant Pastures Farm, LLC | TX | Circle R&H Farm LLC | OH |
| All Grass Farms LLC | IL | Clover Ridge Ranch | MO |
| Alpine Forest Farm | MI | Coleman Farms | TX |
| Amberleigh Farm | TX | Country Dreams Farm | NY |
| Anichini-Moore Ranch & Farm | OK | Court Family Farm LLC | WI |
| Ararat Farm | VA | Crown D Ranch | TX |
| Arnosky Family Farms | TX | CTex Dairy | TX |
| Avandyke, Inc | WA | Cultivated Chicks, LLC | TX |
| Baker's Bluff Farm | MI | Dancing Wind Farm LLC | NH |
| Bar MT Ranch | MO | David E. Will | TX |
| Bedias Creek Farms LLC | TX | Deeply Rooted Pastures | GA |
| Belleviewfarm@aol.com | NY | Del Barcus | TX |
| Bergan Family Farm | WI | Denny Lauing | SD |
| Black Acres Ranch | TX | Divina Farms | CA |
| Black Snake Cattle | IN | Don Shepherd | IL |
| Blessing way Farm LLC | MS | Douglas D. Thacker | IL |
| Borbonus Family Farm | PA | Eaton Farm | IN |
| Brasada Ranch Co. | TX | Eichorn Family Farm LLC | MI |
| Broaqdwall Farm | RI | Elizabeth McDonald | VT |
| Broken Wheel Ranch | IA | Elizabeth S. Weatherford | HI |
| Brookvale Pines Farm, LLC | NH | Epperson Ranches | TX |
| Bryan's Healthy Harvest | TX | EZ S Ranch llc | TX |
| Butte Mountain Farm | CA | Falster Farm | TX |
| C&F Farms, LLC | VA | Farm Partner Living | WA |
| CD&J Mini Ranch | TX | Farmer Ben's Lazy P | NM |
| Ceder Ranch | WY | Farmstead Ferments | VA |
| Chad Wall Farms | TX | Fat Hen Farms | OR |
| | | Fawn Crossing Farms | VA |

12

 An official website of the United States Government.

‹  Back to Document Comments (/document/APHIS-2021-0020-0001/comment?filter=stockgrowers)

**PUBLIC SUBMISSION**

Share ▾

# Comment from South Dakota Stockgrowers Association

Posted by the **Animal and Plant Health Inspection Service** on Apr 20, 2023

Docket (/docket/APHIS-2021-0020)  /  Document (APHIS-2021-0020-0001) (/document/APHIS-2021-0020-0001)  /  Comment

Comment

The South Dakota Stockgrowers Association, the oldest Cattle Organization in the United States, located in South Dakota would like to thank you for the opportunity to comment on the proposed amendments to the Animal Disease Traceability regulations. Please refer to attached letter for comments.

Attachments  1



sdsga animal id response 4-23

⬇ Download ▾

Give Feedback

**Comment ID**

APHIS-2021-0020-1955

 **Tracking Number**

lgo-1amz-vg4g

| Comment Details | Submitter Info |
| --- | --- |

**Document Subtype**

Public Comment

**Received Date**

Apr 19, 2023



*Your Voice in Federal Decision Making*

Give Feedback

About (/about)    Bulk Data Download (/bulkdownload)    Agencies (/agencies)    Learn (/learn)    Reports (/dotreports)    FAQ (/faq)    Commenting Guidance (/commenting-guidance)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Support (/support)

Accessibility Statement (/accessibility)    |

API Requests (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Give Feedback